

**FILED**

FEB 1 9 2019 PS

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

XUEJUN ZOE MAKHSOUS )
)
      Plaintiff, )
)
v. )
)
NICHOLAS A. MASTROIANNI II )
YING DING )
)
      and )
)
US IMMIGRATION FUND, LLC, aka USIF, )
a Delaware limited liability company; )
US IMMIGRATION FUND-NY, LLC, aka the )
Regional Center, a New York limited liability )
company; 701 TSQ1000 FUNDING, LLC, aka 701 )
Fund, a Delaware limited liability company; 701 )
TSQ 1000 FUNDING GP, LLC, aka 701 Manager )
a Delaware limited liability company; NYC 1000 )
INVESTMENT, LLC, aka 701 Fund Co-Manager, )
a Delaware limited liability company; 1568 )
BROADWAY FUNDING 100, LLC, aka 702 Fund,)
a Delaware limited liability company;1568 )
BROADWAY FUNDING 100 GP, LLC, aka 702 )
Fund Manager, a Delaware limited liability company)
NYC 2000 INVESTMENT, LLC, aka 702 Fund )
Co-Manager, a Delaware limited liability company; )
CAPITAL 600 INVESTMENTS, LLC, aka Regional)
Center Co-Manager, a Florida limited Liability )
company; QIAOWAI INTERNATIONALGROUP )
USA, LLC, 4552 Tuscany Dr. Plano, TX; QIAOWAI)
INTERNATIONAL HOLDING, LLC, a Delaware )
limited liability company; QIAOWAI GROUP )
INTERNATIONAL TRAVELAGENCY )
HOLDINGS, INC., and with its Registered agent )
listed as Corporation Service Company, 251 Little )
Falls Dr. Wilmington, DE 19808; )

          Defendants.

1:19-cv-01230
Judge Andrea R. Wood
Magistrate Judge M. David Weisman

TRIAL BY JURY DEMANDED

## COMPLAINT PURSUANT TO RACKETEER INFLUENCED AND CORRUPT
## ORGANIZATIONS ACT AND OTHER CAUSES OF ACTION

Plaintiff XUEJUN ZOE MAKHSOUS, Self-Represented, sues the Defendants, as individuals operating a criminal enterprise, for conspiracy to commit tort and fraud. Defendants Nicolas Mastroanni II ("Mastroanni") and Ding Ying ("Ding"), with companies under their control or business partners and legal counsels, et al., through a conspiracy of tort, fraud and other predicate criminal acts, are involved in raising from and managing investment for EB-5 investors, most of them are Chinese.

Plaintiff is a translator, a researcher, an EB-5 investor right advocate and an independent paralegal in-training working for Chinese EB-5 immigrant investors who have engaged or are in the process of engaging US attorneys related to their investment in EB-5 investment funded businesses. Between June and December 2018, Plaintiff was engaged indirectly as a translator and researcher by 12 former members of 701 TSQ 1000 Funding, LLC, an EB-5 fund managed by some of Defendants, in their requests to withdraw $550,000 investment plus interest after they have decided to terminate their participation in EB-5 immigrant investor program. Plaintiff was contracted to be paid $10,000 per client for her service. Currently Plaintiff is contracted to provide service to members of 1568 Broadway Funding 100, LLC, of AYB Funding 100, LLC as well as of 701 TSQ 1000 Funding, LLC, all of them are EB-5 funds managed by some of the Defendants. Plaintiff is in talks for contracted service with EB-5 investors from other EB-5 funds sponsored by other EB-5 regional centers.

Defendants are involved in raising from and managing investment for EB-5 investors like Plaintiff's clients. Through their conspiracy, Defendants succeeded in exacting hundreds of millions of dollars in various fees from EB-5 investors like Plaintiff's clients, which continue to accumulate to this day. In particular Defendants' conspiracy coerced each of Plaintiff's 12 clients to give up claims to $50,000 administrative fee plus interest income of about $88,000 in return of a $500,000 investment, to Defendant Ding and companies under her control, when these 12 members withdrew in 2018 from 701 TSQ 1000 Funding, LLC managed by some of Defendants. Defendants Mastroianni and Ding's coercive action caused Plaintiff unable to collect her compensation. Starting February

2019 Defendant Mastroianni starts a campaign to discredit Plaintiff by sending warning letters to at one of Plaintiff's clients and to interfere with Plaintiff's business relations with her clients who are members of 1568 Broadway Funding 100, LLC, another EB-5 fund managed by Defendants. Among other things, Plaintiff seeks damages in excess of $120,000, including but not limited to, punitive damages, for these outrageous tort and fraud.

## I.    JURISDICTION AND VENUE

1. This is a civil action for violations of 18 U.S.C. § 1961 et seq. ("Racketeer Influenced and Corrupt Organizations Act" or "RICO"). RICO addresses the corrupt abuse and misuse – usually covertly – of organizations, entities, businesses, institutions or even governments or government agencies, such that superficially legitimate entities actually operate for criminal purposes irrelevant to the entity's purpose.

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. Jurisdiction is also proper pursuant to 18 U.S.C. § 1965, which allows for nationwide jurisdiction pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

3. This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2).

4. This Court has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367.

5. Plaintiff is a resident of Cook County. IL and this Court has jurisdiction.

## II.   THE PARTIES

5. The Plaintiff Xuejun Zoe Makhsous ("Plaintiff or "Zoe") is a self-employed translator, researcher, an EB-5 investor rights advocate and an independent paralegal in-training. Ma is a resident of Cook County, Illinois.

6.   Defendant Nicholas A Mastroianni, II ("Mastroianni"), is a Florida resident and controls several business entities involved in the EB-5 program.

7.   Defendant U.S. Immigration Fund, LLC, ("USIF") is a Delaware limited liability company whose controlling principal is Nicholas Mastroianni, II.

8.   Defendant U.S. Immigration Fund – NY, LLC, ("USIF-NY" or the "Regional Center") is a New York limited liability company, managed and controlled by Mastroianni.

9.   Defendant 701 TSQ 1000 Funding, LLC ("701 Fund" or "Company"), is a Delaware limited liability company ("USIF") whose controlling principal is Nicholas Mastroianni, II.

10.  Defendant 701 TSQ 1000 Funding GP, LLC, ("701 Manager") is a Delaware limited liability company whose controlling principal is Nicholas Mastroianni, II.

11.  Defendant NYC 1000 Investment, LLC ("701 Fund Co-Manager"), is a Delaware limited liability company ("USIF") whose controlling principal is Nicholas Mastroianni, II.

12.  Defendant 1568 Broadway Funding 100, LLC ("702 Fund"), is a Delaware limited liability company ("USIF") whose controlling principal is Nicholas Mastroianni, II.

13.  Defendant 1568 Broadway Funding 100 GP, LLC, ("702 Manager") is a Delaware limited liability company whose controlling principal is Nicholas Mastroianni, II.

14.  Defendant NYC 2000 Investment, LLC ("702 Fund Co-Manager"), is a Delaware limited liability company ("USIF") whose controlling principal is Nicholas Mastroianni, II.

15.  Defendant Capital 600 Investments, LLC ("Regional Center Co-Manager"), is a Florida Limited Liability Company whose principal place of business is located at 115 Front Street, Suite 300, Juniper, FL 33477, and is managed and controlled by Nicholas Mastroianni II.

16.  Defendant Ying Ding ("Ding"), is a US permanent resident who resides at 4552 Tuscany Dr, Plano TX at least between 2011 and 2018.

17. Defendant Qiaowai International Group USA LLC, with its office located at 4552 Tuscany Dr, Plano TX [at least between 2011 and 2018], is controlled by its principal Ding ("collectively call Qiaowai entities").

18. Defendant Qiaowai International Holding, LLC, with its registered agent as Corporation Service Company, located at 251 Little Falls Dr. Wilmington, DE 19808, and whose controlling principal is Ding ("collectively call Qiaowai entities").

19. Defendant Qiaowai Group International Travelling Agency Holdings, Inc. with its registered agent as Corporation Service Company at 251 Little Falls Dr. Wilmington, DE, 19808, and whose controlling principal is Ding ("collectively call Qiaowai entities").

## III. FACTS COMMON TO ALL COUNTS

### Plaintiff's Background

20. Plaintiff, previously a Citizen of China, is a professional translator graduated from the best university in Northeastern of China in 1991.

21. Plaintiff received her Master's in Sociology in 1996 and is a researcher by training.

22. Plaintiff received her Master's in Business Administration in 2001 and has been involved in all aspects of real estate development since then, with focus in mortgages and real estate financing.

23. Plaintiff was invited to join an EB-5 real estate development project in 2007 and after she discovered the practice of non-disclosure of investment risks to prospective EB-5 investors, Plaintiff left the EB-5 regional center sponsored project and started her own EB-5 investment funded senior care development in rural Wisconsin. Plaintiff is a self-taught EB-5 project developer and manages two mini EB-5 enterprises.

24. Plaintiff is currently taking classes to become an independent paralegal.

25.  Plaintiff calls for full risk disclosures in EB-5 fund raising activities and advocates for protection of Chinese EB-5 investors under US securities law. Plaintiff is proficient with all legal documents related to EB-5 fund raising.

26.  Plaintiff was the first person to warn Chinese EB-5 investors of possible 10 years visa backlog as early as December 2015.

27.  Plaintiff is in contact with hundreds of Chinese EB-5 investors with their investment in EB-5 enterprises sponsored by dozen of EB-5 regional centers all over the US.

28.  In fall of 2017 Plaintiff was indirectly engaged by a member of 1568 Broadway Funding 100 LLC and worked with Attorney Justin London in demanding in return of EB-5 investment of $552,000 from the EB-5 fund managed by Mastroianni. The investor received the refund in full.

29.  Plaintiff was indirectly engaged by 12 members of 701 TSX 1000 Funding LLC in summer of 2018, and worked with Attorney Douglas Litowtz in demand return of EB-5 investment of $550,000 plus interests. 12 investors were only able to receive return of $500,000 under coercion by Defendants.

30.  Plaintiff is currently directly contracted by a member of 1568 Broadway Funding 100 LLC and a member of AYB Funding 100, LLC as they are working with a New York attorney.

## EB-5 Immigrant Investor Program

31.  A provision of the 1990 Immigration Reform Act permits foreigners to invest $500,000 (in areas of high unemployment) to $1 million in businesses in the United States in return for permanent residency status. The provision is intended to encourage foreign entrepreneurs to create a new business or to save a troubled business with creation of 10 permanent jobs for US workers. The application form for such immigration benefit is Form I-526, "Immigration Petition by Alien Entrepreneur."

6

32.     The regulations require investor's active involvement in management or policy making of the EB-5 enterprise. The early results of EB-5 program were disappointing until some times in 1993, when an INS (predecessor to USCIS) administrator ruled that being a limited partner in a limited partnership sufficiently fulfilling the latter requirement. This particular policy change effectively turns EB-5 business set up and operated by an entrepreneur into an EB-5 investment in securities by passive investors.

32.     After an individual subscribes to become an EB-5 investor, he or she files a Form I-526 Immigration Petition for Entrepreneur ("I-526 Petition") to show, based on the project's business plan and supporting documents, that the investment will satisfy EB-5 requirements. 8 U.S.C. § 1153(b)(5); 8 C.F.R. § 204.6(a) and (j). Upon approval of the I-526 Petition, USCIS will grant the investor conditional permanent residency, often referred to as a "conditional green card." 8 U.S.C. § 1186 b(a)(1).

33.     An EB-5 investor must establish eligibility at the time of filing and a petition cannot be approved if, after filing, the immigrant investor becomes eligible under a new set of facts or circumstances. Changes that are considered material that occur after the filing of an immigrant investor petition will result in the investor's ineligibility if the investor has not obtained conditional permanent resident status. If *material changes* occur after the approval of the immigrant petition, but before the investor has obtained conditional permanent residence, such changes would constitute good and sufficient cause to issue a notice of intent to revoke and, if not overcome, would constitute good cause to revoke the approval of the petition. A change is material if the changed circumstances would have a natural tendency to influence or is predictably capable of affecting the decision. Changes that occur in accordance with a business plan and other supporting documents as filed will generally not be considered material. If the new commercial enterprise undertakes the commercial activities presented in the initially filed business plan and creates the required number of jobs, the

new commercial enterprise may further deploy the capital into another activity. The activity must be within the scope of the new commercial enterprise and further deployment must be within a commercially reasonable period of time. Further deployment of this nature will not cause the petition to be denied or revoked *under certain circumstances.*

34.     Within two years after receiving a conditional green card, the investor must file with USCIS a Form I-829 Petition by Entrepreneur to Remove Conditions on Permanent Resident Status ("I-829 Petition") to show that the investor satisfied the investment and job creation requirements of the EB-5 program. 8 U.S.C. § 1186b(c); 8 C.F.R. § 216.6(a) and (c). Upon satisfaction of these requirements, USCIS will approve the I-829 Petition and grant the investor lawful permanent residence status, concluding the immigration process. 8 C.F.R. § 216.6(d)(1). If the I-829 Petition is denied, USCIS will terminate the conditional green card and institute removal proceedings to deport the investor from the United States. 8 C.F.R. § 216.6(d)(2).

35.     According to USCIS Policy Manual, an immigrant investor's money may be held in escrow until the investor has obtained conditional permanent resident status if the immediate and irrevocable release of the escrowed funds is contingent only upon 1) approval of the Immigrant Petition by Alien Entrepreneur (Form I-526); and 2) visa issuance and admission to the United States as a conditional permanent resident, or approval of the investor's Application to Register Permanent Residence or Adjust Status (Form I-485). In essence, immigrant investor does not have to place his or her investment at risk in a JCE and keep it in an escrow account controlled by NCE prior to the investor has obtained conditional permanent resident status. See USCIS Policy Manual Volume 6 Part G, Chapter 2.

36.     The initial Form I-526 immigrant petition must be filed in good faith and with full intention to follow the plan outlined in that petition. While USCIS allows this flexibility in Form I-829 filings, nothing in this policy relieves an immigrant investor from the requirements for removal of conditions.

Therefore, even in the event of a change in course, an immigrant investor must always be able to demonstrate that: 1) This at-risk investment was sustained throughout the period of the petitioner's conditional permanent residence in the United States; and 2) The investor created (or maintained, if applicable), or can be expected to create within a reasonable period of time, the requisite number of jobs. See USCIS Policy Manual Volume 6 Part G, Chapter 5.

37.     In about 1993, USCIS implemented a policy change that being a limited partner in a limited partnership sufficiently fulfilling the requirement of policy making in the EB-5 enterprise. Purchasing membership as limited partner in an EB-5 enterprise is securities.

38.     The EB-5 Program attracts many people from real estate industry to set up regional centers to invest the funds coming from immigrants and to turn EB-5 program into a commercial lending vehicle, most of which have more than 100 investors, a threshold for registration requirement of investment company per 1940 Investment Company Act.

39.     Most of the EB-5 fund manager are not proficient with U.S. securities regulations and carry out their operations, either intentionally or by gross negligence, in violation of anti-fraud provisions and registration requirement of securities laws of United States.

## Chinese Securities Regulations

40.     Just like in the US, securities industry is highly regulated in China.

41.     A simple google search can produce information about regulations on providing investment consulting in China, published as early as in 1997, which states: *"Article 2 Anyone who engages in the securities or futures investment consultancy business within the territory of the People's Republic of China must observe these Measures. The securities or futures investment consultancy referred to in these Measures means the directly or indirectly paid consultancy services provided by agencies and their investment consultants engaged in the securities or futures consultancy business for securities or futures investors or clients through securities or futures investment analyses, forecasts*

*or recommendations, etc. in the following forms: (1) to accept entrustment from an investor or client to provide securities or futures investment consultancy services; (2) to hold consultancy seminars, lectures and analysis meetings on securities or futures investment; (3) to publish articles, commentaries and reports on securities or futures investment consultancy in newspapers and periodicals, and to provide securities or futures investment consultancy services through such mass media as radio or television; (4) to provide securities or futures investment consultancy services through such telecommunications facilities as telephone, fax, computer network; and (5) other forms recognized by the China Securities Regulatory Commission (hereinafter referred to as the CSRC ). Article 3 A business permit must be obtained from the CSRC in accordance with the provisions of these Measures to engage in a securities or fixtures consultancy business. No institution or individual shall engage in a securities or fixtures investment consultancy business in the various forms listed in Article 2 of these Measures without the permit of the CSRC. Securities dealer institutions, fixtures broker institutions and their staff shall observe the provisions of these Measures when engaging in the securities or fixtures investment consultancy business beyond the respective scope of those institutions. Article 4 Provisions of relevant laws, regulations, rules and of the CSRC must be observed and the principles of objectivity, fairness, honesty and good faith must be adhered to when engaging in a securities or fixtures investment consultancy business. "*

42.    To raise investment in China by any foreign business, securities issuers shall disclose to the Chinese public to the effect that *THE INTERESTS MAY NOT BE OFFERED OR SOLD DIRECTLY OR INDIRECTLY TO THE PUBLIC IN THE PEOPLE'S REPUBLIC OF CHINA ("CHINA") AND NEITHER THIS MEMORANDUM, WHICH HAS NOT BEEN SUBMITTED TO THE CHINESE SECURITIES AND REGULATORY COMMISSION, NOR ANY OFFERING MATERIAL OR INFORMATION CONTAINED HEREIN RELATING TO THE INTERESTS, MAY BE SUPPLIED TO THE PUBLIC IN CHINA OR USED IN CONNECTION WITH ANY OFFER FOR THE*

10

*SUBSCRIPTION OR SALE OF THE INTERESTS TO THE PUBLIC IN CHINA. THE INTERESTS MAY ONLY BE OFFERED OR SOLD TO CHINA-RELATED ORGANIZATIONS THAT ARE AUTHORIZED TO ENGAGE IN FOREIGN EXCHANGE BUSINESS AND OFFSHORE INVESTMENT FROM OUTSIDE OF CHINA. SUCH CHINA-RELATED INVESTORS MAY BE SUBJECT TO FOREIGN EXCHANGE CONTROL APPROVAL AND FILING REQUIREMENTS UNDER THE RELEVANT CHINA FOREIGN EXCHANGE REGULATIONS.*

### US Securities Regulations

43. Application of US securities laws to EB-5 fund-raising targeting unsophisticated foreign received little attention by EB-5 stakeholders for twenty years, until Securities and Exchange Commission ("SEC") took an enforcement action against an EB-5 regional center in SEC v. Chicago International Convention Center in February 2013. Even today, securities laws related to EB-5 offering and EB-5 fund management is largely ignored.

44. SECTION 17(a) OF THE SECURITIES ACT of 1933 provide that "[I]t shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly— 1) to employ any device, scheme, or artifice to defraud, or 2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or 3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." (*SEC v. Chicago International Convention Center, LLC*). Since then, SEC has taken numerous enforcement actions against fraudulent EB-5 fund promoters, including *SEC v. US Now LLC; SEC v. Justin Moongyu Lee; SEC v. Path America LLC et al; SEC v. EB-5 Asset Management LLC et al; SEC v. Robert Yang et al; SEC v. Kameli et al; SEC v. Ariel Quiros et al; SEC v. Charles Liu et al; SEC v. Emilio Fransciscon et al; SEC v. AJN*

*Investment, LLC et al; SEC v. Andy Shin Fong Chen et al.; SEC v. Ronal Van Den Heuvel, et al.; SEC v. Edward Chen, et al.; SEC v. Palm House Hotel, et al.; SEC v. America Modern Green Senior (Houston) LLC, et al.; SEC v. San Francisco Regional Center, et al.*

45.    SECTION l0(b) OF THE EXCHANGE ACT, AND EXCHANGE ACT of 1934 provides that It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

46.    Under the federal securities laws, any offer or sale of a security must either be registered with the SEC or meet an exemption. Regulation D under the Securities Act provides a number of exemptions from the registration requirements, allowing some companies to offer and sell their securities without having to register the offering with the SEC. Companies that comply with the requirements of Regulation D do not have to register their offering of securities with the SEC, but they must file what's known as a "Form D" electronically with the SEC after they first sell their securities. Before any investor subscribes to an issuer of a private placement offering, there has to be verification. What this means is that the company must take steps to ensure all prospective investors are "accredited" before selling them any securities. If the company fails to conduct this verification, they will not be in compliance with Regulation D through Rule 506(c). If this is not done properly, it will lead to future complications with the SEC, as this problem cannot be solved at a later date. Verification must happen before any sale of securities takes place. Regulation S is similar to Regulation D in that it provides exemption from registering private securities with the SEC. The main

difference is that Regulation S is intended for offerings aimed exclusively at international investors. The status of an "international investor" is based more on geography rather than citizenship. For example, if an investor is physically based within the United States, that person is conserved a domestic investor, even if they are not a citizen of the country. Under Reg S, sales can only be made to non-US residing individuals. To further support this main tenet of the regulation, the second requirement states that there can be absolutely no solicitation of advertising inside the United States. In *SEC v. CMB Export, et al.* SEC charged EB-5 fund promoter for violation of Section 5(a) and (c) of the Securities Act. Section 5(a) of the Securities Act prohibits the use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell a security unless a registration statement is in effect as to such security. Section 5(c) of the Securities Act prohibits the use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy a security unless a registration statement has been filed as to such security.

46.    In addition to charge EB-5 fund promotors for securities fraud and unregistered securities offering, in *SEC v. Luca International Group, LLC et al.* and *SEC v. Serofim Muroff et al.*, SEC charged EB-5 fund promotors of Investment Adviser Fraud. Section 202(a) (11) of the Investment Advisers Act of 1940 generally defines an "investment adviser" as any person or firm that: (1) for compensation; (2) is engaged in the business of; (3) providing advice, making recommendations, issuing reports, or furnishing analyses on securities, either directly or through publications. An EB-5 fund manager is an investment adviser due to his or her ownership, management, and control of EB-5 fund. Rule 206(4)-8 - Pooled investment vehicles provide that (a) Prohibition. It shall constitute a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of Section 206(4) for any investment adviser to a pooled investment vehicle to: (1) Make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made,

in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; or (2) Otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle. (b) Definition. For purposes of this section "pooled investment vehicle" means any investment company as defined in Section 3(a) of the Investment Company Act of 1940 or any company that would be an investment company under section 3(a) of that Act but for the exclusion provided from that definition by either Section 3(c)(1) or Section 3(c)(7) of that Act.

47.     Section 3(c)(1) of the Investment Company Act of 1940 offering exemption from definition of investment company provides that any issuer whose outstanding securities are beneficially owned by not more than **one hundred persons** and which is not making and does not presently propose to make a public offering of its securities. Most commonly used exemption from definition of investment company by EB-5 fund promoters recruiting more than 100 investors is Section 3(c)(5) that generally excludes from the definition of investment company any entity that is primarily engaged in the business of purchasing or otherwise acquiring mortgages and other liens on and interests in real estate.

48.     In a No Action Letter issued to Realex Capital Corporation in 1984, the Securities and Exchange Commission did not decline to take action. Realex was looking to invest as a limited partner in a limited partnership that would own and operate a building. The SEC took the position that the interests would be "investment contracts" and therefore securities, not real estate for purposes of section 3(c)(5). Realex would be relying on the efforts of the managing partners for the success of the enterprise. In this case, Realex had only limited major decision rights. For example there was a limitation on sale, but Realex could only object if it did not receive net cash proceeds at least equal to its capital contributions.

## Sale of 701 Fund to Chinese Investors

49.    Plaintiff discovered that in June 2014, Ding, Mastroianni, and Developer of 701 Project hosted several road shows held in grand hotels in four major cities in China to promote the benefits of investing in a real estate development in New York City ("701 Project").

50.    Plaintiff discovered that Qiaowai recruited 400 Chinese investors through online and other media advertisement and raised $200 million for 701 Fund.

51.    Plaintiff discovered that the business scope of Qiaowai is visa consulting service according to registration information obtained from Chinese business registration search.

52.    Plaintiff discovered that none of Ding (Qiaowai Group), Mastroianni, and Witkoff was registered investment advisors in the US or in China in violation of regulations set by China Securities Regulatory Commission.    None of above parties have obtained permits to provide investment consultation to Chinese public.    Securities issued by 701 Fund was not approved by Chinese regulators. No one alerted investors in Chinese to seek independent advisor to evaluate the investment offering documents as majority of Chinese investor don't read English.

53.    Plaintiff discovered that staff from Qiaowai under Ding's instruction provided prospective investors with marketing brochures in Chinese on US EB-5 Immigrant Investor Program.    In the marketing brochure, it claims a) Immigrant Petitioner shall invest $500,000 in an investment project sponsored by a USCIS approved regional center and investment would be repaid in 5 years.  b) Immigrant Petitioner shall pay additional $45,000 to $60,000 in fees to cover operation and oversight cost of the immigration project. c) There is no asset requirement for the petitioner and source of investment fund can be gifted or inherited. d) Petitioner should receive immigration visa in one and half year.

54. Plaintiff discovered that staff from Qiaowai under Ding's instruction provided marketing brochures in Chinese on 701 Fund and convinced Plaintiff's clients to subscribe to the Fund. No official offering documents were provided to Plaintiff's clients either in English or Chinese.

55. Plaintiff discovered that, under Ding's instruction, Qiaowai instructed her clients to sign "Visa Consultation Service Agreement with Qiaowai. Qiaowai instructed her client to pay about $9,000 in consultation fee, $2,800 in document preparation fee to Qiaowai. Qiaowai also instructed her clients to wire $15, 000 to a Hong Kong company, Rich Most for "management consulting and public relations service" in lieu of immigration attorney fee.

56. Plaintiff discovered that her clients didn't sign any retainer agreement with any immigration attorneys. However, under Ding's instruction, Qiaowai instructed her clients to sign I-526 petitions prepared by Qiaowai with preparers as either Mr. Hsien Hao Chang or Mr. Donoso Ignacio.

57. Plaintiff discovered that her clients were instructed to sign on signature pages of the document provided by Qiaowai under Ding's instruction. The 10 plus pages documents were all in English with no Chinese translation provided. Her clients don't read or write English. No one explained the nature of these documents. Her clients believed that they signed only immigration application forms issued by USCIS.

58. Plaintiff discovered that, with no explanation or translation provided to her clients, Qiaowai induced her clients to sign on the signature pages of 1) the Investor Pre-Subscription Letter Agreement ("Pre-subscription Letter"); 2) Determinations of Accredited Investors Status, 3) Subscription Agreement of 701 Fund; 4) W-7 Form; 5) W-8BEN Form; 6) Joinder in Master Escrow Agreement; 7) Operating Agreement of 701 Fund.

59. According to the written communication sent by Defendant USIF, Defendant USIF acknowledged that Plaintiff's clients were instructed to sign the Subscription Agreement and Operating Agreement, and wired at least $550,000 to bank accounts controlled by Defendant USIF

before Defendant USIF provided numbered Confidential Offering Memorandum. Defendant USIF returned signature pages of the Subscription Agreement and Operating Agreement countersigned by Defendant Mastroianni to Qiaowai, and under Ding's instruction, such documents were kept by Qiaowai for years from Plaintiff's clients.

60.     Under the information and belief, under Ding's instruction, Qiaowai doctored executed Subscription Agreement and Operating Agreement by attaching the signature pages signed by Plaintiff's clients and by Defendant Mastroianni and submitted them to USCIS along with other private information of EB-5 investors.

61.     Plaintiff discovered that throughout the entire subscription process, there was no registered broker-dealer from US or from China hired to conduct suitability test or verify whether those investors were accredited investors. The pre-filled page of "Accredited Investor Status" didn't have investor's name or signature. The form was countersigned by Defendant Mastroianni. Under the information and belief the investor's name on the "Accredited Investor Status" form was handwritten by Defendant Mastroianni.

62.     Plaintiff discovered that at no time during the subscription process, Defendants explained to Chinese investors that they were purchasing an interest in an EB-5 enterprise. As a result they would give up total control of their investment and their investment are at risk for total loss with next to nothing gain.

63.     Plaintiff discovered that Qiaowai and USIF, through the marketing brochures in Chinese on EB-5 and 701 Fund, misled Chinese investors to believe that they were making a 5 years loan to a real estate development and their investment were secured by the real estate development. In fact, Chinese investors purchased limited partnership interests in 701 Fund and the partnership interest is not secured by 701 Development. The limited partnership interests is perpetual until the 701 Fund dissolves.

64.     Plaintiff discovered that the Pre-subscription Letter required investors to acknowledge to seek their own representatives and professional advisors, including legal counsel and accountants to evaluate the investment in the 701 Fund. Under the instruction of Ding, no one from Qiaowai explained the nature of Letter to investors in Chinese and alert investors to seek independent advisors.

65.     Plaintiff discovered that, in addition to visa consulting fees of over $10,000 paid to Qiaowai directly, Plaintiff's clients were required to pay $50,000 administrative fee to 701 Fund. Unknown to the Chinese investors, Defendant Mastroianni disclosed in the Confidential Offering Memorandum, a document not provided to Chinese investors, that most of $50,000 administrative fee would be paid to Ding and Qiaowai for managing subscription process.

66.     Plaintiff discovered that 701 Fund controlled by Defendant Mastroianni charged 5.9% annual interest to 701 Project Developer. Additionally, he charges 1.5% origination fee, prepayment fee, and loan service fee. Unknown to the Chinese investors, Defendant Mastroianni disclosed in the Confidential Offering Memorandum, a document not provided to Chinese investors, that a portion of $29,500 annual interest income would be paid to Ding and Qiaowai for investment consulting during the course of loan made to 701 Project Developer. In contrast, Plaintiff's clients received about $105 per year for their $500,000 investment.

67.     Plaintiff discovered that, in addition to pay about $2,800 for EB-5 document preparation service, Qiaowai instructed Plaintiff's clients to wire $15,000 to a Hong Kong business called Rich Most for management consulting and public relations service in lieu of attorney fee to a US. licensed immigration attorney, Mr. Hsien Hao Chang and Mr. Donoso Ignacio. Plaintiff's clients didn't sign retainer agreement with any US immigration attorney. However, Under the instruction of Ding, Qiaowai prepared I-526 petitions and submitted to USCIS with Chang and Ignacio as preparers for these clients.

18

68.     The Confidential Offering Memorandum ("PPM") of 701 Fund provides no disclosure related to selling foreign securities to the general public in China by individuals with no permit.  The PPM only provides that *"The Company is offering the Units solely to non-U.S. individuals who are "accredited investors" for purposes of Regulation D under the Securities Act of 1933, as amended (the "Securities Act"). The Company is offering the Units in reliance upon Regulation D and Regulation S under the Securities Act"* to be exempt from registration requirement. One of Plaintiff's clients was a college student in US and was not accredited investor with at least $1,000,000 in net worth at the time of purchasing a membership in 701 Fund.

69.     The PPM provides *that the Company intends to avoid registration as an investment company pursuant to the exemption under Section 3(c)(5)(C) of the 1940 Act, which is available for entities primarily engaged in the business of purchasing or otherwise acquiring mortgages and other liens on and interests in real estate. The exemption generally applies if at least 55% of a company's assets are comprised of qualifying assets and at least 80% of its assets are comprised of qualifying assets and real estate-related assets. For these purposes, qualifying assets generally include mortgage loans and other assets that are the functional equivalent of mortgage loans, as well as other interests in real estate." 701 Fund "will seek to structure the Company Loan so that is treated as a qualifying asset under the 1940. Nevertheless, there is a risk that the Company could be deemed to be an investment company, which would result in the dissolution of the Company.*

70.     Section 10.1 of the Operating Agreement provides that *the Manager, the Regional Center and their Affiliates will receive a substantial economic benefit from participating in the Project and from the Company, including the following: (i) the Manager will retain any portion of the Administrative Fees that are not utilized to pay expenses of the Company, the Manager and the Regional Center in connection with the organization and administration of the Company; (ii) the Manager shall receive a portion of the interest payments of the Loan as more fully described in Section 11.8 of this*

*Agreement; (iii) the Manager will receive all fees payable by the Developer in connection with the Loan, including the origination fee paid by the Developer (equal to 1.25% of the principal amount of the Loan), any extension fee paid by the Developer (equal to 0.50% of the Loan amount), the exit fee to be paid by the Developer upon the repayment of the Loan (equal to 0.75% of the Loan amount), any make whole fee paid by the Developer in connection with any prepayment of the Loan, and the application and loan service fee to be paid by the Developer. In addition, the Regional Center shall receive fees for administering the Company and administering compliance with USCIS guidelines.*

71.     Section 4.1 of the Operating Agreement provides that *the Company has been formed for the purpose of making a loan (the "Loan") to the Developer for funding of the development of the Project* ("701 Development").

72.     Section 4.3 of the Operating Agreement provides that *the Company is specifically prohibited from engaging in the business of investing, reinvesting or trading in securities or in the business of issuing face-amount certificates of the installment type or engaging in such business or have any such certificate outstanding.*

73.     The PPM provides that the maturity date of the Company Loan will be the earlier of (a) 60 months after the filing of all I-526 Petitions with the USCIS by the Company's Members, or (b) May 31, 2021. *The Developer may prepay the Company Loan, in whole or in part, at any time after the expiration of the 48th month after the funding of 95% of the Company Loan.*

## Redeployment of 701 Fund to Join 702 Fund

74.     Plaintiff discovered that in February 2018 Borrower/Developer of 702 Fund orchestrated to buy out Borrower/Developer of 701 Fund before 701 Development funded by 701 Fund was completed, and, together with Defendants, orchestrated an early payment to 701 Fund.

75.     Plaintiff discovered that Respondents sent a letter to members of 701 Fund in May 2018 that the sale of 701 Development would cause early repayment of $75 million of the Company's $200 million loan and Defendants would seek members' consent to redeploy the partial repayment to a different project without option for members to withdraw due to early repayment.

76.     Plaintiff learned that a group of investors went to Ding's Qiaowai's office in Beijing and demanded withdraw from the Company. Under Ding's instruction, Qiaowai rejected investors' demand.

77.     Plaintiff learned that members of 701 Fund started to organize and seek independent legal counsel. About 10 members of 701 Fund reached out to Plaintiff.

78.     Plaintiff discovered that on June 5 2018, Defendants sent members of the Company a Consent Solicitation Letter for 701 TSQ 1000 Funding LLC proposing amending Operating Agreement and authorizing to redeploy investment to join 702 Fund ("Proposal") with no option to withdraw from the Company. Per USCIS guidelines, EB-5 enterprises can keep EB-5 fund in escrow accounts until the EB-5 investors receive immigration visa and become conditional permanent residents. None of investors in 701 Fund has received immigration visa. Defendants thus fabricated the need to redeploy Investor EB-5 capital due to early prepayment of the Loan. Subsequently Defendants put into motion a consent solicitation process attempting to seek a majority vote of the members of 701 Fund to approve their self-interested Proposal, rife with conflicts of interest and self-dealing.

79.     Plaintiff discovered that in June 2018 Defendant Mastroianni sent his CFO Mark. Giresi and his immigration counsel Mr. Donoso Ignancio to sell the Proposal to members in China.

80.     Plaintiff discovered that under Ding's instruction, Qiaowai arranged several meetings between USIF delegation and Chinese members. USIF delegation was met with angry Chinese members who objected to the Proposal and who demanded to withdraw from 70 Fund.

81.    Plaintiff discovered that, under such pressure, Defendant USIF sent a supplement letter on June 25 to allow withdrawal from 701 Fund on the condition that the exiting member must vote to approve the Amended Operating Agreement to eliminate Defendants' fiduciary duties and to authorize re-investment at Defendants' discretion.

82.    The Original Consent Solicitation Letter then explains that the Manager intends to reinvest all of the loan repayment proceeds in the form of a $200 million preferred equity investment into the 1568 Broadway development, together with 702 Fund.

83.    For example, the Proposal outlined the following conflicts of interest and self-dealing by Defendants:

- "Conflicts of interest associated with investments in different levels of the capital structure. . . . [The Company's] affiliate may manage an investment made at a different level of the project's capital structure, and such investment may be senior to and have rights and interests different from the investment made by the Company."

- "[T]he Manager will have interests in the [1568 Broadway development] that are different from the interests of the Company, and it is possible that such interests may conflict with those of the Members."

- "The Amended and Restated Operating Agreement has not been negotiated at arm's length. The Manager has developed the Amendment Proposal and has established the terms of the Amended and Restated Operating Agreement, which were not the result of negotiations on an arm's-length basis . . . . [The terms of the reinvestment] were determined by the Manager and are not based on a prevailing market survey or other independent criteria."

- "In connection with the USIF Mezzanine Loan [for 1568 Broadway development], the USIF Mezz Loan Manager [an affiliate of Defendants controlled by Mastroianni] would receive significant fees and other compensation from the New Developer or its affiliates."

- "The Manager may structure its financial interest in the Company so that one or

more of the operators of the authorized immigration agencies utilized by the Company in connection with the offering of Units (the "Co-Owner") "Co-Owner" participates in the distributions made to the Manager pursuant to the Amended and Restated Operating Agreement. The level of participation will be determined at the time of investment."

- "The Manager may receive significant origination and other fees and other

compensation from developers in connection with the origination of Target Investments. These fees will be retained by the Manager."

- "The Manager may pursue transactions that provide its affiliates with economic

and tax benefits not shared with the Members."

84.     The Proposal sets forth three alternatives for the investors:

- Alternative 1 - the investor can vote to approve the Proposal and the Amended

Operating Agreement, and to have his or her capital reinvested in the 702 Times Square project, (aka 1568 Broadway development).

- Alternative 2 - the investor can vote to withdraw his or her capital from the

Company (and give up his or her rights to a green card), as long as he or she votes in favor of the Proposal.

- Alternative 3 - the investor can vote no (or abstain from voting), in which

case if the Proposal passes, the investor's capital will not be reinvested, will be held in a bank account by Defendants, and will no longer be at risk for EB-5 purposes, and the investor will not get the money back until all of the investors' I-829 Petitions have been adjudicated.

85.     As an inducement for withdrawing investors to vote in favor of the Proposal, the June 25 Supplement provides:

*"Even if the Amendment Proposal is not approved, the Manager plans to exercise*

23

> *its discretion under the existing Operating Agreement to permit any Member who elects*
> *Alternative 2 . . . to withdraw from the Company no later than 30 days following the repayment*
> *of the EB-5 Loan in full . . . ."*

86.     In the 10-day period after the Supplement was issued on June 25 leading to the July 5 voting deadline, Defendants intensified their coercive solicitation campaign to extract the necessary votes to pass the inequitable Proposal.

87.     To ensure Defendants to receive enough votes to pass the Proposal, Defendants collided with its previous securities counsel, Ronald Fieldstone of Saul Ewing Arnstein & Lehr LLP, to represent exiting members in the voting process. Fieldstone and his junior attorney, Wen Qian, aggressively recruited exiting members by making false representation that Fieldstone would not advise exiting members to vote Alternative 2 in favor of Defendants.

88.     Discovered that Fieldstone and Wen were providing legal service before exiting members had signed retainer agreement with them, Plaintiff filed a complaint with compliance attorney at Saul Ewing Arnstein & Lehr LLP as some of them were in talk with Plaintiff for contracted service. The compliance attorney at Saul denied such allegation. Saul fired Wen Qian just a few weeks after the voting deadline.

89.     A few days prior to, and on the date of vote deadline on July 5, 2018, Fieldstone successfully convinced two dozen of 40 some exiting members to vote Alternative 2 in support of Defendants. In disgust of Fieldstone's misrepresentation, one of Fieldstone clients terminated agreement and retained Douglas Litowitz and Plaintiff to continue her quest for return of her investment. Fieldstone refused to return her retainer fee when she requested. Fieldstone later wrote a letter to Court in support of Defendants in the injunctions suit filed by 124 re-investing members of 701 Fund.

90.     On July 5, 2018, Defendants claimed that they had enough votes for the Proposal to pass but refused to provide the vote count or any other information about the vote-count process.

91.     Defendants engaged in scare tactics and false threats during the 701 Fund Redeployment. In its campaign to lobby for votes, Defendants have stooped to base intimidation and clearly punitive measures to create an inequitable "take it or leave it" situation.

91.     In a PowerPoint used to persuade investors to vote for the Proposal in June 2018 in China, Defendants pressured the investors to vote for the proposal out of a concern that otherwise they will notify USCIS that the investors' EB-5 capital is no longer "at risk" and that they therefore will not receive a green card:

> *"AS A REMINDER THE VOTING FORM WILL BE THE PRIMARY EVIDENCE WHEN FILING YOUR I-829 PETITION NEEDED TO SHOW THAT YOU HAVE SUSTAINED YOUR INVESTMENT AT RISK. USCIS WILL BE MADE AWARE OF YOUR CHOICE AND IF YOU DO NOT REDEPLOY OR FAIL TO RESPOND, THEN USCIS WILL KNOW YOUR CAPITAL IS NO LONGER AT RISK."*

92.     The PowerPoint similarly warns investors that if they vote against the Proposal, "Your capital will not be redeployed," and that "Investors that check box 3 or do not return a vote will have their capital held by the NCE [the Company} in a depository until such time all of the members I-829 petitions have been approved (per the terms of the original Operating agreement)."

93.     Similar statements were repeated throughout the solicitation materials and in emails and WeChat messages, in which the Investors were advised that if they did not approve the Proposal, their funds would be left in bank deposits and their capital would not be deemed "at risk" for EB-5 purposes. For example, in an email dated June 28, 2018 from Defendant USIF to the Investors, USIF warned the Investors that: "[W]e are writing to remind you that your voting form must be submitted in a week by July 5, 2018. THIS DEADLINE IS FINAL and necessary to timely redeploy the funds and close the proposed deal. Failure to respond will be deemed a "no" vote for purposes of redeploying your funds. Final votes (or nonvotes) and supporting document will be submitted to USCIS after July 5

such that USCIS will be aware that your capital is no longer at-risk should you chose not to redeploy yours funds or fail to timely respond." (emphasis added)

94.      In another email dated July 3, 2018, Defendant USIF made the same threat to the Investors: "Following the conclusion of the July 5 voting, we will promptly confirm your voting selection with you. For those who did not vote we will confirm that you chose not to sustain your investment at risk and USCIS will be notified of the same in accordance with our reporting obligations."

95.      On July 5, 2018, the date of the voting deadline, Defendant USIF reiterated the same threat to the Investors.

96.      Defendants' Alternative 2 exacerbates the coercive nature of the consent solicitation. The coercive nature of the consent solicitation is compounded by "alternative 2," which purports to allow the investors to request immediate withdrawal of their capital (without need to engage legal counsel), but only if they vote in favor of the Proposal to Redeploy capital to the 1568 Broadway development.

97.      Defendants' Alternative 2 improperly tangles the investors' right to withdraw their EB-5 capital with a vote in favor of the amendment proposal --even though these investors will have no continuing interest in the company and no further concern regarding the safety and liquidity of the redeployed capital. There is no legitimate reason to condition the investors' right to withdraw from the 701 Times Square Project on a vote in favor of redeployment to the 1568 Broadway development and doing so unfairly seeks to pit the withdrawing investors against those investors who oppose the 1568 Broadway development.

98.      Under the existing Operating Agreement, investors have a clear right to withdraw their capital once the Developer repays the loan. Section 11.8(a)(ii) provides: "The Cash Flow that arises from any repayment of principal under the Loan shall be allocated to the Members." Section 11.8(c) provides: "The portion of the Cash Flow allocated to the Members under Section 11.8(a)(ii) will be

distributed to the Members in return of their Capital Contributions. These distributions will be allocated amount [sic] the Members in proportion to the amount of their Capital Contributions."

99. There is no legitimate reason why a vote in favor of the Proposal is required as a condition to being permitted to withdraw. It is a purely coercive vote-grabbing ploy by Defendants.

100. To make matters worse, Defendant USIF promised to reward those investors who voted in favor of alternative 2 and to punish investors who voted against the proposal. Thus, USIF announced that even if the vote did not pass, investors who selected alternative 2 would be permitted to withdraw in an expedited process, whereas investors who voted against the Proposal would remain indefinitely locked in. USIF explicitly wrote in its Supplement to the Proposal: "Even if the Amendment Proposal is not approved, the Manager plans to exercise its discretion under the existing Operating Agreement to permit Any Member who elects Alternative 2 . . . to withdraw from the Company no later than 30 days following the repayment of the EB-5 Loan in full. . .."

101. Prior to the voting deadline, Defendant USIF stated that the only way to ensure the withdrawal of the investor's capital was to vote for alternative 2: "The simplest way to expedite a return of your capital should you wish to end the EB-5 process is to vote for [Alternative] 2 by July 5[.]" "[F]or those of you who vote for [Alternative] 2 ahead of the July 5 deadline, we anticipate a fast and easy withdrawal process for the 100% return of your capital contribution as we have now been repaid in full by the Developer. Refusing to vote will significantly slow down this process."

102. There is no legitimate reason that the process of returning capital contributions to exiting member of the Company should be "slow[ed] down" for investors who did not vote for the Proposal. It is a transparently coercive device to garner more votes in favor of re-investing in the 1568 Broadway development

103. Despite announcing that they had sufficient votes for the Proposal to pass, Defendants have refused despite request to provide the vote numbers or any other information to enable Petitioners to

assess the voting process. Under information and belief, Defendants didn't receive over 200 votes
for Alternative 1 in favor of Re-investment in 1568 Broadway development on July 5 2018. Only
with assistance from Fieldstone who convinced his exiting clients to approve the Amended Operating
Agreement that Defendants used its power as Manager to force the re-investment in 702 Project.

104.    The coercive voting process was detailed in Verified Petition for an Injunction in Aid of
Arbitration filed on July 9, 2018, 4 days after voting deadline, by 124 green card seeking members of
701 Fund in SUPREME COURT OF THE STATE OF NEW YORKCOUNTY OF NEW YORK
("New York Action").

105.    The New York Action specifically requested an order to enjoin Defendants from carrying out
the Proposal that contained the following defects:

-       Elimination of Fiduciary Duties

-       Conflicts of Interest

-       Self-Dealing

-       Undue Risk (in form of preferred equity) / Lack of Diversification

-       Illiquidity

-       Abnormally high management fees versus low return to EB-5 investors

105.    In addition to Injunction Suit filed by 124 re-investing members to reject the Proposal,
Attorney Litowitz sent a demand letter before voting deadline to Defendants on behalf of 5 exiting
members to request their rights of rescission of unregistered securities sold to them. These exiting
members requested refund of $550,000 of investment and interest earned on $500,000 capital
contribution.

106.    Defendants rejected the demand filed by Litowtiz. Defendants requested Litowitz and
Plaintiff's clients to vote Alternative 2 in order to receive $500,000. Litowitz refused to such demand.

28

107.    A week after vote deadline of July 5, Plaintiff discovered a letter sent out by Defendant USIF stating *any* exiting member can withdraw of $500,000 if they have filed such request before vote deadline. With this information, Plaintiff approached Michael Zuppone, a legal counsel engaged by Defendants during the voting process and subsequent New York Action, and asked him to honor this letter directly. With his assistance, three of Plaintiff's clients were allowed early withdrawal without vote Alternative 2. However, Defendants coerced Plaintiff's clients to sign a consent letter to give up claims to $50,000 transaction fee and interest earned on capital contribution, against the objection from Litowitz and Plaintiff. Without return of $50,000 transaction fee and interest based on clients' rescission rights under securities law, Litowitz and Plaintiff were unable to collect their fees for service provided to the exiting member.

108.    Plaintiff's clients, along with exiting members represented by Fieldstone are in process of filing a separate lawsuit against Defendants for the return of $50,000 transaction fee and interests and void of the consent letter they were coerced to sign after the voting deadline.

108.    Throughout the EB-5 process, Plaintiff's clients were subject to misrepresentation and coercion by the Defendants in

-    Failure to provide Confidential Offering Memorandum prior to subscription
-    Failure to inform right to be represented by independent Chinese counsel and advisor
-    Coercion to sign a booklet of signature pages with not Chinese translation
-    Coercion to be advised only by Defendants who has no qualification or permit.
-    Coercion to purchase limited partnership interest instead of mortgage loan.
-    Coercion to give up any control of their EB-5 investment
-    Coercion to pay $50,000 fee to 701 Fund that goes to migration agents.
-    Coercion to give up participation of 701 Fund's profit
-    Coercion to allow interest income paid to migration agents.

- Coercion to accept return of $500,000 out of $550,000 investment.
- Coercion to pay $15,000 legal fee without being represented by US attorneys
- Coercion not to sign retainer agreements directly with US legal counsel.
- Coercion to sign consent letter to release Defendants from any legal claim

109. Plaintiff has been providing due diligence research for a re-investing member of 701 Fund. As she was represented by Litowitz instead of Ronnie Fieldstone or Reid and Wise of New York Action, this re-investing investor was requested to sign a special consent letter different from those re-investing members who reached settlement with Defendants after New York Action.

110. The Consent Letter labeled as USIF Consent Form Litowitz Client provides *"Capitalized terms used herein but otherwise defined shall have the meanings ascribed to them in the Operating Agreement of 701 TSQ 1000 Funding, LLC (the "Company"), dated July 5, 2018 (the "Operating Agreement"). "You irrevocably and unconditionally release and discharge 701 TSQ 1000 Funding, LLC, U.S. Immigration Fund, LLC, U.S. Immigration Fund – NY, LLC, the Developer, Escrow Agent and their predecessors, successors, subsidiaries, affiliates, officers, directors, general partners, managers, employees, attorneys, insurers, agents, representatives and assigns, past, present or future (the "Releasees") from any and all claims, losses, liabilities, obligations, suits, debts, liens, contracts, agreements, promises, demands and damages, of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, that the Investor ever had or which were actionable prior to the date of this Member Consent Letter, related to or arising out of the subscription agreement, operating agreement, escrow Agreement and the related 701 TSQ project and offering."* This re-investing client rejected such coercive consent letter.

111. On December 12, 2018, Defendants pressured this re-investing client to sign a consent letter to redeploy her capital to 702 Project. When Plaintiff informed USIF counsel that the invesort was not provided with proposed MEZZ Loan agreement with 702 Developer/Borrower and would not

make any decision, USIF counsel got angry and threated to report her to USCIS if she didn't agree to re-invest her capital right away.

112. On about January 12 2018, Defendants finally sent the executed MEZZ Loan agreement with 702 Developer/Borrower to the re-investing client. Upon review, Plaintiff discovered in the loan document a scheme to rob Chinese EB-5 investors of their investment. After consulting with the re-investing client, Plaintiff informed USIF that she wants to go back to the financing stack of 701 Project as she never agrees to changing the business scope of 701 Fund. Defendants ignore her request sent by Plaintiff.

## **Loan to 1568 Broadway Development**

113. Defendant 702 Fund issued a Confidential Offering Memorandum ("2016 PPM") dated March 10, 2016 to sell up to 700 units to Chinese investors.

114. In April 2016 Defendants, together with 1568 Broadway Developer, hosted several roadshows to promote 702 Fund and the 1568 Broadway development in China. Defendants Mastroianni, Ding, and USIF employee Jianlan Shi gave a long speech about 702 Fund and 1568 Broadway Development as great investment. In particular, Shi discussed financial commitment by JP Morgan to the 702 Development to substantiate her argument. 702 Developer, Mark Siffin, held a news conference about the 1568 Broadway development. Plaintiff has obtained a recording of speeches given at the roadshow.

115. In September 2017 Plaintiff was hired to conduct due diligence by a member of 702 Fund. With Plaintiff's assistance, the member hired a US attorney and sent a demand letter in December 2017 to Defendants USIF for return of $552,000 investment based on claims of misrepresentation and unregistered securities issued by a unregistered investment company. Defendant USIF agreed to return $552,000 and allow to the member to withdraw from 702 Fund.

116. In September 2018, another member of 702 Fund requested Plaintiff's service to help him withdraw from 702 Fund.

117. In December 12 2018, Defendants executed the AMENDED AND RESTATED MEZZANINE LOAN AND SECURITY AGREEMENTS ("702 MEZZ Agreement") with Developer of 1568 Broadway Development ("702 Development"). Defendants didn't disclose the specific loan term of the 702 MEZZ loan with members of 702 Fund before or after the execution.

118. Defendants claimed they issued supplement to 2016 PPM on supplemented on April 19, 2017, July 27, 2017, April 13, 2018, July 24, 2018 and October 18, 2018. Plaintiff's client said he never received it even though he is right in the US for college.

119. Defendants failed to inform members of 702 Fund that 702 Developer was unable to secure funding in the amount of $1.25 billion from JP Morgan, a selling point at the 2016 roadshows in China. 702 Developer receives $1.125 billion loan commitment from Goldman Sachs bank in December 2018.

120. With Defendants' consent, the 702 MEZZ agreement is substantially different from the term sheet disclosed in the 2016 PPM and the changes are adverse to the interests of members of 702 Fund while provides an instant payout of $44,661,772.77 to the Defendants.

121. With Defendants' consent, the 702 MEZZ agreement has increased maximum mezzanine loan amount from $350 million to $494.5 million. 2016 PPM made representation that there would not be an increase of mezzanine amount. The 2016 PPM capped mezzanine financing at $350 million.

122. With Defendants' consent, the 702 MEZZ agreement provides that, if 702 fund fails to sell 700 units to raise $350 million by December 31, 2019, 702 Developer will arrange a new mezzanine loan and 702/701 EB-5 fund has to subordinate to the new mezzanine loan. The 2016 PPM provides that 702 Fund may dissolve if it fails to sell 700 units by March 15, 2017 and 702 Developer seeks alternative financing.

123. Unknown to Petitioners, at the time of executing the 702 MEZZ Agreement, mezzanine loan made by EB-5 Lender to 702 Developer had a current principal amount of $312,200,000 including

proceeds from both 702 Fund and 701 Fund. 702 Fund has only sold about 350 units for the past two years. There is very slim chance that 702 Fund will be able to deliver $350 million from 700 EB-5 investors to 702 Developer by December 31, 2019.

123. With Defendants' consent, the 702 MEZZ agreement provides only equity interests of newly registered (on December 12, 2018) affiliates of 702 Developer as collateral to the loan provided by 702 Fund. The 2016 PPM provides that title insurance proceeds of property owner of the real estate under development as collateral to the loan provided by 702 Fund. Unknown to EB-5 investors from 701 Fund and 702 Fund, the 702 MEZZ agreement provides EB-5 financing as preferred equity to the 702 Property owner to secure senior loan with Goldman Sachs Bank. 2016 PPM didn't disclose to 702 members that 702 Fund will be in form of preferred equity for 702 Developer.

124. With Defendants' consent, the 702 MEZZ agreement provides that the 702 Property under development will be divided into three sales components, which are Hotel Component, Retail Component, and Signage Component, and can be sold off individually like a slice of pizza.

125. With Defendants' consent, the 702 MEZZ agreement provides that the minimum release price for Hotel Component, Retail Component and Signage Component is about $703,125,000, $714,465,000 and $184,860,000 respectively.

126. Unknown to members of 701 Fund and 702 Fund, future owners of Retail Component and Signage Component, CFMDC BWAY RETAIL LLC ("Retail REIT") and CFMDC BWAY SIGNAGE LLC ("Signage REIT"), have issued equity offerings for $125,000 each, according the Form Ds filed with SEC on February 2, 2018.

127. With Defendants' consent, the 702 MEZZ Agreement provides that 702 Developer shall have the right to obtain the release of any Sale Component and the Liens of the Security Instruments when 702 Developer prepays the outstanding principal balance of the Mortgage Loan with GOLDMAN

SACHS BANK by an amount equal to the applicable Release Price, without having to pay off EB-5 Mezz loan in full.

128.    With Defendants' consent, the 702 MEZZ Agreement provides after the release of a Sale Component, no affiliate of 702 Developer will obtain or retain any direct and/or indirect interest in such Sale Component after the consummation of such sale, leaving Borrowers of 702/701 EB-5 loan holds no equity interest in 702 Development while EB-5 loan balance is outstanding.

129.    Under information and belief, Defendants are furious that Plaintiff has obtained the executed 702 MEZZ Agreement and disclose specifics of 702 MEZZ Agreement to members of 701 Fund and 702 Fund.    Defendants have been keeping the information from members of 701/702 Fund. Defendants' in-house counsel told Plaintiff that Plaintiff was the only one who has requested to see the executed MEZZ agreement for due diligence. On Feb 4, 2019, Defendant Mastroianni sent a warning letter ("Zoe Letter") to Plaintiff's client from 702 Fund as the managers of 702 Fund (1568 Broadway Fund 100 GP, LLC and NYC 2000 Investments, LLC).    The Zoe Letter stated that Defendants "*will not be participating in any negotiations of any nature*" with Plaintiff even when she is authorized with Power of Attorney by her client.    The Zoe Letter further stated that Defendants "*are happy to deal with any qualified (i.e.,licensed) attorney that you retain to advise you and hope you will exercise caution in selecting an advisor.*"    The Zoe Letter stated that Defendants "*look forward to cooperating with you (and/or another advisor) in resolving the matter.*"

## The RICO Enterprise

130.    For any Racketeer Influenced and Corrupt Organization case, it is important to distinguish between legitimate organizations, businesses, and even government offices and the abuse of those entities for illegal purposes by the unofficial, corrupt "enterprise."

131.    This pattern of illegal activities committed by the Defendants, the "Predicate Acts," discussed below, were done with the purpose of financial gain at the expanse of EB-5 investors and were done within the past ten (10) years and continuing.

132.    By the acts alleged herein, Defendants, each and every one of them, jointly and severally, have aided and abetted and conspired to violate US Securities and other laws, through their ongoing criminal enterprise as set forth below.

133.    The law presumes generally that people intend the obvious results of their actions.

## IV.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Conduct and Participation in a RICO Enterprise through a Pattern of Racketeering Activity: 18 U.S.C. §§ 1961(5), 1962(c)**

**(Defendants USIF, Mastroianni, USIF-NY, 701 Fund, 701 Fund Managers, 702 Fund, 702 Fund Managers, Ding, and Qiaowai entities)**

134.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

135.    There are 5 elements of a Claim under § 1962(c): 1) That an enterprise existed; 2) That the enterprise affected interstate or foreign commerce; 3) That the defendants were associated with or employed by the enterprise; 4) That the defendants engaged in a pattern of racketeering activity or the collection of an unlawful debt; and 5) That the defendants conducted or participated in the conduct of the enterprise through that pattern of racketeering activity. *Alcorn County v. United States*, 731 F.2d 1160 (5th Cir. 1984). *United States v. Philips*, 644 F.2d 971 (5th Cir. 1981), cert. denied, 457 U.S. 1136 (1982). *Alexander Grant & Co. v. Tiffany Industries, Inc.*, 770 F. 2d 717 (8th Cir. 1985).

136.    Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961 (3).

137. Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

138. **Definition of the Enterprise** Defendants Mastroianni and Ding, together with (1) the Mastroianni-controlled companies, (2) Ding-controlled companies, (3) employees, officers and directors of Mastroianni-controlled companies (including Mark Giresi, CFO of USIF), (4) employees, officers and directors of Ding-controlled companies, and (5) legal counsels and business partners of Defendant Mastroianni and Defendant Ding and businesses controlled by them, form an association-in-fact for the common and continuing purpose to interfere Plaintiff's business relations with Chinese EB-5 investors in their request to recover losses from securities sold by Defendants 701 Fund and 702 Fund and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4). These people formed the enterprise characterized by (1) a common purpose, 2) an ongoing formal or informal organization, and 3) members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. There may also be other members of the enterprise who are unknown at this time. The enterprise continued in an essentially unchanged form since 2010 when USIF was approved by USCIS as a designated regional center until present. *United States v. Turkette,* 452 U.S. 576 (1981). *United States v. Errico,* 635 F. 2d 152 (2d Cir. 1980), cert. denied, 453 U.S. 911 (1981).

139. Alternatively, the Mastroianni and Ding-controlled companies each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

140. Alternatively, the Mastroianni and Ding-controlled companies together constitute an enterprise within the meaning of 18 U.S.C. § 1961(4).

141. **Interstate or Foreign Commerce** Each enterprise itself has engaged in, and the racketeering activities of those associated with the enterprise had impact on interstate and foreign commerce. Defendants induced Plaintiff's clients, who are foreign investors, to invest in securities sold by 701

Fund and 702 Fund to finance 1568 Broadway development in New York City. Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined. Defendants have engaged in the sale of securities in the United States.

a.       Plaintiff's clients are instructed to execute a subscription agreement, and/or consent letters, and send to the Defendants in the U.S.;

b.       Defendants-U.S. residents-have sole discretion whether to accept or reject Plaintiff's clients' subscription agreement and consent letter;

c.       Plaintiff's clients are instructed to wire funds to an escrow agent in the U.S. or wire refund from a bank in the US.;

d.       Plaintiff's clients are also instructed to execute subscription agreements for the purchase of shares of 701 Fund and 702 Fund, a U.S.-based issuer; or consent letter to redeem such shares, and,

e.       Sales and redemption were not final until approved by the sponsors-residents of the United States-and payment is wired between Plaintiff's clients' bank account and a U.S.-based bank controlled by Mastroianni.

142.    The racketeering activities were conducted by the defendants, and these acts are those of the enterprise and affected interstate commerce and foreign commerce. *United States v. Banton*, 647 F.2d 224 (2d Cir), cert denied, 454 U.S.857 (1981). *United States v. Bagnariol*, 665 F.2d 887 (9th Cir. 1981), cert, denied, 456 U.S. 962 (1982).

143.    **Association with the Enterprise** The Defendants are associated with or employed by the enterprise. The defendants know the enterprise and understand the nature of the activities of the enterprise. *United State v. Castellano*, 610 F. Supp. 1359 (S.D.N.Y. 1985).

144.    **Pattern of Racketeering Activity**. Defendants engaged in the conduct of their affairs through a continuing pattern of racketeering activity and did knowingly, willfully and unlawfully

conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §1961 (1), 1961 (3), and 1962(c). Plaintiff has discovered that, since at least 2014, the Defendants 1) made false claim about the at-risk nature of investment in 701 Fund and 702 Fund and failed to disclosed EB-5 investment in 701 Fund and 702 Fund as securities to ; 2) induced Plaintiff's clients to wire $550,000 to accounts controlled by Defendants and to pay transaction based fees to Defendants without full disclosure; 3) doctored executed subscription agreement and operating agreement as well as I-526 petition form submitted to USCIS with only signature pages of Plaintiff's clients; 4) forced Plaintiff's clients to give up participating in income of 701 Fund and 702 Fund; 5) coerced Plaintiff's clients to sign consent letters to release Defendants USIF's liabilities and to give up claim to $50,000 administrative fee and interest income of $88,000 in exchange to return of $500,000 in 2018, causing Plaintiff unable to collect compensation. 6) coerced Plaintiff's clients to terminate business relationship with Plaintiff in negotiation of withdraw from 702 Fund controlled by Mastroianni; Defendants used 1) the mails to submit false documents to Plaintiff's clients and USCIS, 2) Defendants used interstate "wires" – primarily emails – in connection with the racketeering activity and fraud. Thus, Defendants violated the mail fraud and wire fraud provision of the federal criminal law.

145.    The Defendants conducted or participated in the conduct of the enterprise through that pattern of racketeering activity. The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

146.    Predicate acts of racketeering activity are acts that are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. §1961(1)(B), as more specifically alleged below. Defendants each committed at least two such acts or else aided and abetted such acts.

147.    **Relationship among Racketeering Acts** The acts of racketeering were not isolated, but rather the acts of Defendants were connected by a common scheme, plan, or motive. These acts were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during a period of time beginning as early as 2010 when USIF was approved by USIF as a designated regional center and continuing to the present, and there is a continued threat of repetition of such conduct. *Sedima, S.P.R.L. v Imrex Co.*, 105 S. Ct. 3275 (1985). *United States v. Brooklier*, 685 F.2d 1208, 1222 (9th Cir. 1982).

148.    **Conducting the Enterprise through a Pattern of Racketeering** Defendants used their positions in the enterprise facilitated their commission of the racketeering acts and that the racketeering acts had some impact and effect on the enterprise. The Defendants were able to commit the acts solely by virtue of their position or involvement in the affairs of the enterprise. *United States v. Scotto*, 641 F.2d 47 (2d Cir, 1980), cert. denied, 452 U.S. 1961 (1982). *United States v. Provenzano*, 688 F.2d 194 (3d Cir.), cert. denied, 459 U.S. 1079 (1982). *United States v. Cauble*, 706 F.2d 1322 (5 th Cir. 1983), cert. denied, 104 S. Ct. 996 (1984).

149.    The association-in-fact enterprise and the alternative enterprises, as alleged herein, were not limited to the predicate acts and extended beyond the racketeering activity. Rather, they existed separate and apart from the pattern of racketeering activity for the legitimate business purpose of assisting Plaintiff's clients to apply for immigration benefits. Upon information and belief, Defendants have had and do have legitimate business plans outside of the pattern of racketeering activity.

150.    Plaintiff specifically alleges that Defendants participated in the operation and management of the association-in-fact enterprise and the alternative enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described below.

151.   **Predicate Act: Use of Mails and Wires to Injure Plaintiff in Violation of 18 U.S.C. §§ 1341 and 1343.** Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1341 and 1343 in that they devised or intended to devise a scheme or artifice to interfere Plaintiff's clients' business relationship with Plaintiff and cause Plaintiff financial loss by means of false or fraudulent pretenses, representations or promises. For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and things by the US. mails or by private or commercial interstate carriers, or received such therefrom. Defendants also transmitted or caused to be transmitted by means of wire communications in interstate or foreign commerce various writings, signs and signals. The acts of Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business. or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

152.   Defendants carried out their scheme in different states and countries and could not have done so unless they used the U.S. mails or private or commercial interstate carriers or interstate wires. In furtherance of their scheme alleged herein, Defendants Mastroianni and Ding communicated among themselves and with Plaintiff's clients in furtherance of the scheme to interfere with business relationship between Plaintiff and her clients and cause her financial loss. These communications were typically transmitted by wire (i.e., electronically) and/or through the United States mails or private or commercial carriers. Defendants also transmitted or caused the Letter and Agreements to be transmitted by mail or wire between 2014 and 2019.

153.   After Defendants coerced Plaintiff's clients to sign consent letter and imposed a loss of over $100,000 for each of Plaintiff's 12 clients between August to December 2018, Defendants finally transmit to each of 12 Plaintiff's clients $500,000 of dollar in fund by wire from bank accounts in the

United States controlled by Mastroianni. As a result, Plaintiff lost $10,000 in consulting fee from each of her 12 clients.

## Predicate Act: Transport and Receipt of Stolen Money in Violation of 18 U.S.C. §2314 and 2315.

154. Defendants committed acts constituting indictable offenses under 18 U.S.C. §2314 in that having devised or intended to devise a scheme or artifice to defraud Plaintiff and her clients or to obtain money from Plaintiff and her Plaintiff and her clients by means of false or fraudulent pretenses, representations or promises, Defendants transported or caused to be transported in interstate or foreign commerce money having a value of $5000 or more, which was stolen, converted or taken by fraud. Defendants also committed acts constituting indictable offenses under 18 U.S.C. §2315 in that they received money in excess of $5000, which crossed a State or United States boundary after being stolen, unlawfully converted or taken. The acts of Defendants set forth above were done willfully and with knowledge that the money was stolen, converted or taken by fraud. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

155. Upon information and belief Mastroianni and Mastroianni-Controlled companies, along with Ding, and Ding-controlled companies, also ensured that would receive transaction-based fees of $50,000 and interests earned on $500,000 at about 5.9% rate for four years from, directly and indirectly from Plaintiff and her clients invested in 701 Fund and 702 Fund while knowing that a portion of such money would be placed outside of US to avoid taxation by IRS. PPM of 701 Fund and 702 Fund provide that Plaintiff's clients may receive phantom income on that portion of the interest income received by Defendants which is (i) used to pay for operating expenses (including fees payable to foreign agents, the Regional Center and/or Manager, collective the Defendants) and (ii) not distributed to the Members.

## Predicate Act: Travel in Furtherance of Scheme to Defraud in Violation of 18 U.S.C. §1952.

156.   Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1952 in that, having devised or intended to devise a scheme or artifice to defraud Plaintiff and her clients or to obtain money from Plaintiff and her clients by means of false or fraudulent pretenses, representations or promises, Defendants then traveled in foreign commerce and used facilities of foreign commerce in order to promote, manage and facilitate the continuation of their scheme. Among other things, upon information and belief, in 2014, 2016, and 2018 Defendant Mastroianni and Defendant Ding on behalf of themselves and other Defendants, traveled to China and hosted roadshows with the intent to promote, manage and facilitate the Defendants' scheme to defraud Plaintiff and her clients by inducing EB-5 investors to invest in 701 Fund and 702 Fund as well as to for 701 investors re-invest their capital in 702 Project in 2018.

157.   **Continuity of Conduct**. Defendants' violations of state and federal law as set forth herein, each of which directly and proximately injured Plaintiff and her clients and other EB-5 investors, constituted a continuous course of conduct spanning a period from as early as 2010 when USIF was approved by USCIS as a designated regional center to present, which was intended to obtain money through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. §1961(l) and (5).

158.   Upon information and belief, Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(c).

159.   The unlawful actions of Defendants, and each of them, have directly, illegally, and approximately caused and continue to cause injuries to Plaintiff and her clients. Plaintiff seeks an award of damages in compensation for, among other things, $120,000 Defendants stole from Plaintiff when Defendants coerced each of her 12 clients to sign Consent Letter in August to December 2018

to give up claims of $50,000 administrative fee plus $88,000 in interest income on their $500,000 capital investment.

160.     Plaintiff accordingly seeks an award of three times the damages it sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

## SECOND CAUSE OF ACTION
### Conspiracy to Engage in a Pattern of Racketeering Activity:
### 18 U.S.C. § 1961(5), 1962(d)
### (Defendants USIF, Mastrioanni, USIF-NY, 701 Fund, 701 Fund Managers, 702 Fund, 702 Fund Managers Ding and Qiaowai entities)

161.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

162.     **Elements of Conspiracy** In violation of 18 U.S.C. § 1962(d), the Defendants Ding, Qiaowai, Mastroianni, USIF, USIF-NY, 701 Fund, 701 Fund Managers, 702 Fund, 702 Fund Managers and each of them, knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of racketeering activity as alleged in paragraphs 130-160 above. *United States v. Boffa,* 688 F.2d 919 (3d Cir. 1982), cert. denied, 103 S. Ct. 1272, 1280 (1983). *United States v. Elliott,* 571 F. 2d 880 (5th Cir.), cert. denied, 439 U. S. 953 (1978).

163.     **The Commission of Racketeering Act**s The Defendants agreed to participate in the affairs of the enterprise through a patter of racketeering activity. By actually committing two or more racketeering acts the defendants have shown that they agreed to participate in the affairs of the enterprise through a pattern of racketeering activity. *United States v. Elliott*, 571 F.2d 880 (5th Cir.), cert. denied, 439 U.S. 953 (1978). The conspiracy commenced specifically in June 2014 when Defendants and their representatives organized and hosted roadshows to promote 701 Fund to

43

Chinese EB-5 investors and made no mention that investment in 701 Fund was securities and at risk for total loss. The conspiracy repeated in June 2016 when Defendants and their representatives organized and hosted roadshows to promote 702 Fund to Chinese EB-5 investors and made no mention that investment in 702 Fund was securities and at risk for total loss. The conspiracy continued in June 2018 when Defendants and their representatives organized and hosted meeting to coerce 701 Fund investors to re-invest their capital in 702 without disclosing securities violations committed by Defendants and later coerced them to sign consent letters to give up claims to $50,000 in administrative fee and $88,000 of interest income. The conspiracy's purpose was to induce Plaintiff's clients and other Chinese EB-5 investors to purchase or re-invest in securities without independent advisors and legal counsels, in violation securities regulations of China and US. By sending the "Zoe Letter" to members of 702 Fund and interfere with business relationship between Plaintiff and her clients, Defendants try to deprive EB-5 investors of independent due diligence research critical to interests of EB-5 investors of 702 Fund or other funds controlled by Defendants.

164. **Agreement to Commit Two or More Racketeering Acts** Defendants agreed to participate in the affairs of the enterprise by personally committing two or more racketeering acts to further the affairs of the enterprise through a pattern of racketeering activity. *United States v. Winter*, 663 F.2d 1120 (1st Cir. 1981). *United States v. Phillips,* 664 F. 2d 971 (5 th Cir. 1981), cert, denied, 457 U.S. 1136 (1982). Plaintiff discovered that Defendants intentionally withheld offering documents from Plaintiff's clients prior to inducing them to wire $550,000 to accounts controlled by Defendants and to pay hefty fees to migration agents for selling securities to them without their consents. Defendants intentionally failed to inform Plaintiff's clients in Chinese that they need to consult licensed securities advisers or provide Chinese translation of the subscription documents because Chinese investors don't read English. Defendant misled them to sign, which were only signature pages of offering documents under disguise as immigration paper work and I-526 petition form submitted to USCIS.

Defendants doctored the executed Subscription Agreement and Operating Agreement without Plaintiff's clients' knowledge. Even the countersigned Subscription Agreement and Operating Agreement by Mastroianni were mailed and hidden in Defendant Qiaowai's office for several years without Plaintiff's clients' knowledge.

165. Defendants were in the business of issuing securities, marketing securities, and providing investment advice for compensation, all done without registration with Securities and Exchange Commission in violation of 1933 Investment Act, 1940 Investment Adviser Act, and 1940 Investment Company Act. The investment made by 701 Fund and 702 Fund in 702 Development is investment contracts with 702 Developer instead of purchasing mortgage or direct interests in real estate under development. The investment contracts are securities and not qualified assets for 3C5 exemption from registration of 701 Fund and 702 Fund as investment company. At the time making EB-5 loan, 702 Developers have zero equity in 702 Development when the existing hotel with $540 million purchase price is used to secure $1.125 billion senior loan with GOLDMAN SACHS BANK. The sale of US based securities to the general public in China were not approved by Chinese regulators and without proper disclosure to the Chinese investors. Defendants retained a securities counsel to draft Private Placement Memorandum with full knowledge that they need to follow US securities law. Defendants intentionally neglected to verify if they meet the exemption requirements with SEC and proceeded their activities without proper registration or notification, including filing Form D with SEC.

166. With consents of Defendants 702 Developer, that is Maefield Development and Fortress Investment Group, orchestrated the sale of 701 Hotel Project with the intention to transfer EB-5 investment in 701 Fund to finance 702 Development that was unable to secure a construction loan from JP Morgan for over two years. Ignoring the adverse effects of accepting early repayment on investors from 701 Fund, Defendants coerced investors into re-investing in 702 Development to benefit Maefield Development and Fortress Investment Group while taking an instant payout of

$44,661,772.77 on December 12, 2018. Defendants conspire with 702 Developer to made a $494.5 million loan to 702 Developer secured with worthless pledges. The pledgors of EB-5 loan were 702 Developer's affiliates newly registered on the day of executing EB-5 loan agreement and have zero equity or assets.

167. With consents of Defendants Maefield Development and Fortress Investment Group and Defendants know that they are not registered investment advisors and they intentionally failed to inform investors of 701 Fund and 702 Fund to seek independent advisor to evaluate investment risk of re-investment. In addition Defendants filed lawsuit against Plaintiff to silence her as she is the most vocal critic of Defendants. By sending the "Zoe Letter" to their investors, Defendants continue to subject their investors to practice of manipulation and coercion.

168. Even if some of the Defendants did not agree to harm Plaintiff specifically and directly, the purpose of the acts they engaged in was to advance the overall objective of the conspiracy, and the harm to Plaintiff was a reasonably foreseeable consequence of Defendants' actions.

169. **Causation and Damages** Plaintiff has been injured and continues to be injured in her business and property by Defendants' conspiracy in violation of 18 U.S.C. § 1962(d) caused by the predicate acts or damages indirectly caused by the pattern of acts, or both. The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiff in its business or property. *Sedima, S.P.R.L. v. Imrex Co.*, 105 S. Ct. 3275 (1985).

170. **Damages** Defendants' violation of the statute caused damages to Plaintiff's property. Plaintiff seeks an award of damages in compensation for, among other things, $120,000 of loss of compensation when Defendants coerced 12 of Plaintiff's clients to sign Consent Letter giving up their claim to return of $50,000 administrative fee as well as of interest income at 5.9% on their $500,000 capital contribution, equal to $29,500 per years for three and half years. Plaintiff further seeks an award of three times the damages they sustained, and the recovery of reasonable attorneys' fees and

costs of investigation and litigation, as well as any other relief as authorized. *Alcorn County v. U.S. Interstate Supplies, Inc.*, 731 F. 2d 1160, 1169 (5th Cir. 1984). *Hellenic Lines, Ltd. v. O'Hearn,* 523 F. Supp. 244 (S.D.N.Y. 1981). *Parness v. Heinold Commodities, Inc.,* 487 F. Supp. 645 (N.D. Ill. 1980).

## THIRD CAUSE OF ACTION

### (Tortious Interference with a Business Relationship)
### (Defendants USIF, Mastroianni, USIF-NY, 701 Fund, 701 Fund Managers, 702 Fund, 702 Fund Managers Ding and Qiaowai entities)

171.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

172.    Plaintiff has business relationship with members of 701 Fund and members of 702 Fund.

173.    Defendants know of that relationship and Defendants, individually and in collusion with one another, and with knowledge, by engaging in the conduct described above, directly or indirectly, interfered with that relationship.

174.    Defendants individually and in collusion with one another, and with knowledge, by engaging in the conduct described above, directly or indirectly, acted solely out of malice and coercion, and/or improper means that amounted to a crime or independent tort.

175.    Defendants' interference caused injury to the relationship with her clients.

176.    Defendants conduct was willful, wanton, malicious, and oppressive.

177.    Defendants' unlawful conduct has directly, legally, and proximately caused and continues to cause injuries to Plaintiff in its business or property. By reason of Defendants' misconduct Defendants are liable to Plaintiff in an amount to be determined at trial. Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

## FOURTH CAUSE OF ACTION

**(Civil Conspiracy of Intentional Interference with Prospective Economic Relations)**
**(Defendants USIF, Mastroianni, USIF-NY, 701 Fund, 701 Fund Managers, 702 Fund, 702**
**Fund Managers Ding and Qiaowai entities)**

178.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

179.    Plaintiff has been an advocate for Chinese EB-5 investors' rights under the protection of US securities laws.   Plaintiff is well known in the EB-5 investor community as a dedicated and knowledgeable EB-5 professional. Plaintiff's WeChat messages have inspired hundreds of Chinese EB-5 investors to protect their rights under US securities laws.  Due to this international exposure, Plaintiff has many ongoing and pending business and economic relationships with existing and potential clients within Chinese EB-5 investor community who have contributed over $20 billion to the EB-5 immigrant investor program, which will, in all probability, lead to future economic benefits if not, for Defendants' wrongful acts.

180.    Plaintiff is informed and believe and based thereon allege that Defendants had full knowledge of Plaintiff's international exposure, and the aforementioned existing and potential business and economic relationships.

181.    Plaintiff is informed and believe and based thereon allege that because Defendants had full knowledge that Plaintiff operates on an international scale, Defendants knew of the existence of the current and prospective business relationships between Plaintiff and their current or potential clients from China and the United States.

182.    Defendants deliberately, willfully, wrongfully and intentionally interfered with Plaintiff's right to transact business with, and derive business income from, her existing and potential relationships with third parties by sending "Zoe Letter" to her clients, and coercing existing and

potential clients to refrain from entering into a business relationship with Plaintiff due to concerns of unprofessionalism, unethical conducts, and incompetence. Defendants knew that by sending "Zoe Letter", it will damage Plaintiff's reputation and good will, and the interference with Plaintiff's business and economic relationships was certain or substantially certain to occur.

183. Each Defendant committed at least one overt act in furtherance of such conspiracy including coercing existing and potential EB-5 clients to refrain from entering into a business relationship with Plaintiff.

165. Each Defendant acted with the common intent to defraud Plaintiff and understood that all other Defendants shared in that common purpose.

166. Defendants' conduct was willful, wanton, malicious, and oppressive with intention to damage Plaintiffs' reputation and to promote their own business interests at the expense of Plaintiffs. As a result, Plaintiffs are entitled to punitive and exemplary damage.

167. Defendants' unlawful conspiracy has directly, legally, and proximately caused and continues to cause injuries to Plaintiff in its business and property. Accordingly, Plaintiff seeks an award of damages in compensation for, among other things, over $120,000 loss of entitled compensation when Defendants coerced each of Plaintiff's 12 clients to give up their claim of return of $50,000 administrative plus interests earned on their $500,000 capital at 5.9% for over 3 years in amount of $88,500 , which occurred as a result of Defendants' conduct. Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

I. Award in excess of $120,000 in compensatory damages, consequential, exemplary and punitive damages of $50 million, not including the trebled damages for the RICO causes of action, against Defendants, each and every one of them jointly and severally.

II. Enjoin permanently Defendants from interfering business relations between Plaintiff and her clients in their request seeking return of their EB-5 investment in full and with interests.

III. Award attorneys' fees and other litigation costs reasonably incurred in this action pursuant to the Racketeer Influenced and Corrupt Organizations Act.

IV. Any other relief the Court deems just and proper.

**JURY DEMAND**

**Plaintiff respectfully demands a jury trial on all issues so triable.**

Dated: February 19, 2019

Respectfully Submitted,

XUEJUN MAKHSOUS, Plaintiff, *pro se*

P. O. BOX 2651, GLENVIEW, IL 60025