# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| XUEJUN ZOE MAKHSOUS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| NICHOLAS A. MASTROIANNI II | ) | |
| YING DING | ) | |
| RICHARD HADDAD | ) | |
| | ) | |
| and | ) | |
| | ) | Civil Action No. |
| US IMMIGRATION FUND, LLC, aka USIF, | ) | |
| a Delaware limited liability company; | ) | |
| US IMMIGRATION FUND-NY, LLC, aka the | ) | |
| Regional Center, a New York limited liability | ) | TRIAL BY JURY DEMANDED |
| company; 701 TSQ1000 FUNDING, LLC, aka 701 | ) | |
| Fund, a Delaware limited liability company; 701 | ) | |
| TSQ 1000 FUNDING GP, LLC, aka 701 Manager | ) | |
| a Delaware limited liability company; NYC 1000 | ) | |
| INVESTMENT, LLC, aka 701 Fund Co-Manager, | ) | |
| a Delaware limited liability company; 1568 | ) | |
| BROADWAY FUNDING 100, LLC, aka 702 Fund, | ) | |
| a Delaware limited liability company;1568 | ) | |
| BROADWAY FUNDING 100 GP, LLC, aka 702 | ) | |
| Fund Manager, a Delaware limited liability company | ) | |
| AYB FUNDING 100, LLC, aka AYB II Fund, | ) | |
| a Delaware limited liability company;1568 | ) | |
| AYB FUNDING 100 GP, LLC, aka AYB II | ) | |
| Fund Manager, a Delaware limited liability company | ) | |
| NYC 2000 INVESTMENT, LLC, aka 702 Fund | ) | |
| Co-Manager, a Delaware limited liability company; | ) | |
| CAPITAL 600 INVESTMENTS, LLC, aka Regional | ) | |
| Center Co-Manager, a Florida limited Liability | ) | |
| company; QIAOWAI INTERNATIONALGROUP | ) | |
| USA, LLC, 4552 Tuscany Dr. Plano, TX; QIAOWAI | ) | |
| INTERNATIONAL HOLDING, LLC, a Delaware | ) | |
| limited liability company; QIAOWAI GROUP | ) | |
| INTERNATIONAL TRAVELAGENCY | ) | |
| HOLDINGS, INC., and with its Registered agent | ) | |
| listed as Corporation Service Company, 251 Little | ) | |
| Falls Dr. Wilmington, DE 19808; | ) | |

Defendants.

## AMENDED COMPLAINT PURSUANT TO RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND OTHER CAUSES OF ACTION

Plaintiff XUEJUN ZOE MAKHSOUS, Self-Represented, sues the Defendants, as individuals operating a criminal enterprise, for conspiracy to commit tort and fraud. Defendants Nicolas Mastroianni II ("Mastroianni") and Ding Ying ("Ding"), with companies under their control or business partners and legal counsels, et al., through a conspiracy of tort, fraud and other predicate criminal acts, are involved in colluding & converting illegally obtained funds as well as maliciously prosecuting and defaming Plaintiff.

Plaintiff is a trained Chinese/English interpreter/translator, a trained researcher/investigator, and an EB-5 investor right activist. As early as Oct 1 2013, The U.S. Securities and Exchange Commission's ("SEC") Office of Investor Education and Advocacy and U.S. Citizenship and Immigration Services ("USCIS") issued a joint alert on investment scams targeting foreign nationals who seek to become permanent lawful U.S. residents through the Immigrant Investor Program ("EB-5"). In close coordination with USCIS, which administers the EB-5 program, the SEC has taken emergency enforcement action to stop allegedly fraudulent securities offerings made through EB-5.

The EB-5 program provides certain foreign investors who can demonstrate that their investments are creating jobs in this country, with a potential avenue to lawful permanent residency in the United States. Business owners apply to USCIS to be designated as "regional centers" for the EB-5 program. These regional centers offer investment opportunities in "new commercial enterprises" that may involve securities offerings. Through EB-5, a foreign investor who invests a certain amount of money that is placed at risk, and creates or preserves a minimum number of jobs in the United States, is eligible to apply for conditional lawful permanent residency. Toward the end of the two- year period of conditional residency, the foreign investor is eligible to apply to have the

conditions on their lawful permanent residency removed, if he or she can establish that the job creation requirements have been met. Foreign investors who invest through EB-5, however, are not guaranteed a visa or to become lawful permanent residents of the United States. The fact that a business is designated as a regional center by USCIS does not mean that USCIS, the SEC, or any other government agency has approved the investments offered by the business, or has otherwise expressed a view on the quality of the investment. The SEC and USCIS are aware of attempts to misuse the EB-5 program as a means to carry out fraudulent securities offerings. However, such alert was never sent to EB-5 investors in China through US immigration attorneys or securities brokers. It is believed that any negative news of EB-5 fraud and facts about bad actors like Defendant Mastroianni with his bankruptcy record and lawsuits were removed from Chinese online search engines paid by EB-5 migration agencies like Defendant Ding and Qiaowai.

Since August 2017, Plaintiff has been contacted by nearly 100 Chinese investors from EB-5 funds managed by Defendants for fraud analysis in the context of the EB-5 investment alert issued by SEC in 2013. In August 2017 Plaintiff took an assignment to conduct fraud analysis for an investor in 1568 Broadway Funding 100, LLC ("702 Fund") that provides up to $350 million mezzanine loan from up to 700 EB-5 investors to finance 1568 Broadway Development ("702 Project") in New York. Given the investment alert about EB-5 scams issued by SEC, Plaintiff believes EB-5 loan to 1568 Broadway Development is a classic example of EB-5 scams with its complicated organization structure other than the fact that Defendant Mastroianni, with no certification and registration, has $2.9 millions in about 20 EB-5 funds under his control. **See Exhibit 1 and Exhibit 2.** The offering documents issued in 2016 provides that 702 Fund will provide $250 million by Threshold Date of Mar 31, 2017 or Developers of 702 Project may seek alternative financing. In such case, 702 Fund

may dissolve.  **See Exhibit 3.**  Under information and belief 702 Fund was not able to provide $250 million EB-5 financing by March 31, 2017,

By end of 2017 702 Developers failed to meet the terms and secure construction loan from JP Morgan due to insufficient equity. **See Exhibit 4.**  702 Developers devised a plan to relocate $200 million of EB-5 loan in 701 TSQ 1000 Funding, LLC ("701 Fund") to make up the equity shortfall for 702 Project. They initiated a buy-out of majority interest owner of 701 Time Square Edition Hotel Development ("701 Project") and took over the control of $200 million of EB-5 loan associated with the project in about February 2018. Subsequently 702 Developers conspired with some of Defendants for a plan to make early repayment of EB-5 loan out of 701 Project on the condition that EB-5 loan would be redeployed into 702 Project.  On May 18 2018, Defendant 701 Fund and Manager sent a letter to members of 701 Fund about early repayment and intent to redeployment without disclosing the project of redeployment. **See Exhibit 5.**   Between June and December 2018, 12 former members of 701 Fund engaged Attorney Douglas Litowitz ("Litowitz") to represent them in their demands for return of their investment. Plaintiff was engaged indirectly as a translator and a fraud investigator to work with Litowitz and was promised to be paid $10,000 per client for her service.

Defendants Mastroianni, Ding colluded with their former hired-gun, securities attorney Ronnie Fieldstone ("Fieldstone") of Ernstein & Lehr LLP to devise a scheme to sabotage Litowitz's plan for legal action to enforce rescission rights due to Defendants 701 Fund's misrepresentation. The rescission rights will allow defrauded exiting investors to take back their investment in full including $500,000 capital and administrative fee of $50,000 plus interests and cost. Under information and belief, in May 2018, Defendant Ding and Qiaowai used an agent "Linda" to infiltrated WeChat groups set up by members of 701 Fund to discredit Plaintiff and draw clients away from Litowitz and Plaintiff.  As result "Linda" assisted Fieldstone to sign up about 40 exiting

members to be his clients in June 2018. **See Exhibit 6.** In contrast, Litowitz had about 12 clients between June and October 2018. In July Defendants Mastroianni, Ding colluded with Fieldstone to fix withdraw procedures and repayment amount for the exiting members of 701 Fund. Instead of full return of investment of $550,000 plus interests and cost advocated by Litowitz, Defendants Mastroianni, Ding colluded with Fieldstone to return only $500,000 of capital to exiting member with release of all liabilities by Defendants. The exiting members of 701 Fund were coerced to accept the terms set by Defendants and substantial loss *without* getting immigration visas after 3.5 years' investment. Attorney Litowitz and hence Plaintiff were unable to collect their fees based on contingency for management fee returned to exiting investors. Defendants Mastroianni and Ding's coercive action caused Plaintiff unable to collect her compensation.

Between June and September 2018, together Litowtiz and Plaintiff were unwavering advocates for rights of their exiting clients not to succumb to the tyranny of Defendant Mastroianni. In view of success of Litowitz and Plaintiff, the social network circles the idea that from then on all the investors in USIF's projects might retain Litowtiz and Plaintiff to represent them in defending their rights against the deceit of Defendant Mastroianni. **See Exhibit 7.** Defendants Mastroianni and Ding became panic at the success of Litowitz and Plaintiff and Defendants USIF, 701 Fund and 701 Manager filed a lawsuit against Litowitz and Plaintiff in New York County Supreme Court on Oct 4, 2018 ("New York Lawsuit"). This laughable, baseless lawsuit was thoroughly described in Defendants' Motion to Dismiss of the instant original complaint. The sole goal of Defendants' lawsuit was to humiliate and intimidate Litowitz and Plaintiff from defending rights of over 5,000 investors in the EB-5 funds managed by Defendants. This malicious lawsuit was thrown out of court by a New York Judge on March 29, 2018. **See Exhibit 8.** Humiliated by Plaintiff's fierce defense and Defendants' defeat by Plaintiff even without her hiring a lawyer, Defendant Mastroianni and Richard

Haddad, the attorney who represented Defendants in the New York Lawsuit started a campaign to defame Plaintiff and called Plaintiff "ambulance chaser". Defendants Mastroianni and 702 Fund disseminated letters to members of 702 Fund and used the New York Lawsuit to legalize their defamatory comments about Plaintiff. **See Exhibit 9**. On about April 9 Defendant Haddad sent an agent to Chicago and contacted at least one acquaintance of Plaintiff to spread false information about Plaintiff. Among other things, Plaintiff seeks damages in excess of $50,120,000, including but not limited to, punitive damages, for these outrageous tort and fraud.

I. **JURISDICTION AND VENUE**

1. This is a civil action for violations of 18 U.S.C. § 1961 et seq. ("Racketeer Influenced and Corrupt Organizations Act" or "RICO"). RICO addresses the corrupt abuse and misuse – usually covertly – of organizations, entities, businesses, institutions or even governments or government agencies, such that superficially legitimate entities actually operate for criminal purposes irrelevant to the entity's purpose.

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. Jurisdiction is also proper pursuant to 18 U.S.C. § 1965, which allows for nationwide jurisdiction pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

3. This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2).

4. This Court has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367.

5. Plaintiff is a resident of Cook County. IL and this Court has jurisdiction.

II. **THE PARTIES**

6.  The Plaintiff Xuejun Zoe Makhsous ("Plaintiff' or "Zoe") is a self-employed translator, researcher, an EB-5 investor rights advocate and an independent paralegal in-training. Ma is a resident of Cook County, Illinois.

7.  Defendant Nicholas A. Mastroianni, II ("Mastroianni"), is a Florida resident and controls about 20 business entities that manage $2.9 billions of EB-5 investment from over 5,000 investors.

8.  Defendant U.S. Immigration Fund, LLC, ("USIF") is a Delaware limited liability company whose controlling principal is Nicholas Mastroianni, II.

9.  Defendant U.S. Immigration Fund – NY, LLC, ("USIF-NY" or the "Regional Center") is a New York limited liability company, managed and controlled by Mastroianni.

10.  Defendant Capital 600 Investments, LLC ("Regional Center Co-Manager"), is a Florida Limited Liability Company whose principal place of business is located at 115 Front Street, Suite 300, Juniper, FL 33477, and is managed and controlled by Nicholas Mastroianni II.

11.  Defendant 701 TSQ 1000 Funding, LLC ("701 Fund" or "Company"), is a Delaware limited liability company ("USIF") whose controlling principal is Nicholas Mastroianni, II.

12.  Defendant 701 TSQ 1000 Funding GP, LLC, ("701 Manager") is a Delaware limited liability company whose controlling principal is Nicholas Mastroianni, II.

13.  Defendant NYC 1000 Investment, LLC ("701 Fund Co-Manager"), is a Delaware limited liability company ("USIF") whose controlling principal is Nicholas Mastroianni, II.

14.  Defendant 1568 Broadway Funding 100, LLC ("702 Fund"), is a Delaware limited liability company ("USIF") whose controlling principal is Nicholas Mastroianni, II.

15.  Defendant 1568 Broadway Funding 100 GP, LLC, ("702 Manager") is a Delaware limited liability company whose controlling principal is Nicholas Mastroianni, II.

16.  Defendant NYC 2000 Investment, LLC ("702 Fund Co-Manager"), is a Delaware limited liability company ("USIF") whose controlling principal is Nicholas Mastroianni, II.

17.  Defendant AYB Funding 100, LLC ("AYBII Fund"), is a Delaware limited liability company ("USIF") whose controlling principal is Nicholas Mastroianni, II.

18.  Defendant AYB Funding 100 GP, LLC, ("AYBII Manager") is a Delaware limited liability company whose controlling principal is Nicholas Mastroianni, II.

19.  Defendant NYC 400 Investment, LLC ("AYBII Fund Co-Manager"), is a Delaware limited liability company ("USIF") whose controlling principal is Nicholas Mastroianni, II.

20.  Defendant Ying Ding ("Ding"), is a US permanent resident who resides at 4552 Tuscany Dr, Plano TX at least between 2011 and 2018.

21.  Defendant Qiaowai International Group USA LLC, with its office located at 4552 Tuscany Dr, Plano TX [at least between 2011 and 2018], is controlled by its principal Ding ("collectively call Qiaowai entities").

22.  Defendant Qiaowai International Holding, LLC, with its registered agent as Corporation Service Company, located at 251 Little Falls Dr. Wilmington, DE 19808, and whose controlling principal is Ding ("collectively call Qiaowai entities").

23.  Defendant Qiaowai Group International Travelling Agency Holdings, Inc. with its registered agent as Corporation Service Company at 251 Little Falls Dr. Wilmington, DE, 19808, and whose controlling principal is Ding ("collectively call Qiaowai entities").

24.  Defendant Richard Haddad ("Haddad") is a resident in the State of New York who works at 230 Park Ave, New York, NY.


III.    **FACTS COMMON TO ALL COUNTS**

## **Plaintiff's Background**

25.   Plaintiff, previously a Citizen of China, is a professional translator graduated from the best university in Northeastern of China in 1991.

26.   Plaintiff received her Master's in Sociology in 1996 and is a researcher by training.  Since 2014, Plaintiff devoted substantial time to conduct EB-5 fraud analysis.  Plaintiff filed her first whistleblower report with SEC in late 2014 when eventually led to SEC to take enforcement action against an EB-5 regional center.

27.   Plaintiff received her Master's in Business Administration in 2001 and has been involved in all aspects of real estate development since then, with focus in mortgages and real estate financing.

28.   Plaintiff was invited to join an EB-5 real estate development project in 2007 and after she discovered the practice of non-disclosure of investment risks to prospective EB-5 investors, Plaintiff left the EB-5 regional center sponsored project and started her own EB-5 investment funded senior care development in rural Wisconsin.  Plaintiff is a self-taught EB-5 project developer and manages two mini EB-5 enterprises.

29.   Plaintiff is currently taking classes to become an independent paralegal.

30.   Ever since SEC and USCIS issued joint alert on EB-5 scams in October 2013, Plaintiff calls for full risk disclosures in EB-5 fund raising activities and advocates for protection of Chinese EB-5 investors under US securities law.  Plaintiff is proficient with all legal documents related to EB-5 fund raising and **provides US legal information to Chinese EB-5 investors** as such information are not available in China and Chinese migration agencies pay Chinese internet search engines to block and delete negative information about EB-5 immigration programs.

31.     Plaintiff was the first person to warn Chinese EB-5 investors of possible 10 years visa backlog as early as December 2015.

32.     Plaintiff is in contact with hundreds of Chinese EB-5 investors with their investment in EB-5 enterprises sponsored by dozen of EB-5 regional centers all over the US.

## EB-5 Immigrant Investor Program

33.      A provision of the 1990 Immigration Reform Act permits foreigners to invest $500,000 (in areas of high unemployment) to $1 million in businesses in the United States in return for permanent residency status. The provision is intended to encourage foreign entrepreneurs to create a new business or to save a troubled business with creation of 10 permanent jobs for US workers. The application form for such immigration benefit is Form I-526, "Immigration Petition by Alien Entrepreneur."

34.     The regulations require investor's active involvement in management or policy making of the EB-5 enterprise. The early results of EB-5 program were disappointing until some times in 1993, when an INS (predecessor to USCIS) administrator ruled that being a limited partner in a limited partnership sufficiently fulfilling the latter requirement. This particular policy change effectively turns EB-5 business set up and operated by an entrepreneur into an EB-5 investment in securities by passive investors.

35.     After an individual subscribes to become an EB-5 investor, he or she files a Form I-526 Immigration Petition for Entrepreneur ("I-526 Petition") to show, based on the project's business plan and supporting documents, that the investment will satisfy EB-5 requirements. 8 U.S.C. § 1153(b)(5); 8 C.F.R. § 204.6(a) and (j). Upon approval of the I-526 Petition, USCIS will grant the investor

conditional permanent residency, often referred to as a "conditional green card." 8 U.S.C. § 1186 b(a)(1).

36.     An EB-5 investor must establish eligibility at the time of filing and a petition cannot be approved if, after filing, the immigrant investor becomes eligible under a new set of facts or circumstances. Changes that are considered material that occur after the filing of an immigrant investor petition will result in the investor's ineligibility if the investor has not obtained conditional permanent resident status.  If ***material changes*** occur after the approval of the immigrant petition, but before the investor has obtained conditional permanent residence, such changes would constitute good and sufficient cause to issue a notice of intent to revoke and, if not overcome, would constitute good cause to revoke the approval of the petition. A change is material if the changed circumstances would have a natural tendency to influence or is predictably capable of affecting the decision. Changes that occur in accordance with a business plan and other supporting documents as filed will generally not be considered material. If the new commercial enterprise undertakes the commercial activities presented in the initially filed business plan and creates the required number of jobs, the new commercial enterprise may further deploy the capital into another activity. The activity must be within the scope of the new commercial enterprise and further deployment must be within a commercially reasonable period of time. Further deployment of this nature will not cause the petition to be denied or revoked *under certain circumstances.*

37.     Within two years after receiving a conditional green card, the investor must file with USCIS a Form I-829 Petition by Entrepreneur to Remove Conditions on Permanent Resident Status ("I-829 Petition") to show that the investor satisfied the investment and job creation requirements of the EB-5 program. 8 U.S.C. § 1186b(c); 8 C.F.R. § 216.6(a) and (c). Upon satisfaction of these requirements, USCIS will approve the I-829 Petition and grant the investor lawful permanent residence status,

concluding the immigration process. 8 C.F.R. § 216.6(d)(1). If the I-829 Petition is denied, USCIS will terminate the conditional green card and institute removal proceedings to deport the investor from the United States. 8 C.F.R. § 216.6(d)(2).

38.     The initial Form I-526 immigrant petition must be filed in good faith and with full intention to follow the plan outlined in that petition. While USCIS allows this flexibility in Form I-829 filings, nothing in this policy relieves an immigrant investor from the requirements for removal of conditions. Therefore, even in the event of a change in course, an immigrant investor must always be able to demonstrate that: 1) This at-risk investment was sustained throughout the period of the petitioner's conditional permanent residence in the United States; and 2) The investor created (or maintained, if applicable), or can be expected to create within a reasonable period of time, the requisite number of jobs. See USCIS Policy Manual Volume 6 Part G, Chapter 5.

39.     In about 1993, USCIS implemented a policy change that being a limited partner in a limited partnership sufficiently fulfilling the requirement of policy making in the EB-5 enterprise. Purchasing membership as limited partner in an EB-5 enterprise is securities.

40.     The EB-5 Program attracts many people from real estate industry to set up regional centers to invest the funds coming from immigrants and to turn EB-5 program into a commercial lending vehicle, most of which have more than 100 investors, a threshold for registration requirement of investment company per 1940 Investment Company Act.

41.     Most of the EB-5 fund manager are not proficient with U.S. securities regulations and carry out their operations, either intentionally or by gross negligence, in violation of anti-fraud provisions and registration requirement of securities laws of United States.

42.     EB-5 immigrant visas are limited by the EB-5 law Congress passed in 1990. All employment-based and family-based preference immigration is subject to limits. For EB-5, the annual limit is

10,000 immigrant visas (currently counted as the investor, spouse and any dependent children) per fiscal year. No single country can use up more than 7.1% of the available immigrant visas, but any unused immigrant visas (i.e., if no other country uses up at least 7.1%) can "flow up" to a single country using more than 7.1%. For example, China was able to use 85% of the available EB-5 immigrant visas in 2014 because no other country was close to the 7.1%.

43.     The Chinese Student Protection Act ("CSPA"), signed it into law on October 9, 1992, established permanent residence for Chinese nationals that came to the United States from June 5, 1989 to April 11, 1990. Over the years, the Act granted green cards to an estimated number of 54,000 Chinese nationals. The CSPA authorized the issuance of 1,000 immigrant visas to students from mainland China. However, 700 of those visas "shall be deemed to have been previously issued to natives of that foreign state under section 203(b)(5) of [the INA] in that year." The other 300 come from the EB-3 category. This theoretically reduces the base number of EB-5 visas available to China (695) to a deficit (-5) in any given year. **In effect, nationals of mainland China may only immigrate to the United States under the EB-5 program where there is insufficient demand for EB-5 visas from other countries.**

44.     As EB-5 program gains popularity in countries besides mainland China, more and more countries start to reserve EB-5 immigrant visas for their citizens and some countries like Vietnam and India are to use up their 700 EB-5 immigrant visas annually. Such high demand leaves less and less EB-5 visas to nationals of mainland China.  Chinese EB-5 investors who filed their immigration petitions in 2014 are faced with visa backlog for up to 8 years. It is estimated that by 2025, there might be no more EB-5 immigrant visas available to nationals of mainland China who had filed their immigration petitions since March 2015. **See Exhibit 9.**

45. Chinese EB-5 immigration petitioners usually place their $500,000 investment in US job creation enterprises even before their I-526 petitions are approved by USCIS. The initial term of investment loan to US job creation enterprises is 5 years. At the end of the 5 years term, **EB-5 fund managers require Chinese EB-5 investors to redeploy their investment to meet "at risk" requirement even though Chinese EB-5 investors might not become US residents for many years or never.**

46.     USCIS issued a conflicting guideline in its Policy Alert on June 15 2017 and the Alert provides that an investor must continue to be eligible for the EB-5 visa classification throughout the adjudication of his or her Form I-526 and until he or she obtains conditional permanent resident status by making an investment that remains "at risk." However, **USCIS Policy Manual Volume 6 Part G, Chapter 2 also provides that an immigrant investor's money may be held in escrow until the investor has obtained conditional permanent resident status** if the immediate and irrevocable release of the escrowed funds is contingent only upon 1) approval of the Immigrant Petition by Alien Entrepreneur (Form I-526); and 2) visa issuance and admission to the United States as a conditional permanent resident, or approval of the investor's Application to Register Permanent Residence or Adjust Status (Form I-485).

## Chinese Securities Regulations

47.     Just like in the US, securities industry is highly regulated in China.

48.     A simple google search can produce information about regulations on providing investment consulting in China, published as early as in 1997, which states: *"Article 2 Anyone who engages in the securities or futures investment consultancy business within the territory of the People's Republic of China must observe these Measures. The securities or futures investment consultancy referred to in these Measures means the directly or indirectly paid consultancy services provided by agencies*

*and their investment consultants engaged in the securities or futures consultancy business for securities or futures investors or clients through securities or futures investment analyses, forecasts or recommendations, etc. in the following forms: (1) to accept entrustment from an investor or client to provide securities or futures investment consultancy services; (2) to hold consultancy seminars, lectures and analysis meetings on securities or futures investment; (3) to publish articles, commentaries and reports on securities or futures investment consultancy in newspapers and periodicals, and to provide securities or futures investment consultancy services through such mass media as radio or television; (4) to provide securities or futures investment consultancy services through such telecommunications facilities as telephone, fax, computer network; and (5) other forms recognized by the China Securities Regulatory Commission (hereinafter referred to as the CSRC ).*

*Article 3 A business permit must be obtained from the CSRC in accordance with the provisions of these Measures to engage in a securities or fixtures consultancy business. No institution or individual shall engage in a securities or fixtures investment consultancy business in the various forms listed in Article 2 of these Measures without the permit of the CSRC. Securities dealer institutions, fixtures broker institutions and their staff shall observe the provisions of these Measures when engaging in the securities or fixtures investment consultancy business beyond the respective scope of those institutions. Article 4 Provisions of relevant laws, regulations, rules and of the CSRC must be observed and the principles of objectivity, fairness, honesty and good faith must be adhered to when engaging in a securities or fixtures investment consultancy business."*

49.     To raise investment in China by any foreign business, securities issuers shall disclose to the Chinese public to the effect that *THE INTERESTS MAY NOT BE OFFERED OR SOLD DIRECTLY OR INDIRECTLY TO THE PUBLIC IN THE PEOPLE'S REPUBLIC OF CHINA ("CHINA") AND NEITHER THIS MEMORANDUM, WHICH HAS NOT BEEN SUBMITTED TO THE CHINESE*

*SECURITIES AND REGULATORY COMMISSION, NOR ANY OFFERING MATERIAL OR INFORMATION CONTAINED HEREIN RELATING TO THE INTERESTS, MAY BE SUPPLIED TO THE PUBLIC IN CHINA OR USED IN CONNECTION WITH ANY OFFER FOR THE SUBSCRIPTION OR SALE OF THE INTERESTS TO THE PUBLIC IN CHINA. THE INTERESTS MAY ONLY BE OFFERED OR SOLD TO CHINA-RELATED ORGANIZATIONS THAT ARE AUTHORIZED TO ENGAGE IN FOREIGN EXCHANGE BUSINESS AND OFFSHORE INVESTMENT FROM OUTSIDE OF CHINA. SUCH CHINA-RELATED INVESTORS MAY BE SUBJECT TO FOREIGN EXCHANGE CONTROL APPROVAL AND FILING REQUIREMENTS UNDER THE RELEVANT CHINA FOREIGN EXCHANGE REGULATIONS.*

### US Securities Regulations

50.     Application of US securities laws to EB-5 fund-raising targeting unsophisticated foreign received little attention by EB-5 stakeholders for twenty years, until Securities and Exchange Commission ("SEC") took an enforcement action against an EB-5 regional center in SEC v. Chicago International Convention Center in February 2013.  Even today, securities laws related to EB-5 offering and EB-5 fund management is largely ignored.

51.     SECTION 17(a) OF THE SECURITIES ACT of 1933 provide that "[I]t shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly— 1) to employ any device, scheme, or artifice to defraud, or 2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not

misleading; or 3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." (*SEC v. Chicago International Convention Center, LLC).* Since then, SEC has taken numerous enforcement actions against fraudulent EB-5 fund promoters, including *SEC v. US Now LLC; SEC v. Justin Moongyu Lee; SEC v. Path America LLC et al; SEC v. EB-5 Asset Management LLC et al; SEC v. Robert Yang et al; SEC v. Kameli et al; SEC v. Ariel Quiros et al; SEC v. Charles Liu et al; SEC v. Emilio Fransciscon et al; SEC v. AJN Investment, LLC et al; SEC v. Andy Shin Fong Chen et al.; SEC v. Ronal Van Den Heuvel, et al.; SEC v. Edward Chen, et al.; SEC v. Palm House Hotel, et al.; SEC v. America Modern Green Senior (Houston) LLC, et al.; SEC v. San Francisco Regional Center, et al.*

52.      SECTION l0(b) OF THE EXCHANGE ACT, AND EXCHANGE ACT of 1934 provides that It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

53.      Under the federal securities laws, any offer or sale of a security must either be registered with the SEC or meet an exemption. Regulation D under the Securities Act provides a number of exemptions from the registration requirements, allowing some companies to offer and sell their securities without having to register the offering with the SEC. Companies that comply with the requirements of Regulation D do not have to register their offering of securities with the SEC, but they must file what's known as a "Form D" electronically with the SEC after they first sell their

securities. Before any investor subscribes to an issuer of a private placement offering, there has to be verification. What this means is that the company must take steps to ensure all prospective investors are "accredited" before selling them any securities. If the company fails to conduct this verification, they will not be in compliance with Regulation D through Rule 506(c). If this is not done properly, it will lead to future complications with the SEC, as this problem cannot be solved at a later date. Verification must happen before any sale of securities takes place. Regulation S is similar to Regulation D in that it provides exemption from registering private securities with the SEC. The main difference is that Regulation S is intended for offerings aimed exclusively at international investors. The status of an "international investor" is based more on geography rather than citizenship. For example, if an investor is physically based within the United States, that person is conserved a domestic investor, even if they are not a citizen of the country. Under Reg S, sales can only be made to non-US residing individuals. To further support this main tenet of the regulation, the second requirement states that there can be absolutely no solicitation of advertising inside the United States. In *SEC v. CMB Export, et al.* SEC charged EB-5 fund promoter for violation of Section 5(a) and (c) of the Securities Act. Section 5(a) of the Securities Act prohibits the use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell a security unless a registration statement is in effect as to such security. Section 5(c) of the Securities Act prohibits the use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy a security unless a registration statement has been filed as to such security.

54.     In addition to charge EB-5 fund promotors for securities fraud and unregistered securities offering, in *SEC v. Luca International Group, LLC et al.* and *SEC v. Serofim Muroff et al.*, SEC charged EB-5 fund promotors of Investment Adviser Fraud. Section 202(a) (11) of the Investment

Advisers Act of 1940 generally defines an "investment adviser" as any person or firm that: (1) for compensation; (2) is engaged in the business of; (3) providing advice, making recommendations, issuing reports, or furnishing analyses on securities, either directly or through publications. An EB-5 fund manager is an investment adviser due to his or her ownership, management, and control of EB-5 fund. Rule 206(4)-8 - Pooled investment vehicles provide that (a) Prohibition. It shall constitute a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of Section 206(4) for any investment adviser to a pooled investment vehicle to: (1) Make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; or (2) Otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle. (b) Definition. For purposes of this section "pooled investment vehicle" means any investment company as defined in Section 3(a) of the Investment Company Act of 1940 or any company that would be an investment company under section 3(a) of that Act but for the exclusion provided from that definition by either Section 3(c)(1) or Section 3(c)(7) of that Act.

55.     Section 3(c)(1) of the Investment Company Act of 1940 offering exemption from definition of investment company provides that any issuer whose outstanding securities are beneficially owned by not more than **one hundred persons** and which is not making and does not presently propose to make a public offering of its securities. Most commonly used exemption from definition of investment company by EB-5 fund promoters recruiting more than 100 investors is Section 3(c)(5) that generally excludes from the definition of investment company any entity that is primarily engaged in the business of purchasing or otherwise acquiring mortgages and other liens on and interests in real estate.

56.     In a No Action Letter issued to Realex Capital Corporation in 1984, the Securities and Exchange Commission did not decline to take action. Realex was looking to invest as a limited partner in a limited partnership that would own and operate a building. The SEC took the position that the interests would be "investment contracts" and therefore securities, not real estate for purposes of section 3(c)(5). Realex would be relying on the efforts of the managing partners for the success of the enterprise. In this case, Realex had only limited major decision rights. For example there was a limitation on sale, but Realex could only object if it did not receive net cash proceeds at least equal to its capital contributions.

## Sale of Securities Issued by 701 Fund, 702 Fund, AYB II Funds to Chinese Investors

57.     Plaintiff discovered that between 2014 and 2016, Ding, Mastroianni, and Developers of 701 Project, 702 Project and AYB II Project (collectively "EB-5 Projects") hosted road shows held in grand hotels in major cities in China to promote the securities issued by Defendants 701 Fund, 702 Fund, AYB Fund, all controlled by Defendant Mastroianni, to finance certain real estate developments in New York City. **See Exhibit 12.** The public and investors at the show were not disclosed with the facts that those EB-5 funds are controlled by Defendant Mastroianni, but not by the Developers of EB-5 projects. With information and belief, Defendants misled the public and investors to believe that $500,000 capital will be returned directly to the investors in 5 years by developers of EB-5 projects.

58.     Plaintiff discovered that, through online and other media advertisement in addition to public road shows, Qiaowai as agent for Ding, Mastroianni, have recruited 400 investors with $200 million for 701 Fund, about 360 investors with $180 million for 702 Fund, and at least 498 investors with $294 million for AYB II Fund (collectively "EB-5 Funds"). However, the offering documents

provide that EB-5 Funds claim Regulation D exemption to avoid registration their securities with SEC on the grounds that these Funds will not engage public promotion and advertising.

59.     Plaintiff discovered that the business scope of Qiaowai is visa consulting service according to registration information obtained from Chinese business registration search. Defendants Mastroianni, USIF used Defendant Ding and Qiaowai as the marketing agent for EB-5 funds managed by Defendants Mastroianni and USIF and pay Ding and Qiaowai transaction-based fees from the $50,000 administrative fees paid by EB-5 investors.  EB-5 investors were not disclosed with this fact because Ding, Qiaowai, Mastroianni, and USIF colluded to withhold complete offering documents from EB-5 investors.

60.     Plaintiff discovered that, at time of promoting EB-5 Funds, none of Ding ("Qiaowai Group"), Mastroianni, and Developers of EB-5 Projects were registered investment advisors in the US or in China in violation of regulations set by China Securities Regulatory Commission.  None of above parties have obtained permits to provide investment consultation to Chinese public.  Securities issued by EB-5 Funds were not approved by Chinese regulators. No one alerted investors in Chinese to seek independent financial advisor or legal counsel to evaluate the investment offering documents as majority of Chinese investor don't read English.

61.     Plaintiff discovered that staff from Qiaowai under Ding's instruction provided prospective investors with marketing brochures in Chinese on US EB-5 Immigrant Investor Program.  In the marketing brochure, it claims a) Immigrant Petitioner shall invest $500,000 in an investment project sponsored by a USCIS approved regional center and investment would be repaid in 5 years.  b) Immigrant Petitioner shall pay additional $45,000 to $60,000 in fees to cover operation and oversight cost of the immigration project. c) There is no asset requirement for the petitioner and source of

investment fund can be gifted or inherited. d) Petitioner should receive immigration visa in one and half year.

62.     Plaintiff discovered that staff from Qiaowai under Ding's instruction provided marketing brochures in Chinese on 701 Fund, 702 Fund and AYB II Fund and convinced Plaintiff's clients to subscribe to these Funds. No official offering documents were provided to some of Plaintiff's clients either in English or Chinese.

63.     Plaintiff discovered that, under Ding's instruction, Qiaowai instructed her clients to sign "Visa Consultation Service Agreement with Qiaowai. Qiaowai instructed her client to pay about $9,000 in consultation fee, $2,800 in document preparation fee to Qiaowai. Qiaowai also instructed her clients to wire $15, 000 to a Hong Kong company, Rich Most or some other businesses for "management consulting and public relations service" in lieu of immigration attorney fee.

64.     Plaintiff discovered that her clients didn't sign any retainer agreement directly with any immigration attorneys.  However, under Ding's instruction, Qiaowai instructed her clients to sign I-526 petitions prepared by Qiaowai with preparers as either Mr. Hsien Hao Chang or Mr. Donoso Ignacio.

65.     Plaintiff discovered that her clients were instructed to sign on signature pages of the document provided by Qiaowai under Ding's instruction.   The 10 plus pages documents were all in English with no Chinese translation provided.  Her clients don't read or write English. No one explained the nature of these documents. Her clients believed that they signed only immigration application forms issued by USCIS.

66.     Plaintiff discovered that, with no explanation or translation provided to her clients, Qiaowai induced her clients to sign on the signature pages of 1) the Investor Pre-Subscription Letter Agreement ("Pre-subscription Letter"); 2) Determinations of Accredited Investors Status, 3) Subscription

Agreement; 4) W-7 Form; 5) W-8BEN Form; 6) Joinder in Master Escrow Agreement; 7) Operating Agreement.

67.     According to the written communication sent by Defendant USIF, Defendant USIF acknowledged that Plaintiff's clients were instructed to sign the Subscription Agreement and Operating Agreement, and wired $548,000 to $552,000 to bank accounts controlled by Defendant USIF before Defendant USIF provided numbered Confidential Offering Memorandum. Defendant USIF returned signature pages of the Subscription Agreement and Operating Agreement countersigned by Defendant Mastroianni to Qiaowai, and under Ding's instruction, such documents were kept by Qiaowai for years from Plaintiff's clients.

68.     Under the information and belief, under Ding's instruction, Qiaowai doctored executed Subscription Agreement and Operating Agreement by attaching the signature pages signed by Plaintiff's clients and by Defendant Mastroianni and submitted them to USCIS along with other private information of EB-5 investors.

69.     Plaintiff discovered that throughout the entire subscription process, there was no registered broker-dealer from US or from China hired to conduct suitability test or verify whether those investors were accredited investors.  The pre-filled page of "Accredited Investor Status" didn't have investor's name or signature.  The form was countersigned by Defendant Mastroianni. Plaintiff's clients stated, at the time of signing subscription agreement, nobody inquired about their status as accredited investors and they didn't claim to have over $1,000,000 in net assets. Under the information and belief the investor's name on the "Accredited Investor Status" form was handwritten by Defendant Mastroianni and his staff in the US.  However, the offering documents provide that 701 Fund, 702 Fund and AYB II Fund claim Regulation D exemption to avoid registration their securities with SEC on the grounds that these Funds will accept investors who are verified as accredited investors.

70.     Plaintiff discovered that at no time during the subscription process, Defendants explained to Chinese investors that they were purchasing an interest in an EB-5 enterprise. As result they would give up total control of their investment and their investment are at risk for total loss even in the case the investors don't receive EB-5 visas.

71.     Plaintiff discovered that Qiaowai and USIF, through the marketing brochures in Chinese on EB-5 and their EB-5 Funds, misled Chinese investors to believe that they were making a 5 years loan to real estate developments and their investment were secured by the real estate development. In fact, Chinese investors purchased limited partnership interests in EB-5 Funds personally controlled by Mastroianni, and the partnership interest is not secured with direct real estate assets of EB-5 Developments. Chinese investors can't exit from these EB-5 Funds without consent of Mastroianni.

72.     Plaintiff discovered that the Pre-subscription Letter required investors to acknowledge to seek their own representatives and professional advisors, including legal counsel and accountants to evaluate the investment in these Funds.  Under the instruction of Ding, no one from Qiaowai explained the nature of Letter to investors in Chinese and alert investors to seek independent advisors.

73.     Plaintiff discovered that, in addition to visa consulting fees of over $10,000 paid to Qiaowai directly, Plaintiff's clients were required to pay $48,000 to 52,000 in administrative fee to these Funds. Defendant Mastroianni disclosed in the Confidential Offering Memorandum, documents not provided to most of Chinese investors, that most of administrative fee would be paid to Ding and Qiaowai for placing Chinese investors in these EB-5 Funds controlled by Mastroianni.

74.     Plaintiff discovered that these Funds controlled by Defendant Mastroianni charged 5.9%, 6.65% and 4.5% annual interest respectively to EB-5 Project Developers. Additionally, he charges 1.5% origination fee, prepayment fee, and loan service fee. Defendant Mastroianni disclosed in the Confidential Offering Memorandum, documents not provided to Chinese investors, that a portion of

about $30,000 annual interest income would be paid to Ding and Qiaowai for investment consulting during the course of loan made to EB-5 Projects. In contrast, Plaintiff's clients received about $105 per year on their $500,000 investment.

75.     Plaintiff discovered that, in addition to pay about $2,800 for EB-5 document preparation service, Qiaowai instructed Plaintiff's clients to wire their attorney fees $15,000 to a Hong Kong business called Rich Most for management consulting and public relations service instead of depositing in client trust accounts in a US. bank for tax evasion purpose. Plaintiff's clients were assigned to Mr. Hsien Hao Chang and Mr. Donoso Ignacio but didn't sign retainer agreements with them.  Mr. Donoso Ignacio is also the immigration counsel for Defendants USIF, Plaintiff's clients were not informed that Mr. Hsien Hao Chang and Mr. Donoso Ignacio are only immigration attorneys that don't provide advice on their investment.  Mr. Hsien Hao Chang and Mr. Donoso Ignacio made **NO** contacts with Plaintiff's clients before their I-526 Immigration Petitions were filed with USCIS. Mr. Hsien Hao Chang and Mr. Donoso Ignacio made **NO** verification of investments made by investors are legally obtained. Under the instruction of Ding, Qiaowai prepared all I-526 petitions submitted to USCIS with Mr. Hsien Hao Chang and Mr. Donoso Ignacio as preparers for these clients.

76.     The Confidential Offering Memorandum ("PPM") of EB-5 Funds provides **NO** disclosure related to selling foreign securities to the general public in China by individuals with no permit.  The PPM only provides that *"The Company is offering the Units solely to non-U.S. individuals who are "accredited investors" for purposes of Regulation D under the Securities Act of 1933, as amended (the "Securities Act"). The Company is offering the Units in reliance upon Regulation D and Regulation S under the Securities Act"* to be exempt from registration requirement. Some of Plaintiff's clients were college students in US and was not accredited investor with at least $1,000,000 in net worth at the time of purchasing a membership in EB-5 Funds.

## 702 Fund and 702 Project

77.    On Oct 1, 2013, SEC and USCIS issued an Investor Alert: Investment Scams Exploit Immigrant Investor Program. SEC and USCIS warn the investors that the fact that a business is designated as a regional center by USCIS does not mean that USCIS, the SEC, or any other government agency has approved the investments offered by the business, or has otherwise expressed a view on the quality of the investment. The SEC and USCIS are aware of attempts to misuse the EB-5 program as a means to carry out fraudulent securities offerings.

78.    The Investor Alert advises EB-5 investors to look for hallmarks of fraud including 1) Promises of a visa or becoming a lawful permanent resident. 2) Guaranteed investment returns or no investment risk. 3) Overly consistent high investment returns. 4)Unregistered investments. 5) Unlicensed sellers. 6) Layers of companies run by the same individuals.

79.    SEC advises investors to consult attorneys who specialize in securities law.

80.    Since 2014, Chinese migration agencies including Ding and Qiaowai, along with US immigration attorneys including Mr. Hsien Hao Chang and Mr. Donoso Ignacio, that promote EB-5 immigration program in China, intentionally or with gross negligence fail to inform Chinese EB-5 investors of this Investor Alert about EB-5 investment scams.  Chinese migration agents and US immigration attorneys fail to advise Chinese EB-5 investors to consult attorneys who specialize in securities law.

81.    Even though Regulation D exemption of unregistered securities prohibit public promotion, Plaintiff discovered that Defendants Mastroianni and Ding, along with management of 702 Developers, held several road shows in grand hotels in major cities in China in 2016. At Defendant

Mastroianni and his staff Sheng Jianlan gave passionate speech about 702 Project, according to the recording obtained by Plaintiff.  **See Exhibit 12** Transcription of Speech by Sheng Jianlan.

82.     Chinese investors were never given risk disclosure in the Offering documents that there is negative quota of EB-5 visas available to Chinese investors and they may have not any EB-5 immigration visas available to them if demands from other countries use up EB-5 visas reserved for these countries. When requested to provide evidence of senior loan commitment by JP Morgan as advertised during the road show, USIF provided unverified, a construction loan term sheet executed on July 20, 2017.  The term sheet seems to be valid until December 2017. However, by December 2017, USIF failed to provide senior loan commitment by JP Morgan.  The particular investor engaged Attorney Justin London of Law Offices of Justin London and in December 2017, Attorney London sent a demand letter to Defendants based on the fraud analysis provided by Plaintiff.  **See Exhibit 13.** One week later, Defendants agreed to full refund to the investor in the amount of $552,000 including capital contribution of $500,000 and management fee of $52,000.

83..    Even though Chinese investors are not provided with complete Offering documents under the direction of Chinese migration agents, the immigrating attorneys who file I-526 petitions for their clients are in possession of complete Offering documents and could easily verify information with their clients.  For the fact that immigration attorneys receive referrals from Chinese migration agents and US EB-5 fund issuers, these immigration attorneys collude with Chinese migration agents and US EB-5 fund issuers to cover up EB-5 scams against the interests of their Chinese clients who have paid $15,000 each for immigration attorneys to uphold their fiduciary duty.

84.     The Confidential Offering Memorandum of 702 Fund provides: ***The Company may not comply with the applicable securities laws of the United States -*** *This offering is not registered with the Securities and Exchange Commission and is being made pursuant to certain exemptions from*

*state and federal registration requirements. If it is later determined that the offering did not fully comply with United States federal or state law, we may be required to refund certain investors' capital contributions, plus interest. Due to our intended use of the proceeds, we likely will not have sufficient capital to return to those investors requesting a return of their capital in the event of a failure to comply with applicable securities laws. Additionally, if lawsuits for rescission are brought under the Securities Act and successfully concluded for failure to register any of our securities offerings, or for acts or omissions constituting offenses under the Securities Act or other applicable securities laws, our capital and assets could be adversely affected, jeopardizing our ability to operate successfully. Further, if any portion of the capital contributions of investors seeking a visa under the EB-5 Program are used to pay the costs of defense of a suit by the Securities and Exchange Commission or are returned to the investors seeking rescission, certain investors may be denied permanent visas under the EB-5 Program because funds were used for purposes other than to create jobs.*

85.     The Confidential Offering Memorandum of 702 Fund provides that *the security for the Mezzanine Loan will consist of a collateral assignment of any title insurance proceeds of the owner of the Borrower Property and a pledge of the direct or indirect membership interests of in the owner of the Borrower Property. The Mezzanine Loan will **<u>not be secured by a mortgage</u>** on the Borrower Property or the Project. As a result, the security of the Mezzanine Loan is limited and may not be sufficient to ensure the repayment of the Mezzanine Loan.*

86.     As described in Demand Letter sent by Attorney London to USIF in December 2017, according to the Chinese advertisement ran on one or more online Chinese websites promoting 702 Fund, Ding and Qiaowai, the marketing agent for Mastroianni and USIF, stated:

> • After the entire family immigrates to the United States, the full amount will be returned.

> • It is almost like a good investment. There is no investment risks, but with some ROI.

• In the end, the whole family gets green cards.

87.     At the roadshow on April 17, 2016, USIF staff, Sheng Jianlan, told investors that

   • their funds were "legally protected,"

   • the project has attracted enough funding commitments to ensure its completion,

   • this project was a great money-maker and had unlimited potential

88     Most important, Mastroianni also failed to disclose to the investors at the road show or in the

Offering documents of his criminal, legal, and financial history such as the following material facts

that any investor would want to know as any investor wants to know who is managing their funds:

- Between 1985 and 1993, court records show that Rhode Island police arrested Mastroianni four times for felony possession of a controlled substance. Mastroianni pleaded no contest four times, and received a suspended sentence and probation each time.

- In May 2000, Mastroianni's business Interstate Design & Construction went into receivership. Banks foreclosed on his office properties and two homes.

- In 2002, a surety bond company sued Mastroianni to recover costs of completing 28 of his soundproofing jobs and won a $1.1 million default judgment that you did not pay until December 2013.

- In July 2003, the U.S. Department of Labor sued Mastroianni accusing Mastroianni of diverting $401,361 in required employer pension fund contributions, which were to be made "no less than quarterly." The suit claimed Mastroianni illegally used the money for "various personal expenses" and to provide seed money for another business that Mastroianni owned. After the government won a default judgment, the case was finally closed in April 2006 with a negotiated partial restitution payment of $75,000.

- In September 2013, Mastroianni filed for personal bankruptcy. In that proceeding, a court-appointed trustee accused Mastroianni of "knowingly and fraudulently" lying about his assets, including hundreds of thousands in cash and retirement accounts. Ultimately, because of his lies, Mastroianni agreed that his debts would not be discharged in the bankruptcy.

- Even as legal disputes dragged on in Rhode Island courtrooms, Mastroianni relocated to Palm Beach County, Fla., where Mastroianni began operating a new company, Allied Capital & Development that specializes in projects "with the highest standards of quality and construction," according to its promotional materials. Allied's website says [Mastroianni] has been "recognized for his commitment to excellence in construction," and notes that he has "hosted numerous charitable events with both prominent sports figures and political constituents. Yet in Florida, virtually every one of the dozen or so projects Allied launched over the past decade has faced delays, lawsuits or construction problems. Allied has completed few of them.

- In July 2004, a building collapse at Allied's townhouse development in Hobe Sound, named "Tranquility," killed two workers and seriously injured several others. Allied, the developer and construction manager, faced no criminal charges or regulatory penalties, but it settled multiple lawsuits. Afterwards, Mastroianni defended the concrete contractor he had hired to a local reporter, saying Allied had "checked them out" and had "no reason to believe they caused any problems here." Local press later reported that the contractor had a history of serious safety violations and lacked workers' compensation insurance. After investigating the matter, Florida regulators barred the concrete company from doing business in the state and fined it $2.4 million. Today Mastroianni describes it as "a tragic accident on the part of the General Contractor" and insisted "my partners and I were not constructing the project and had no

involvement in the day-to-day operations." (though OSHA's final report of its investigation, dated Dec. 1, 2004, recounted the role of Mastroianni's firm in key construction decisions.) Meanwhile, a lender foreclosed on a nearby Allied townhouse development called Heron Cove after a Mastroianni-led business defaulted on a $12.3-million loan. And four other Mastroianni projects, in Cocoa and Palm Beach County, have not been built. Court records show the developments have faced lawsuits and foreclosure actions. Mastroianni recently settled with one lender who demanded an additional $6.3 million from him and a former partner, who signed personal guarantees.

- In numerous instances, Mastroianni have failed even to respond when a lawsuit is filed. For example, in 2007, owners at Marbella Villas, 54 townhouses that Allied developed in North Palm Beach, sued one of Mastroianni's companies, citing its refusal to fix "construction deficiencies and defects," which homeowners and their lawyers say included a broken water main that allegedly created a sinkhole, unfinished landscaping, a malfunctioning front gate, and structural defects. Mastroianni didn't contest the charges, and the homeowners won a $1.25 million default judgment. But they have yet to collect a penny. According to the lawyer for the homeowners, by the time the judgment had issued, Mastroianni abandoned the two corporate entities ordered to pay the judgment, allowing their registrations to lapse.

89.     Mastroianni refunded $500,000 in capital contribution and $52,000 in management fee 8 days upon receiving the demand letter from Attorney London in December 2018.  Plaintiff provided fraud analysis in drafting this demand letter.

90.     Mastroianni sets up a shadow company to the business entity that acts as General Partner for ever y EB-5 Fund he manages. 1568 Broadway Funding 100 GP, LLC is "702 Manager" while NYC

2000 Investment, LLC is "702 Fund Co-Manager" whose controlling principal is Nicholas Mastroianni, II but with no information about NYC 2000 Investment, LLC.

91.     The Offering document of 702 Fund dated March 28 2016 provides that 702 Fund will make the Mezzanine Loan to CFMDC BWAY Hotel Mezz I LLC, (the "EB-5 Loan Borrower") up to $350 million as a mezzanine loan and the title insurance proceeds of the property under development as collateral. The Property (other than the theatre (the "Borrower Property")) is owned by Times Square Hotel Owner, LLC (the "Property Owner"). According to the sign posted on construction site, visited by Plaintiff on March 27, 2019, the Owner is Times Square Hotel Owner, LLC at 142 West 57th Street, New York, NY 10019.

92.     Under information and belief, Mastroianni caused a loan agreement signed on July 20, 2017 between 702 Fund and CFMDC BWAY Hotel Mezz I LLC with CFMDC BWAY Hotel Mezz I LLC as 702 Fund Borrower.

93.     The Operating Agreement of 702 Fund provides that 702 Fund has been formed for the purpose of making a loan (the "Mezzanine Loan") to the Borrower for the funding of the Project. Under information and belief, Mastroianni caused a wire transfer to CFMDC BWAY Hotel Acquisition LP first of $160 million on July 20, 2017 and later of over $7 million on or about Nov 7, 2018. CFMDC BWAY Hotel Acquisition LP is **NOT** 702 Fund Borrower pursuant to the loan agreement signed on July 20, 2017 between 702 Fund and CFMDC BWAY Hotel Mezz I LLC.

94.     Only in March 2019 in an effort to solicitate redeployment loan from certain investors of AYB II Fund to finance 702 Project that USIF disclosed that Maefield Development, Fortress Investment Group and L&L Holding have purchased the hotel portion of 1568 Broadway for $200 million on July 20, 2017, with a recorded lien of $162,874,240.  USIF didn't disclose if the lien holder is JPMorgan Chase or 720 Fund that possibly provided $160 million.  JPMorgan Chase provided $75

million for the hotel purchase in addition to previously providing $175 million in financing on the hotel portion of the building. Maefield Development, Fortress Investment Group and L&L Holding are the developers of 702 Project that owns CFMDC BWAY Hotel Acquisition LP, CFMDC BWAY Hotel Mezz I LLC and Times Square Hotel Owner, LLC and 30 other business entities related to 702 Project. See Exhibit 1. Mastroianni and USIF never disclose such complicated business structure to members of 702 Fund.

95.　　Times Square Hotel Owner, LLC (the "Property Owner") of 702 Project entered a construction loan term sheet with JPMorgan Chase Bank in the amount of $1.3 billion on July 20, 2017 which expired in December 2017 without construction loan provided to Times Square Hotel Owner, LLC. Mastroianni and USIF never disclose such material fact to members of 702 Fund.

96.　　Unknown to members of 702 Fund, 702 Developers and Mastroianni caused AMENDED AND RESTATED MEZZANINE LOAN AND SECURITY AGREEMENT ("MEZZ Loan Agreement" that USIF to be entered on December 12, 2018 between 702 Fund (in Note A at 6.65% and Note B at 7.65% interest rate) and 701 Fund (in Note C at 13% interest rate) and/or possible AYBII Fund (in Note D at 13% interest rate) with CFMDC BWAY Hotel **Mezz** I LLC, CFMDC BWAY Retail **Mezz** I LLC, and CFMDC BWAY Signage **Mezz** I LLC (collectively EB-5 Borrower) in the aggregate principal amount of $494,500,000. **See Exhibit 14.** The MEZZ Loan Agreement has not been provided to members of 701 Fund, 702 Fund or AYB II Fund since it was signed on December 12, 2018. In January 2019, Plaintiff requested a copy of loan agreements to conduct due diligent for a member of 701 Fund to make decision on redeployment.

97.　　Unknown to members of 702 Fund, 702 Developers issued two REIT offerings in February 2018 for $125,000 each to 125 individuals or entities with $5 million net worth as qualified investors and paid $1,000 each to become a shareholder of these two REITs, CFMDC BWAY Retail LLC

("Retail REIT") and CFMDC BWAY Signage LLC ("Signage REIT"). **See Exhibit 15.** The 100 shareholders in each REIT are eligible to receive distribution of $100,000 a year. 702 Developers set minimum release price for assets for Retail REIT and Signage REIT at $714,465,000 and $184,860,000 respectively.

98.     Unknown to members of 702 Fund, 702 Developers arranged on December 12, 2018 Building Loan Agreement (**Exhibit 16**), Senior Loan Agreement (**Exhibit 17**),, and Project Loan Agreement (**Exhibit 18**), (collectively "Senior Loan Agreement') for a mortgage loan in the aggregate principal amount of $1,125,000,000 between GOLDMAN SACHS BANK USA and Times Square Hotel Operating Lessee, LLC, TIMES SQUARE HOTEL **OWNER**, LLC, CFMDC BWAY **OWNER** LLC, and CFMDC BWAY SIGNAGE **OWNER** LLC.

99.     Unknown to members of 702 Fund, 702 Developers formed on December 12, 2018 CFMDC BWAY Hotel **Pledgor** LLC, CFMDC Retail **Pledgor** LLC and CFMDC BWAY Signage **Pledgor** LLC, each a Delaware limited liability company. Together with TIMES SQUARE HOTEL **OWNER**, LLC, these newly formed entities are called "Sole Member". On December 12, 2018 the Sole Member made certain Pledge and Security in favor of GOLDMAN SACHS BANK USA with respect to the pledge of all of Sole Member's equity interest ("Mortgage Collateral") in TIMES SQUARE HOTEL **OWNER**, LLC, CFMDC BWAY **OWNER** LLC, and CFMDC BWAY SIGNAGE **OWNER** LLC. On the same day, CFMDC BWAY Hotel **Mezz** I LLC, CFMDC BWAY Retail **Mezz** I LLC, and CFMDC BWAY Signage **Mezz** I LLC (collectively EB-5 Loan Borrowers) made certain Pledge and Security ("EB-5 Collateral") in favor of EB-5 Lender with respect to the pledge of all of their equity interests in CFMDC BWAY Hotel **Pledgor** LLC, CFMDC Retail **Pledgor** LLC and CFMDC BWAY Signage **Pledgor** LLC. Such complicated investment structure was never disclosed to members of 701 Fund, 702 Fund and AYB II Fund that provide financing for 702 Project.

100.     The Offering document of 702 Fund dated March 28 2016 provides that 702 Fund's security for the Mezzanine Loan will include, but is not limited to, **(i) a collateral assignment of any title insurance proceeds of the owner of the Borrower Property** and (ii) depending upon the security provided to the Senior Lender in connection with the Senior Loan, (A) a first priority pledge of the ownership of 100% of the membership interests of the Borrower in the owner of the Borrower Property or (B) a first priority pledge of the ownership of 100% of the membership interests of the Borrower in an entity that indirectly owns the owner of the Borrower Property.  The security of a collateral assignment of any title insurance proceeds of the owner of the Borrower Property was removed on December 12, 2018.

101.     Unknown to members of 702 Fund, Senior Loan agreement made by 702 Developers on December 12, 2018, with permission of Defendants, provides that "Permitted Preferred Common Equity" means an indirect equity interest in the EB-5 Borrower that entitles the PPCE Holder to receive a preferred return on its equity that is prior to the common equity and to approve customary "major decisions" but that has (a) no mandatory redemption date prior to the Extended Maturity Date, **(b) no pledge of equity or other collateral,** (c) no right to cause a change of Control of [Senior Loan] Borrower or any Guarantor, (d) remedies that, in [Senior Loan] Borrower's reasonable discretion, are customarily given to holders of preferred equity that is structured like debt but excluding, in all cases, any of the remedies prohibited in clauses (a)-(c) above, and (e) all proceeds of the Permitted Preferred Common Equity (net of out-of-pocket transaction costs and expenses) shall be contributed to [Senior Loan] Borrower and spent on the Project.

102.     The Offering document of 702 Fund dated March 28 2016 provides that, under the Term Sheet for the Mezzanine Loan, the Borrower does not have any obligation to accept the Mezzanine Loan unless the Company is able to fund a Mezzanine Loan of at least $250,000,000 by the Threshold Date

(March 15, 2017). Accordingly, if the Company sells less than 500 Units in the Offering, the Borrower could elect to obtain alternative financing. If the Borrower exercises this option, the Manager will refund to the subscribers their Capital Contributions of $500,000 and $42,000 of their Administrative Fees unless such funds have been advanced to the Borrower under the Mezzanine Loan.

103.    Under information and belief, 702 Fund was unable to fund a Mezzanine Loan of at least $250,000,000 by the Threshold Date (March 15, 2017).  In 2018, EB-5 Borrower and Property Owner have elected to obtain alternative financing including $144,500,000 from 701 Fund and $780 million in new equity in December 2018 as reported by USIF and 702 Fund.

104.    In December 12 2018, Defendants executed the AMENDED AND RESTATED MEZZANINE LOAN AND SECURITY AGREEMENTS ("702 MEZZ Agreement") with Developer of 1568 Broadway Development ("702 Development").  Defendants didn't disclose the specific loan term of the 702 MEZZ loan with members of 702 Fund before or after the execution.

105.    Defendants claimed they issued supplement to 2016 PPM on supplemented on April 19, 2017, July 27, 2017, April 13, 2018, July 24, 2018 and October 18, 2018.  One of Plaintiff's clients in 702 Fund said he never received it even though he is right in the US for college.

106.    With Defendants' consent, the 702 MEZZ agreement is substantially different from the term sheet disclosed in the 2016 PPM and the changes are adverse to the interests of members of 702 Fund while provides an instant payout of $44,661,772.77 to the Defendants.

107.    With Defendants' consent, the 702 MEZZ agreement has increased maximum mezzanine loan amount from $350 million to $494.5 million. 2016 PPM made representation that there would not be an increase of mezzanine amount. The 2016 PPM capped mezzanine financing at $350 million.

108.    With Defendants' consent, the 702 MEZZ agreement provides that, if 702 fund fails to sell 700 units to raise $350 million by December 31, 2019, 702 Developer will arrange a new mezzanine loan and 702/701 EB-5 fund has to subordinate to the new mezzanine loan.

109.    With Defendants' consent, the 702 MEZZ agreement provides only equity interests of newly registered (on December 12, 2018) affiliates of 702 Developer as collateral to the loan provided by 702 Fund. The 2016 PPM provides that title insurance proceeds of property owner of the real estate under development as collateral to the loan provided by 702 Fund.  Unknown to EB-5 investors from 701 Fund and 702 Fund, the 702 MEZZ agreement provides EB-5 financing as preferred equity to the 702 Property owner to secure senior loan with Goldman Sachs Bank. 2016 PPM didn't disclose to 702 members that 702 Fund will be in form of preferred equity for 702 Developer.

110.    Given such development, the member of 702 Fund, Member Y, represented by Attorney Janet Esagoff and through court action in New York in March 2019, requested to exercise right of rescission and return of $500,000 in capital contribution and management fee.  Mastroianni and USIF denied his request on the excuse that 702 Fund transferred to CFMDC BWAY Hotel Acquisition LP **without** any written agreement. In addition, Mastroianni and USIF filed sanction against the member and his attorney even though Mastroianni and USIF failed to prove that the transfer of EB-5 Loan to CFMDC BWAY Hotel Acquisition LP meets EB-5 job creation requirement.

111.    In exchange of return of $500,000, Mastroianni and USIF even asked Member Y to find another investor as a substitute.  Member Y denied such request.

112.    Without consent from members of 702 Fund, Mastroianni and USIF changed the Threshold Date from March 15, 2017 to December 1, 2019.

113. Unknown to members of 702 Fund, 701 Fund and AYBII Fund, Mastroianni and USIF received $44,661,772.77 in compensation on December 12, 2018 when they caused the execution of MEZZ loan agreement.

**Redeployment of 701 Fund to Finance 702 Project in 2018 and**

**Collusion with Fieldstone to Fix Refund of Exiting Members**

114. By end of 2017, 702 Developers failed to raise sufficient equity and EB-5 loan and JPMorgan Bank didn't provide a construction in the amount of $1.3 billion according to a loan term sheet executed between 702 Developers on July 20, 2017. Mastroianni and USIF never disclose such material fact to members of 702 Fund or later to members of 701 Fund during the redeployment process.

115. Plaintiff discovered that in February 2018 702 Developer orchestrated to buy out Borrower/Developer of 701 Fund before 701 Development funded by 701 Fund was completed, and, together with Defendants, orchestrated an early payment to 701 Fund. 702 Developers devised a plan to relocate $200 million of EB-5 loan in 701 TSQ 1000 Funding, LLC to make up the equity shortfall for the 1568 Broadway Development. They effected a buy-out of majority interest owner of 701 Time Square Edition Hotel and took over the control of $200 million of EB-5 loan associated with the project in about February 2018. 702 Developers conspired with some of Defendants for a plan to make early repayment of EB-5 loan out of 701 Time Square Edition Hotel development on the condition that EB-5 loan would be redeployed into 702 Development.

116. On May 18 2018, Defendant 701 TSQ 1000 Funding LLC and its General Partner sent a letter to members of 701 TSQ 1000 Funding LLC about early repayment and intent to redeployment without

disclosing the project of redeployment. **See Exhibit 19.** Plaintiff discovered that Respondents sent a letter to members of 701 Fund in May 2018 that the sale of 701 Development would cause early repayment of $75 million of the Company's $200 million loan and Defendants would seek members' consent to redeploy the partial repayment to a different project without option for members to withdraw due to early repayment.

117. The PPM of 701 Fund provides *that the Company intends to avoid registration as an investment company pursuant to the exemption under Section 3(c)(5)(C) of the 1940 Act, which is available for entities primarily engaged in the business of purchasing or otherwise acquiring mortgages and other liens on and interests in real estate. The exemption generally applies if at least 55% of a company's assets are comprised of qualifying assets and at least 80% of its assets are comprised of qualifying assets and real estate-related assets. For these purposes, qualifying assets generally include mortgage loans and other assets that are the functional equivalent of mortgage loans, as well as other interests in real estate."* 701 Fund *"will seek to structure the Company Loan so that is treated as a qualifying asset under the 1940. Nevertheless, there is a risk that the Company could be deemed to be an investment company, which would result in the dissolution of the Company.* **See Exhibit 20.** Defendants USIF, 701 Fund, 701 and Manager never provide any evidence that how 701 Fund meets exemption of registration from SEC beyond their verbal claim.

118. Plaintiff learned that in May 2018 about 10 members of 701 Fund went to Qiaowai's office in Beijing and demanded Ding to return their investment and they would withdraw from the Company. Under Ding's instruction, Qiaowai rejected investors' demand and told them to sue.

119. Plaintiff learned that members of 701 Fund started to organize and seek independent legal counsel. About 10 members of 701 Fund reached out to Plaintiff. Between June and September 2018, about 12 members of 701 Fund engaged Litowitz to represent them in their demands for return of

their investment. Plaintiff provided fraud analysis of USIF and 702 Project and assisted communications between Litowitz and members of 701 Fund.

120.    Plaintiff discovered that on June 5 2018, Defendants sent members of the Company a Consent Solicitation Letter for 701 TSQ 1000 Funding LLC proposing amending Operating Agreement and authorizing Defendants unchecked discretion to redeploy investment to join 702 Project ("Proposal" **See Exhibit 21**) with a voting deadline on July 5, 2018.

- Option 1 - I CONSENT to the Amendment Proposal and ELECT to have my capital contribution reinvested into Target Investments.

- Option 2 -  I CONSENT to the Amendment Proposal and DO NOT elect to have my capital contribution reinvested into Target Investments (and understand that if the proposal is approved, I will be designated a Non-Reinvesting Member who will not earn the Current Return and Accrued Return and my investment may be deemed not to be "at risk" and my petition could be denied by USCIS).

- Option 3 - I DO NOT CONSENT to the Amendment Proposal and DO NOT elect to have my capital contribution reinvested in Target Investments (and understand that whether or not the proposal is approved my investment may be deemed not to be "at risk" and my petition could be denied by USCIS. Further, **I acknowledge I may not receive a return of my capital contribution until such time as ALL members' I-829 Petitions are adjudicated**).

121.    As of June 2018, none of members in 701 Fund has received immigration visas as Chinese EB-5 investors face visa backlog since May 2015. Due to Chinese Student Protection Act of 1992, all EB-5 visas available to nationals of mainland China have been pre-approved for about 54,000 Chinese students and their family members in 1992. As result, nationals of mainland China may only immigrate to the United States under the EB-5 program where there is insufficient demand for EB-5

visas from other countries. Defendants USIF and 701 Fund never disclosed to members of 701 Fund the possibility of no EB-5 visas available to some of members.

122. Facing uncertainty of visa backlog, some members of 701 Fund decided to terminate their immigration process. They wanted to take back their investment and exit from 701 Fund. However, the Consent Solicitation Letter would not give exiting members an option to take back their investment.

123. Plaintiff discovered that on or about June 20 2018 Defendant Mastroianni sent his CFO Mark. Giresi and USIF's immigration counsel Mr. Donoso Ignancio to China to sell its redeployment plan. With Ding's instruction, Qiaowai arranged several meetings between USIF delegation and Chinese members. USIF delegation was met with angry Chinese members who objected to the Proposal and who demanded to withdraw from 701 Fund.

124. Plaintiff discovered that, under such pressure, Defendant USIF sent a supplement letter on June 25 to allow members to withdraw from 701 Fund on the condition that the exiting member must vote to approve the Amended Operating Agreement to eliminate Defendants' fiduciary duties and authorize Defendants' unchecked discretion in future investment decision.

125. To ensure the success of redeploying $200 million to finance 702 Project, Defendants devised an elaborate plan to counteract dissidents. Defendants set up two battle fronts to maximize votes on Option 1 and Option 2, both of which will give Defendants the authorization to redeploy to 702 Project. Defendants USIF and Qiaowai would use scare tactic or deceit so even the exiting members will not choose Option 3.

126. Under information and belief, Defendants Ding and Qiaowai had their agent with WeChat ID as "Linda" to infiltrate WeChat groups to recruit dissident members of 701 Fund away from Litowitz and Reid & Wise and to be represented by USIF's previous securities counsel Fieldstone. In June

2018, a member from 701 Fund informed Plaintiff that a person with WeChat ID as "Linda" had relentlessly discredited Plaintiff in WeChat groups, even though Plaintiff didn't know about this individual. Plaintiff reached out and confronted "Linda". "Linda" claimed that Fieldstone was the most qualified attorney and had much better qualification than Litowitz that Plaintiff worked with. Even though Plaintiff informed "Linda" that Fieldstone was a former securities counsel for USIF and had conflict of interests with members of 701 Fund and could not help both exiting members and green-card seeking members, "Linda" ignored such fact and set up a WeChat group for Fieldstone with over 125 members from 701 Fund. "Linda" arranged a video conference between Fieldstone and potential clients from 701 Fund. As Plaintiff informed "Linda" that Litowitz would initiate a lawsuit against Defendants USIF and 701 Fund on behalf of his clients for right of rescission and return of capital investment plus interests and costs based on Defendants USIF and 701 Fund's securities violation, under information and belief, such information was passed on to Mastroianni and Fieldstone. In June and July 2018, Mastroianni and Fieldstone colluded on the strategy to counter demands of exiting members in term of procedures and amount of refund to the exiting members.

127.    After an article from the Real Deal on June 13, 2018 quoted Fieldstone's statement that he expected that most of the investors in 701 Seventh were willing to work with USIF to redeploy to other projects, "Linda" vehemently tried to diffuse suspicion of collusion from exiting members between Fieldstone and USIF in conjunction with Fieldstone's junior attorney, Wen Qian.

128.    On or about June 15, 2018 Fieldstone sent retainer agreement to some exiting members of 701 Fund. **See Exhibit 22.** In his retainer agreement, Fieldstone didn't disclose conflicts of interests existing where he represent both exiting members and green card seeking members at the same time in addition to the conflicts of interests where Fieldstone maintains close business relationship with

USIF.   Later in Aug 2018 sent a letter to New York Court in support of USIF against 100 other green card seeking members of 701 Fund in the New York Action.

129.   When recruiting exiting members, Fieldstone made representation that he would not advise exiting members to vote Option 2 in exchange for right to exit. Fieldstone found other provisions in the documents that gave exiting members the right to exit.   One client found Fieldstone not trustworthy and cancelled her agreement with Fieldstone and got her $1500 back.   When some exiting clients were angry with Fieldstone about misleading them to selection Option 2 to approve USIF's new operating agreement in exchange of $500,000 and started trouble with Fieldstone's firm, "Linda" came out to blame those angry clients for not following Fieldstone's advice.   **See Exhibit 23.** Another client only discovered Fieldstone's misrepresentation on about June 30.   She also cancelled agreement with Fieldstone but Fieldstone refused to return $1500 to her.   These two exiting members eventually retained Litowitz and Plaintiff and exited 701 Fund **without** taking any of USIF's options.

130.   Between June 25 and vote deadline of July 5, 2018, Fieldstone successfully convinced two dozens of his exiting members to vote Option 2 in support of Defendants while a dozen of his clients refused to choose Option 2 initially.   The votes of Consent were counted on July 5, 2018. However, there was no official announcement of the results in term of number of votes for Option 1, Option 2, Option 3 and those abstained from voting. On July 5, only news about vote count was from "Linda", who told WeChat group that the redeployment was approved with 236 votes.   Linda's statement was later confirmed by Wen.

131.   On July 11. USIF made a new announcement to those requested to withdraw during the open period to do so before July 5, saying they would issue the requisite forms and return their capital. USIF didn't require exiting members to vote.   **See Exhibit 24.** With intention or gross negligence, Fieldstone and his junior attorney Wen didn't inform the last group of exiting clients about the

announcement from USIF on July 11. When USIF extended deadline to July 12, Fieldstone and his junior attorney Wen pressured once again last group of his exiting clients to choose Option 2 in support of Defendants. Fieldstone and Wen colluded with Defendants to punish the second group of exiting members for not making such decision on July 5 by not to return their capital after 60 days. The first group of exiting members who chose Option 2 on July 5 received their capital within two weeks.

132. During the redeployment process, USIF and 701 Fund engaged a very reputable attorney, Michael Zuppone of Paul Hastings LP of New York. With this particular announcement discovered by Plaintiff and presented Mr. Zuppone, Litowitz and Mr. Zuppone reached an agreement to return capital to exiting clients. Exiting clients represented by Litowitz didn't vote on Defendants' Proposal and received their capital as little as in one day when USIF received the withdrawal documents.

133. Under information and belief, Fieldstone bypassed Zuppone and worked with Mastroianni and USIF directly even though Fieldstone knew Mastroianni and USIF were represented by Zuppone at the time. When told that clients of Plaintiff would be receiving their capital in two weeks, Wen told her clients some irrelevant facts about exiting clients represented by Reid & Wise not receiving their capital soon and asked her clients to be patient. **See Exhibit 25.** Wen was dismissed from her firm a few days later.

134. Discovered that Fieldstone and Wen were soliciting clients, and some of those have already received retainer agreements from Litowitz, Plaintiff filed a complaint with compliance attorney at Saul Ewing Arnstein & Lehr LLP. The compliance attorney at Saul denied such allegation.

135. Even though USIF made announcement on July 11 to those requested to withdraw during the open period to do so before July 5 and promised to issue the requisite forms and return their capital, USIF drafted Request to Withdraw and Consent to Withdraw documents to mislead exiting members

to believe they would receive their capital in 30 days. Fieldstone didn't explain to his clients that they were not entitled to 30 days return of capital by signing USIF's documents. Qiaowai tried to force these documents on one of Litowitz's client to sign documents on July 12. When the client refused, Qiaowai contacted the client's father in China to pressure her sign. Through WeChat Plaintiff supported the client against pressure from Qiaowai and explained to her father that Litowitz had reviewed the documents and the documents didn't promise 30 days return of capital. Qiaowai's verbal promise would not stand in court if the client didn't receive capital in 30 days and choose to sue. Plaintiff stayed up to midnight to communicate Litowitz's message to the client's father in China. Eventually Qiaowai backed down. Litowitz drafted Request to Withdraw and Consent to Withdraw documents with specific condition of 30 days return of capital for his clients. USIF refused to accept Litowitz's Withdraw and Consent to Withdraw documents. As a fraud investigator, Plaintiff confirmed with USIF the timeline of return of capital through email. After such confirmation, Litowitz instructed his clients to sign USIF's Withdraw and Consent to Withdraw documents and the client received her capital in ONE day after USIF received her documents.

136. Attorney Litowitz sent a demand letter before voting deadline to Defendants on behalf of 5 exiting members to request their rights of rescission of unregistered securities sold to them. These exiting members requested refund of $550,000 of investment and interest earned on $500,000 capital contribution.

137. Defendants rejected the demand filed by Litowtiz. Defendants requested Litowitz and Plaintiff's clients to vote Alternative 2 in order to receive $500,000. Litowitz refused to such demand.

138. On July 9 2018 more than 100 members of 701 Fun,d, represented by Reid & Wise filed a lawsuit in New York State Court ("New York Action") to stop their money from being redeployed into 702 Development in the form of a $200 million preferred equity investment into the 702 Project.

139.    The EB-5 investors allege in the lawsuit that during a recent vote on a redeployment plan, USIF "coerced" them into choosing the option that most benefited itself. For example, the Proposal outlined the following conflicts of interest and self-dealing by Defendants:

- "Conflicts of interest associated with investments in different levels of the capital structure. . . . [702 Fund] affiliate may manage an investment made at a different level of the project's capital structure, and such investment may be senior to and have rights and interests different from the investment made by the Company."

- "[T]he Manager will have interests in the [702 Project] that are different from the interests of the Company, and it is possible that such interests may conflict with those of the Members."

- "The Amended and Restated Operating Agreement has not been negotiated atarm's length. The Manager has developed the Amendment Proposal and has established the terms of the Amended and Restated Operating Agreement, which were not the result of negotiations on an arm's-length basis . . . . [The terms of the reinvestment] were determined by the Manager and are not based on a prevailing market survey or other independent criteria."

- "In connection with the USIF Mezzanine Loan [for 702 Project],the USIF Mezz Loan Manager [an affiliate of Defendants controlled by Mastroianni] would receive significant fees and other compensation from the New Developer or its affiliates."

- "The Manager may structure its financial interest in the Company so that one ormore of the operators of the authorized immigration agencies utilized by the Company in connection with the offering of Units (the "Co-Owner") "Co-Owner" [**Qiaowai**]participates in the distributions made to the Manager pursuant to the Amended and Restated Operating Agreement. The level of participation will be determined at the time of investment."

- "The Manager may receive significant origination and other fees and other compensation from developers in connection with the origination of Target Investments. These fees will be retained by the Manager."

- "The Manager may pursue transactions that provide its affiliates with economic and tax benefits not shared with the Members."

140.    On June 25, USIF added a new interpretation to Option 2 that exiting members can receive their capital contribution back within 30 days if they choose Option 2 to approve the Amendment. Exiting members can contact USIF and Qiaowai directly for return of capital contribution without representation by an attorney.

141.    Defendants engaged in scare tactics and false threats during the 701 Fund Redeployment. In its campaign to lobby for votes, Defendants have stooped to base intimidation and clearly punitive measures to create an inequitable "take it or leave it" situation.

142.    In a PowerPoint used to persuade investors to vote for the Proposal in June 2018 in China, Defendants pressured the investors to vote for the proposal out of a concern that otherwise they will notify USCIS that the investors' EB-5 capital is no longer "at risk" and that they therefore will not receive a green card:

> "*AS A REMINDER THE VOTING FORM WILL BE THE PRIMARY EVIDENCE WHEN FILING YOUR I-829 PETITION NEEDED TO SHOW THAT YOU HAVE SUSTAINED YOUR INVESTMENT AT RISK. USCIS WILL BE MADE AWARE OF YOUR CHOICE AND IF YOU DO NOT REDEPLOY OR FAIL TO RESPOND, THEN USCIS WILL KNOW YOUR CAPITAL IS NO LONGER AT RISK.*"

143.    The PowerPoint similarly warns investors that if they vote against the Proposal, "Your capital will not be redeployed," and that "Investors that check box 3 or do not return a vote will have their

capital held by the NCE [the Company} in a depository until such time all of the members I-829 petitions have been approved (per the terms of the original Operating agreement)."

144. Similar statements were repeated throughout the solicitation materials and in emails and WeChat messages, in which the Investors were advised that if they did not approve the Proposal, their funds would be left in bank deposits and their capital would not be deemed "at risk" for EB-5 purposes. For example, in an email dated June 28, 2018 from Defendant USIF to the Investors, USIF warned the Investors that: "[W]e are writing to remind you that your voting form must be submitted in a week by July 5, 2018. THIS DEADLINE IS FINAL and necessary to timely redeploy the funds and close the proposed deal. Failure to respond will be deemed a "no" vote for purposes of redeploying your funds. Final votes (or nonvotes) and supporting document will be submitted to USCIS after July 5 such that USCIS will be aware that your capital is no longer at-risk should you chose not to redeploy yours funds or fail to timely respond." (emphasis added)

145. In another email dated July 3, 2018, Defendant USIF made the same threat to the Investors: "Following the conclusion of the July 5 voting, we will promptly confirm your voting selection with you. For those who did not vote we will confirm that you chose not to sustain your investment at risk and USCIS will be notified of the same in accordance with our reporting obligations."

146. On July 5, 2018, the date of the voting deadline, Defendant USIF reiterated the same threat to the Investors.

147. Defendants' Option 2 exacerbates the coercive nature of the consent solicitation. The coercive nature of the consent solicitation is compounded by "Option 2," which purports to allow the investors to request immediate withdrawal of their capital (without need to engage legal counsel), but only if they vote in favor of the Proposal to Redeploy capital to the 702 Project.

148.    Defendants' Option 2 improperly tangles the investors' right to withdraw their EB-5 capital with a vote in favor of the amendment proposal --even though these investors will have no continuing interest in the company and no further concern regarding the safety and liquidity of the redeployed capital. There is no legitimate reason to condition the investors' right to withdraw from the 701 Project on a vote in favor of redeployment to the 702 Project and doing so unfairly seeks to pit the withdrawing investors against those investors who oppose the 702 Project.

149.    Under the existing Operating Agreement, investors have a clear right to withdraw their capital once the Developer repays the loan. Section 11.8(a)(ii) provides: "The Cash Flow that arises from any repayment of principal under the Loan shall be allocated to the Members." Section 11.8(c) provides: "The portion of the Cash Flow allocated to the Members under Section 11.8(a)(ii) will be distributed to the Members in return of their Capital Contributions. These distributions will be allocated amount [sic] the Members in proportion to the amount of their Capital Contributions."

150.    There is no legitimate reason why a vote in favor of the Proposal is required as a condition to being permitted to withdraw. It is a purely coercive vote-grabbing ploy by Defendants.

151.    To make matters worse, Defendant USIF promised to reward those investors who voted in favor of Option 2 and to punish investors who voted against the proposal. Thus, USIF announced that even if the vote did not pass, investors who selected Option 2 would be permitted to withdraw in an expedited process, whereas investors who voted against the Proposal would remain indefinitely locked in. USIF explicitly wrote in its Supplement to the Proposal: "Even if the Amendment Proposal is not approved, the Manager plans to exercise its discretion under the existing Operating Agreement to permit Any Member who elects Option 2 . . . to withdraw from the Company no later than 30 days following the repayment of the EB-5 Loan in full. . .."

152.    Prior to the voting deadline, Defendant USIF stated that the only way to ensure the withdrawal of the investor's capital was to vote for Option 2: "The simplest way to expedite a return of your capital should you wish to end the EB-5 process is to vote for [Option] 2 by July 5[.]" "[F]or those of you who vote for [Option] 2 ahead of the July 5 deadline, we anticipate a fast and easy withdrawal process for the 100% return of your capital contribution as we have now been repaid in full by the Developer. Refusing to vote will significantly slow down this process."

153.    There is no legitimate reason that the process of returning capital contributions to exiting member of the Company should be "slow[ed] down" for investors who did not vote for the Proposal. It is a transparently coercive device to garner more votes in favor of re-investing in the 702 Project.

154.    Despite announcing that they had sufficient votes for the Proposal to pass, Defendants have refused despite request to provide the vote numbers or any other information to enable Petitioners to assess the voting process.  Under information and belief, Defendants didn't receive over 200 votes for Option 1 in favor of Re-investment in 702 Project on July 5 2018.  Only with assistance from Fieldstone who convinced his exiting clients to approve the Amended Operating Agreement that Defendants used its power as Manager to force the re-investment in 702 Project.

155.    The coercive voting process was detailed in Verified Petition for an Injunction in Aid of Arbitration filed on July 9, 2018, 4 days after voting deadline, by 124 green card seeking members of 701 Fund in SUPREME COURT OF THE STATE OF NEW YORKCOUNTY OF NEW YORK ("New York Action").

156.    The New York Action specifically requested an order to enjoin Defendants from carrying out the Proposal that contained the following defects:

-    Elimination of Fiduciary Duties

-    Conflicts of Interest

- Self-Dealing

- Undue Risk (in form of preferred equity) / Lack of Diversification

- Illiquidity

- Abnormally high management fees versus low return to EB-5 investors

157.    Mastroianni and USIF placated 100 members in the New York Action with half-hearted settlement offer to redeploy their funds in the form of mezzanine loan instead of preferred equity and New York Action was withdrawn.  However, unknown to these members who filed the New York Action, their investment was still in the form of preferred equity in 702 Project when Defendants USIF and 701 Manager executed MEZZ Loan Agreement just three months later.

158.    Throughout the EB-5 process, Plaintiff's clients were subject to misrepresentation and coercion by the Defendants in

- Failure to provide Confidential Offering Memorandum prior to subscription

- Failure to inform and attempt to influence the right to be represented by independent Chinese counsel and advisor in 2014 and 2018

- Coercion to sign a booklet of signature pages with not Chinese translation

- Coercion to be advised only by Defendants who has no qualification or registration with SEC.

- Coercion to purchase limited partnership interest instead of mortgage note.

- Coercion to give up any control of their EB-5 investment and surrender it to Mastroianni.

- Coercion to give up participation of 701 Fund's profit

- Coercion to allow interest income of about $29,000 a year paid to Qiaowai while retaining about $105 a year.

- Coercion to accept return of $500,000 out of $550,000 investment and allow the difference of $50,000 fee to Qiaowai

- Coercion to pay $15,000 legal fee without being fully represented by US immigration attorneys

- Coercion not to sign retainer agreements directly with US legal counsel.

- Coercion to sign consent letter to release Defendants from any legal claim in 2018

159. Since August 12, 2018 Plaintiff has been providing due diligence research and fraud analysis for one re-investing member of 701 Fund, Member X. As she was represented by Litowitz instead of Ronnie Fieldstone or Reid and Wise of New York Action, Member X was requested to sign a special consent letter to exclude fiduciary duties of 701 Fund. Member X was a former client of Reid and Wise of New York Action. Member X provided Plaintiff the settlement terms of New York Action. Member X didn't want to accept redeployment to 702 Project of the settlement term.

160. The Consent Letter labeled as USIF Consent Form Litowitz Client provides *"Capitalized terms used herein but otherwise defined shall have the meanings ascribed to them in the Operating Agreement of 701 TSQ 1000 Funding, LLC (the "Company"), dated July 5, 2018 (the "Operating Agreement"). "You irrevocably and unconditionally release and discharge 701 TSQ 1000 Funding, LLC, U.S. Immigration Fund, LLC, U.S. Immigration Fund – NY, LLC, the Developer, Escrow Agent and their predecessors, successors, subsidiaries, affiliates, officers, directors, general partners, managers, employees, attorneys, insurers, agents, representatives and assigns, past, present or future (the "Releasees") from any and all claims, losses, liabilities, obligations, suits, debts, liens, contracts, agreements, promises, demands and damages, of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, that the Investor ever had or which were actionable prior to the date of this Member Consent Letter, related to or arising out of the subscription*

*agreement, operating agreement, escrow Agreement and the related 701 TSQ project and offering."* This re-investing client rejected such coercive consent letter.

161.    On December 12, 2018, Defendant 701 Fund pressured Member X to sign a consent letter to redeploy her capital to 702 Project.  When Plaintiff informed USIF counsel that the investor was not provided with the proposed MEZZ Loan agreement with 702 Developer/Borrower and could not make any decision, USIF counsel got angry and threated to report her to USCIS if she didn't agree to re-investing her capital right away.

162.    On about January 12 2018, Defendants finally sent the executed MEZZ Loan agreement with 702 Developer/Borrower to Member X.  Upon review, Plaintiff discovered imbedded in the new executed MEZZ Loan agreement a scheme to rob Chinese EB-5 investors of their investment of $494.5 millions. After communicating with the Member X, Plaintiff informed USIF that Member X wants to go back to the financing stack of 701 Project as Member X never agreed to changing the business scope of 701 Fund.  Defendants ignore Member X's request sent by Plaintiff.

163.    On December 12, 2018, Defendant USIF, 701 Fund and 702 Fund executed MEZZ Loan agreement with 702 Developer/Borrower with loan term never disclosed to members of 701 Fund and 702 Fund. The MEZZ loan agreement section 19.31 provides that *701 TSQ Lender represents and warrants to Borrower that (i) the funds used by Administrative Agent to advance Note C were previously used by 701 TSQ Lender as a part of a loan under the EB-5 Program with respect to the property located at 701 Seventh Avenue, New York, New York (the "701 Loan") and (ii) all foreign investors that were the source of the 701 Loan and whose funds are being used to fund Note C (the "701 Investors") have given their express approval and authorization to the use of their investment as part of the Loan pursuant to the terms hereof.*  Unknown to members of 701 Fund and 702 Fund, the MEZZ Loan Agreement permits 701 Fund and 702 Fund to have ***indirect equity*** interest in the

*EB-5 Borrower (or any indirect equity interest holder of the EB-5 Borrower) that entitles the PPCE Holder to receive a preferred return on its equity that is prior to the common equity and to approve customary "major decisions" but that has (a) no mandatory redemption date prior to the Extended Maturity Date, (b) **<u>no pledge of equity or other collateral</u>**, (c) no right to cause a change of Control of Borrower or any Guarantor, (d) remedies that, in [Senior Loan] Borrower's reasonable discretion, are customarily given to holders of preferred equity that is structured like debt but excluding, in all cases, any of the remedies prohibited in clauses (a)-(c) above, and (e) all proceeds of the Permitted Preferred Common Equity (**<u>net of out-of-pocket transaction costs and expenses</u>**) shall be contributed to [Senior Loan] Borrower and spent on the Project.* However, both PPM of 702 Fund and Settlement Agreement of 701 Fund after New York Action require the 701 Fund and 702 Fund not to be in the form of equity of EB-5 Borrower in that *"Borrower Party" means each of (a) Borrower, Sole Member, EB-5 Borrower, Guarantor, and any Affiliate Service Provider, (b) Fortress Investment Group LLC or any of its Affiliates, (c) L&L Holding Company, LLC or any of its Affiliates, and, (d) so long as it or one of its Affiliates retains an equity ownership interest in Borrower, Maefield Development Corporation or any of its Affiliates..*

164.    Defendants USIF, 701 Fund and 702 Fund fail to inform that per the MEZZ Loan Agreement with **<u>$494.5 million</u>** commitment, EB-5 Borrower have paid **<u>$44,661,772.77</u>** to Administrative Agent of 701 Fund and 702 Fund on December 12, 2018, and if such payment is out-of-pocket transaction costs and expenses for arrange the mezzanine loan for 702 Project.


## <u>Redeployment of AYB II Fund to Finance 702 Project in 2019</u>


163.    About 498 Members of AYB II Fund each invested $549,000 between 2014 and 2015 in the amount of $249 million to fund the construction of Stage B of Atlantic Yards in Brooklyn, New York

("Atlantic Yard Project"). Unknown to members of AYB II Fund, in September 2018, the EB-5 Fund Borrower/ AYB Developer made arrangement to sell the collateral pledged in favor of EB-5 loan to a third party developer. Defendants USIF and AYB II Fund intentionally withheld the news announcement made by Developer in September 2018 that they have sold some of the EB-5 loan collateral and related construction plan to a third-party developer in deviation from the business plan that members filed with USCIS to approve their immigration benefits. Such change of business plan may adversely impact members' eligibility of EB-5 immigration benefits as well as security of their investment. Only until Jan 21, 2019 Defendants USIF and AYB II Fund notified members of AYB II Fund their decision to grant the request of Borrower/Developer to release a lien of Lot B15 of Atlantic Yard Project in exchange of early repayment of over $63 million that intend to be redeployed to certain projects controlled by Mastroianni without naming 702 Project as the target project. **See Exhibit 26**.

164.    Fraud Analysis conducted by Plaintiff shows Defendants USIF and AYB II Fund never provided to Members the Confidential Private Placement Memorandum ("PPM") date Jan 2, 2014. Plaintiff was able to get a copy of PPM of AYB II Fund from other sources. **See Exhibit 27.** The PPM is authored by no other but Ronald Fieldstone. The PPM of AYBII Fund provides AYBII Fund has been advised, by Fieldstone preassumely, that AYBII Fund is "not an "investment company" and is therefore exempt under the 1940 Act; however, there are no assurances that this will ultimately be the case". With Fieldstone as the securities counsel, Defendants USIF and AYB II Fund have eliminated the fiduciary duty in the Operating Agreement pursuant to Section 18-1101(c) of the Delaware LLC Act so that Defendants Mastroianni and AYB II Manager shall not owe any fiduciary duties of any nature whatsoever to AYB II Fund and members, except Defendants Mastroianni, USIF and AYB II Fund Manager shall be subject to the implied contractual covenant of good faith and fair

dealing and shall not be entitled to be indemnified or held harmless due to, or arising from, fraud, bad faith, gross negligence or willful misconduct.

165.     Under information and belief, Fieldstone advised USIF and AYB II Fund Manager in the PPM he authored that they likely do not need to register as an "investment adviser" under the Advisers Act because the foregoing definition of "investment adviser" likely does not apply to the Developer, Manager and/or Regional Center with respect to the services provided by them in connection with this Offering, including, without limitation, taking into account the fact that all investment advice under this Offering is being provided to Members by independent, unaffiliated, third party, licensed and bonded migration agents outside the United States. In this case, Fieldstone refers Qiaowai as independent, unaffiliated, third party, licensed and bonded migration agents outside the United States. Fieldstone admits that "However, there can be no assurance that such is the case and that the Developer, Manager or Regional Center could not otherwise be deemed an "investment adviser" requiring registration as an "investment adviser" under the Advisers Act."  Under information and belief, Fieldstone is aware of the fact that Qiaowai is marketing agent for USIF and about 20 funds managed by USIF.

166.     Members of AYB II Funds stated, on the day of signing the required documents in Defendant Qiaowai's office, that they were given only signature pages of offering documents to sign.  No Chinese translation were provided to accompany all English documents.  No one informed the members that they are entitled to independent legal counsel and or financial adviser to review these documents before they sign. No one asked them if they are accredited investors that have one million dollars in net assets, a requirement to purchase unregistered EB-5 securities disclosed in the PPM.

167.     Defendants USIF and AYB II Fund never informed member that the AYB II Fund Borrower/Developer has failed to follow through the construction plan described in the Offering

documents, even though such delays by AYB II Fund Borrower/Developer were publicly reported by Norman Oder, a dedicated blogger on Atlantic Yard Project for over 10 years.

168.    The Jan 21, 2019 Notice made untrue statements and Defendants USIF and AYB II Fund were not able to provide independent reports to support.  Such statements include 1) "To date, 491 investors with their family members have successfully received conditional green cards"; 2) "6,091 jobs have been created, more than enough to satisfy removal of conditions and permanent residency for 100% of the members in the project"; 3) "In considering the borrower's request to release part of its lien, the Company conducted due diligence to determine whether this sale would cause the borrower to be out of compliance with the terms of the Loan Agreement, including the important loan to value ratio **of 80% (the "LTV Ratio").** To that end, the Company obtained a third-party appraisal to determine the current value of the entire project and legal opinions from expert immigration counsel to determine whether, pursuant to the terms of the Loan Agreement, the sale of parcel B15 would require the borrower to repay a part of the principal of the Loan." 4) We expect the balance of the loan to be repaid upon maturity.

169.    The PPM provides that there **is no guarantee** that the Loan will be repaid by the Developer or that the proceeds from the foreclosure of any of the security for the Loan will be sufficient to cover any non-payment of the Loan.

170.    The PPM of AYB II Fund provides that (vi) the development of approximately 3.3 million square feet of residential use and retail space to occur on the followinge parcels over the Platform: buildings B5, B6 and B7 (over Block 1120) and buildings B8, B9 and B10 (over Block 1121). In addition, B15 will be developed on Block 1128 on terra firma (all such buildings are reflected on the Map of Loan Collateral attached hereto as Exhibit F).  B5, B6, B7, B8, B9, B10 as well as B15 were placed as collateral for AYB II loan.  However, according to the appraisal report on Aug 17, 2018

prior to the sale of B15 in Sept 2018, the combined value of B5, B6, B7, B8 was less than 80% of $249 million of AYB II Loan. Defendants USIF and AYB II Fund didn't provide explanation about their decision to allow B15 to be sold and B9/10 were excluded from the valuation of collateral of AYB II loan. Based on Plaintiff's fraud analysis, B9/10 has been pledged for additional $100 million EB-5 Funding to AYB Developer by Defendant USIF without consent by members of AYB II Fund.

171.    On February 20, 2019, Defendants USIF and AYB II Fund sent members a Redeployment Flow Chart. **See Exhibit 28.** The Flow Chart shows Atlantic Yards Developer has received $542.3 million in senior loan funding. To verify such statement, a couple of members of AYB Funding 100 LLC staged a sit-in for over 20 hours in Defendant Qiaowai's office and demanded evidence of senior loan funding. With translation support from Plaintiff over WeChat, USIF staff stationed in Qiaowai's office provided a confirmation letter **(See Exhibit 29)** and followed up with loan application with Citibank in 2015 **(See Exhibit 30).** Defendants USIF and AYB II Fund are not able to provide definite evidence to support their representation that Atlantic Yards Developer has secured $542.3 million in senior loan funding in their Consent Solicitation Brochure.

172.    The February 20, 2019 Redeployment Flow Chart provides four redeployment options. USIF and AYB II Fund intentionally withheld the executed MEZZ loan agreement with 702 Developer regarding EB-5 note holders have preferred common equity in 702 Project even though the financing is structured as a debt and there is no collateral for EB-5 loan. **See Exhibit 31.**

173.    On February 20, 2019, Defendants USIF and AYB II Fund sent a notice to all investors in the AYB 100 Fund with a link to consent solicitation package via DocuSign. Despite investors' repeated requests for a copy of Consent Solicitation package via email so they can send it to their legal counsels and advisers USIF staff refused repeatedly to provide those documents with only promise to guide the investors to how to sign consent via DocuSign. **See Exhibit 32.** AYB FUNDING 100 LLC

MEMBER CONSENT LETTER. USIF staff called dissident members repeatedly to pressure them to sign consent letters, as they have done with members of 701 Fund in 2018. USIF and AYB II steered members into consent to redeploy in 702 Project.

174.    Since February 2019, one member of AYB II Fund engaged Attorney Janet Esagoff in the legal actions against some of the Defendants. with assistance from Plaintiff, in New York court to stop Defendant USIF and AYB II Fund from harassing her and other members during Consent Solicitation and provide full disclosure of AYB Project as well as Redeployment Project. Defendants refused. This member had to join a sit-in in Qiaowai's office for her right to full disclosure. Again, she was given false statement by Defendant USIF. When she demanded to exit AYB II Fund and give up her immigration application, she was told that she could only receive 25% of $500,000 capital. Now she is facing almost total loss of her investment that she made in 2015, when she was not provided with any offering documents telling her such risk and she was not provided with legal counsel nor financial adviser as Fieldstone authored in the offering documents. This is just one of numerous false statements Defendants populate in their promotion of EB-5 investment and re-investment. At no time Defendants speak truth about visa backlog facing by most of their investors, that there might be no ore EB-5 visas available to Chinese EB-5 investors who filed their application with USCIS after March 2015. Defendants USIF and AYB II Fund force at risk redeployment upon those members who filed their immigration petitions after March 2015 to "meet EB-5 investment requirements" even though these members may never receive EB-5 visas.

**Malicious Prosecution Against Plaintiff in 2018**

175.    In Aug 2017, Plaintiff was contacted by a member of 702 Fund to conduct fraud analysis. Later, Plaintiff referred this member to engage Attorney London from Chicago for his demand for

rescission of investment. In December 2017, the construction loan term sheet provided by JPMorgan to fund 702 Development expired. Based on Plaintiff's fraud analysis, Attorney London drafted and sent a demand letter to Defendant Mastroianni, USIF and 702 Fund. One week later, Defendant Mastroianni, USIF and 702 Fund granted this member right of rescission and return $500,000 capital and $52,000 in management fee to this member. With information collected on 702 Fund and 702 Project in 2017, Plaintiff grew suspicious of the intention of 702 Developers, who in February 2018 bought 701 Lead Developer out of an uncompleted development and in May 208 made early repayment of $200 million EB-5 loan back under the control of Defendants Mastroianni and USIF, given the fact that 702 Fund was under-subscribed by about $200 million.

176. In April 2018, The SLS project involved the renovation and repositioning of the Sahara Hotel & Casino into the SLS Hoel & Casino. The project was conducted in two phases, both of which involved an EB-5 raise of up to $200 million that was subsequently loaned to a job creating entity. The lawsuit in question involves the second phase. The EB-5 investor-plaintiffs allege they were defrauded, in part, through the migration agents' marketing materials and verbal representations, including a deceptive timeline regarding how long it would take for them to receive green cards, false and deceptive job creation numbers and undisclosed or misrepresented uses of funds. The lawsuit alleges that investors were defrauded through misrepresentations that EB-5 funds would only be used for job creating activities. Investors instead claim that over $150 million of EB-5 funds were used to pay commissions, fees, salaries and other expenses that were unrelated to job creating activities. Plaintiff saw similarity between SLS and 702 Development in relation of use of EB-5 financing. Plaintiff announced her concerns on WeChat to members of 701 Fund.

177. After three of Litowtz's clients received their capital facilitated by Plaintiff, USIF's in-house counsel Jason Metula contacted Plaintiff and requested Plaintiff to remove the reference of USIF and

Qiaowai from Reviv-East website that described a member of 702 Fund received $552,000 back from USIF and Qiaowai. Out of courtesy Plaintiff took the reference of USIF off but refused to take off the reference of Qiaowai. Reviv-East is a Hong Kong company that Plaintiff was an independent contractor to conduct due diligence.

178. A few days later, Plaintiff received a Cease and Desist Letter from the in-house counsel, Ashley Flucas, of Defendants USIF and 701 Fund even though at the time, Defendants USIF and 701 Fund were represented by Michael Zuppone of Paul Hastings LP. Plaintiff told Defendants that they can sue Plaintiff in Chicago, where she lives.

179. On October 4, 2018 Defendants USIF and 701 Fund filed a lawsuit against Plaintiff, Litowitz as well Reviv-East in New York Court alleging Litowitz and Plaintiff set up Reviv-East in 2017 to defraud Defendants USIF and 701 Fund. This lawsuit is an attempt by Defendants USIF and 701 Fund and Richard Haddad to weaponize the law and use it to silence their critics and confuse unsophisticated EB-5 investors who are subjects of Defendants' tyranny. Their lawsuit was thrown out of court by New York Judge on March 29.

180. The lawsuit has been vexatious, frivolous, and improper at every word. Defendants' fraud and defamation claims rest upon their failure to do basic fact-finding research, their lack of competence and lack of professionalism. Defendants possess no evidence that Plaintiff and Litowitz together established Reviv-East in January 2018. Defendants alleged that over 70 members exited of 701 Fund as result of actions of Litowitz and Plaintiff. However Defendants presented no evidence that as many as 70 investors retained Litowitz and assisted by Plaintiff to request to withdraw from 701 Fund between June and September 2018. Under information and belief, Defendants USIF and 701 Fund and their current attorney Richard Haddad of Otterbourg had obtained from Hong Kong a copy of corporate record of Reviv-East. See **Exhibit 30.** Yet, Defendants USIF and 701 Fund and Richard

Haddad fabricated the relationship between Plaintiff and Litowitz and Reviv-East based using statements by "Linda" who had made some comment to Plaintiff just a few months before. Despite the fact that the corporate records showed that Plaintiff and Litowitz don't have ownership in Reviv-East, Defendants USIF and 701 Fund and Richard Haddad filed a "Verified Complaint" based on Plaintiff and Litowitz's ownership of Reviv-East. The Verified Complaint made the reference about Qiaowai being named on Reviv-East website.

182.   In the lawsuit Defendants USIF and 701 Fund and Richard Haddad alleged that Plaintiff breached the withdrawal agreement with an exiting member of 701 Fund. Defendants USIF and 701 Fund and Richard Haddad are fully aware that Plaintiff is not a signature party to the withdrawal agreement. Defendants USIF and 701 Fund and Richard Haddad chose not to sue the exiting member of 701 Fund that they made reference to in the Verified Complaint. Defendants USIF and 701 Fund and Richard Haddad alleged in their lawsuit that Plaintiff breached the Attorney's Confidentiality Agreement. Again, Defendants USIF and 701 Fund and Richard Haddad are fully aware that Plaintiff is not a signature party to the confidential agreement. Defendants USIF and 701 Fund and Richard Haddad could not exclude the possibility that a former member, Member X, of New York Action provided the settlement agreement to Plaintiff to conduct due diligence.

183.   Defendants USIF and 701 Fund and Richard Haddad alleged in their lawsuit that Plaintiff's warnings about USIF, 702 Fund and 702 Project were lies but failed to provide any evidence to support their version of facts. All Plaintiff's statement about USIF, 702 Fund and 702 are supported with evidence included in this RICO complaint.

184.   Defendants USIF and 701 Fund and Richard Haddad alleged that as many as 70 investors exited from 701 Fund as result of Plaintiff's action, however, they intentionally neglected to inform

the Court that about 40 out of 70 exiting members were actually represented by USIF's former securities counsel Fieldstone, with who, they devised the procedure and return of withdrawal process.

185.    A few days before Defendants USIF and 701 Fund and Richard Haddad filed an Amended "Verified" Complaint, nearly 80 Chinese investors have filed suit against Defendant Mastroianni in Florida court alleging he defrauded them of their EB-5 investments.  See **Exhibit 34.**

186.    Defendants USIF and 701 Fund and Richard Haddad are fully aware that Plaintiff has no asset or business connection in New York and New York court would have no jurisdiction over Plaintiff in their lawsuit.  Regardless of their advertised knowledge and experience in law, Defendant Richard Haddad, on behalf of Defendants USIF and 701 Fund, insisted to file this malicious lawsuit against Plaintiff in New York Court as a schilling effect to scare and prosecute any critics and investors, in particular, of Defendant Mastroianni and USIF.

187.    Defendants USIF and 701 Fund and Richard Haddad executed a contract and paid for a service processor to deliver the Amended "Verified" Complaint to Plaintiff in her residence in Chicagoland.

188.    The lawsuit filed by Defendants serves no purpose but to assassinate Plaintiff's reputation and business as Plaintiff is the only person in the EB-5 industry who advocated rights of Chinese EB-5 investors. In October 2018, Plaintiff staged a one-person demonstration against USCIS's At-Risk policy during the 2018 AILA & IIUSA EB-5 Industry Forum in Chicago.

**Defamation Against Plaintiff in 2018 and 2019**

189.    To coordinate a scheme to eliminate Plaintiff as an advocate for EB-5 investors and a critic of Defendants as well as a precedent case for future disputes with over 5,000 Chinese EB-5 investors from whom Defendants Mastroianni and Ding raised $2.9 billions of investment, Defendants used "Linda" as an agent to infiltrate Chinese EB-5 WeChat groups to discredit Plaintiff and to draw

Chinese investors away from being represented by Litowitz. Colluded with Fieldstone, Defendants together successfully sabotaged Litowitz's plan to enforce investors' right of rescission by filing a lawsuit in New York court for securities violations.

190. Under information and belief, Defendants are furious that Plaintiff has obtained the executed 702 MEZZ Agreement and disclose specifics of 702 MEZZ Agreement to members of 701 Fund and 702 Fund. Defendants have been keeping the information from members of 701/702 Fund. Defendants' in-house counsel told Plaintiff that Plaintiff was the only one who has requested to see the executed MEZZ agreement for due diligence. Under information and belief, Defendants are furious that Plaintiff launched a fierce defense as a *pro se* defendant against Defendants' malicious prosecution in New York Court. Realized that Defendants' lawsuit has not deterred members of 702 Fund from using Plaintiff's investigative service and attorney referral service, On Feb 4, 2019, Defendants sent a letter to members of 702 Fund and spread lies that Plaintiff.

191. After the New York Court threw out the frivolous and malicious lawsuit filed by Defendants USIF and 701 Fund, Defendants USIF and 701 Fund and Richard Haddad started a campaign of lies about Plaintiff out of their humiliated defeat. In April 2019 Defendant Haddad has contacted at least of one of Plaintiff's acquaintance in Chicago to spread lies about Plaintiff.

192. For a seasoned attorney, in the lawsuit against Litowitz and Plaintiff, Haddad intentionally twisted a rejected century old legal argument that attorney is legal representative to insert Litowitz and Plaintiff into New York jurisdiction. Now Haddad tries to confuse legal information that Plaintiff provides to her clients with legal service that Litowitz and other attorneys provide to these clients.

193. For the past 5 years, Plaintiff provides investigative research of EB-5 scams and she is nothing more than Dr. Bull of EB-5 to inform Chinese EB-5 and the public the EB-5 scams that described in the Investment Alert issued by SEC and USCIS in 2013., As an EB-5 activist Plaintiff wants to raise

the awareness of Chinese EB-5 investors' plight and, with legal service provided US attorneys to the defrauded Chinese EB-5 investors, Plaintiff wants to prove to Chinese investors that America is a land of law and no one is above the law when it comes to fraud.

**Diversion and Conversion of Exiting Investors' Administrative Fees and Interests Caused Loss of Income to Plaintiff in 2018**

194.    Defendants' EB-5 fund-raising displays all the hallmark signs of EB-5 scams described the Investor's Alert issued by SEC and USCIS in the 2013.

- Defendants Mastroianni and Ding promised that members of 701 Fund, 702 Fund, and AYB II Fund to receive immigration visas in 1-3 years. However, none of investors that contacted Plaintiff has received immigration visas after over 4 years of investment.

- Defendants Mastroianni and Ding guaranteed investment returns or no investment risk during the road show promotion in China and in their Chinese marketing brochures. Chinese investors were led to believe that they gave up only the interest income in exchange of US green cards for a whole family and their capital would be returned in five years.

- Defendants Mastroianni and Ding had sold unregistered investments through public advertising and promotion to unsophisticated Chinese public that claims to meet Regulation D and Regulation S Defendants Mastroianni and Ding intentionally failed to provide complete offering documents, such as risk disclosures, operating agreement, subscription agreement, accredited investor questionnaire, to Chinese investors before they made investment. No Chinese translation was provided to investors who don't read English.

- Defendants Mastroianni and Ding are unlicensed sellers in China and in the US. Defendant Ding and Qiaowai registered their business as providing immigration consulting service to Chinese consumers and don't possess registration for investment brokerage and advisory, contrary to what Fieldstone claimed in the offering documents he authorized.

- Defendants Mastroianni and Ding never disclosed to Chinese investors that every EB-5 funds they invested are issued and controlled by Mastroianni using his layers of shell companies. Chinese investors don't hold mortgage note with the EB-5 projects as they believed. Information about Mastroianni's checkered background such as his felony charges, bankruptcies, and lawsuits were withheld from EB-5 investors.

195.     Defendants Mastroianni and Ding are fully aware that, due to their misrepresentation, Chinese investors are entitled to rescission rights that Chinese investors will receive $500,000 capital contribution, $49,000 to $52,000, interests, and other costs. On such belief, Defendants Mastroianni and Ding returned $552, 000 to one member of 702 Fund in December 2017.

196.     Under information and belief, in June and July 2018, Defendants Mastroianni and Ding colluded with Fieldstone and devised a scheme to deny exiting members of 701 Fund the return of their full investment plus 3.5 years' interest income.  Defendants Mastroianni and Ding successfully recruited about 40 members of 701 Fund to be represented by Fieldstone as a leverage against exiting members of 701 Fund represented by Litowitz assisted by Plaintiff.  As a result, even though Litowitz demanded return of full investment of $550,000 plus 3.5 years' interest income on behalf of his clients, these clients were not as successful as the one member of 702 Fund in December 2017. Each exiting member eof 701 Fund loss $50,000 administrative fee and 3.5 years of income without receiving the immigration visas that Defendants Mastroianni and Ding promised.  Under information and belief most of $50,000 administrative fee and half of 3.5 years of income were diverted into the possession

by Defendants Ding as transaction-based fee for placing investors in 701 Fund in 2015 and so-called investment advisory fee to investors for 3.5 years. As Litowitz and Plaintiff were contracted to receive compensation primarily based on return of the $50,000 administrative fee and 3.5 years of income, Plaintiff lost about $120,000 in service fee as result of conversion by Defendants Mastroianni and Ding.

197. Under information and belief, Defendants Mastroianni and Ding conspire with 702 Developer and AYB Developer to convert EB-5 investment into their piggy bank with no intention to return EB-5 investment to Chinese EB-5 investors, even though these Chinese EB-5 investors may never see the immigration visas they dream of and have paid over $550,000 for. Defendants' deceptive scheme was fully illustrated in the lawsuit filed against Defendant Mastroianni in Florida court in October 2018 by nearly 80 Chinese investors alleging Mastroianni, by using financing maneuvers, defrauded them of their EB-5 investments of $500,000 each. **See Exhibit 31.** Those 80 investors are considered lucky ones as they all become US permanent residents since 2012. The members of 701 Fund and 702 Fund may see their worst nightmare when they lose all their EB-5 investment without receiving immigration visas in their life time.


**The RICO Enterprise**

198. For any Racketeer Influenced and Corrupt Organization case, it is important to distinguish between legitimate organizations, businesses, and even government offices and the abuse of those entities for illegal purposes by the unofficial, corrupt "enterprise."

199. This pattern of illegal activities committed by the Defendants, the "Predicate Acts," discussed below, were done with the purpose of financial gain at the expanse of activists like Plaintiff in addition to EB-5 investors and were done within the past 5 (5) years and continuing.

200.     By the acts alleged herein, Defendants, each and every one of them, jointly and severally, have aided and abetted and conspired to violate US laws, through their ongoing criminal enterprise as set forth below.

201.     The law presumes generally that people intend the obvious results of their actions.

## IV.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Conduct and Participation in a RICO Enterprise through a Pattern of Racketeering Activity: 18 U.S.C. §§ 1961(5), 1962(c)**
**(Defendants USIF, Mastroianni, USIF-NY, 701 Fund, 701 Fund Managers, 702 Fund, 702 Fund Managers, AYB II Fund, AYB II Manager, Ding, and Qiaowai entities)**

202.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

203.     There are 5 elements of a Claim under § 1962(c): 1) That an enterprise existed; 2) That the enterprise affected interstate or foreign commerce; 3) That the defendants were associated with or employed by the enterprise; 4) That the defendants engaged in a pattern of racketeering activity or the collection of an unlawful debt; and 5) That the defendants conducted or participated in the conduct of the enterprise through that pattern of racketeering activity. *Alcorn County v. United States*, 731 F.2d 1160 (5th Cir. 1984). *United States v. Philips*, 644 F.2d 971 (5th Cir. 1981), cert. denied, 457 U.S. 1136 (1982). *Alexander Grant & Co. v. Tiffany Industries, Inc.*, 770 F. 2d 717 (8th Cir. 1985).

204.     Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961 (3).

205. Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

206. **Definition of the Enterprise** Defendants Mastroianni and Ding, together with (1) the Mastroianni-controlled companies, (2) Ding-controlled companies, (3) employees, officers and directors of Mastroianni-controlled companies (including Mark Giresi, CFO of USIF), (4) employees, officers and directors of Ding-controlled companies, and (5) legal counsels and business partners of Defendant Mastroianni and Defendant Ding and businesses controlled by them, form an association-in-fact for the common and continuing purpose to prosecute and slander Plaintiff in addition to interfering Plaintiff's business relations with Chinese EB-5 investors in their request to recover losses from securities sold by Defendants 701 Fund, 702 Fund and AYB II Fund and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4). These people formed the enterprise characterized by (1) a common purpose, 2) an ongoing formal or informal organization, and 3) members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. There may also be other members of the enterprise who are unknown at this time. The enterprise continued in an essentially unchanged form since 2010 when USIF was approved by USCIS as a designated regional center until present. *United States v. Turkette,* 452 U.S. 576 (1981). *United States v. Errico*, 635 F. 2d 152 (2d Cir. 1980), cert. denied, 453 U.S. 911 (1981).

207. Alternatively, the Mastroianni and Ding-controlled companies each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

208. Alternatively, the Mastroianni and Ding-controlled companies together constitute an enterprise within the meaning of 18 U.S.C. § 1961(4).

209. **Interstate or Foreign Commerce** Each enterprise itself has engaged in, and the racketeering activities of those associated with the enterprise had impact on interstate and foreign commerce. Defendants Mastroianni and his entities are Florida based individual and businesses, engaged Richard Haddad from a New York law firm, contracted service processor to deliver summon to Plaintiff in Chicago area. Defendants induced Plaintiff's clients, who are foreign investors, to invest in securities sold by 701 Fund, 702 Fund, AYB II Fund to finance 702 Project and AYB Project in New York City. Defendants Ding and her entities engage business activities both in China and in the US, have Chinese agent discredit Plaintiff in WeChat groups to draw investors away from Plaintiff and US attorneys that she refers. Defendants directly and indirectly made use of the means and instrumentalities of interstate or Foreign commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

a. Defendants signed contracts in Florida, filed legal documents in New York, arranged service processors in Illinois in relation to the malicious prosecution of Plaintiff.

b. Defendants arranged wires to transfer money in in relation to the malicious prosecution of Plaintiff;

c. Defendants sent their agent and delivered false evidence to at least one individual in Chicago in an attempt to slander Plaintiff;

d. Plaintiff's clients are instructed to execute a subscription agreement, and/or consent letters, and send to the Defendants in the U.S. to facilitate conversion of investment;

e. Defendants-U.S. residents-have sole discretion whether to accept or reject Plaintiff's clients' subscription agreement and consent letter;

f. Plaintiff's clients are instructed to wire funds to an escrow agent in the U.S. or wire refund from a bank in the US.;

g.      Sales and redemption were not final until approved by the sponsors-residents of the United States-and payment is wired between Plaintiff's clients' bank account and a U.S.-based bank controlled by Mastroianni.

210.    The racketeering activities were conducted by the defendants, and these acts are those of the enterprise and affected interstate commerce and foreign commerce.  *United States v. Banton*, 647 F.2d 224 (2d Cir), cert denied, 454 U.S.857 (1981). *United States v. Bagnariol*, 665 F.2d 887 (9th Cir. 1981), cert, denied, 456 U.S. 962 (1982).

211.    **Association with the Enterprise** The Defendants are associated with or employed by the enterprise. The defendants know the enterprise and understand the nature of the activities of the enterprise. *United State v. Castellano*, 610 F. Supp. 1359 (S.D.N.Y. 1985).

212.    **Pattern of Racketeering Activity**. Defendants engaged in the conduct of their affairs through a continuing pattern of racketeering activity and did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §1961 (1), 1961 (3), and l962(c).  Plaintiff has discovered that,  since at least 2014,  the Defendants 1) made false claim about the at-risk nature of EB-5 investment and visa backlogs; 2) induced Plaintiff's clients to wire about $550,000 to accounts controlled by Defendants and to pay transaction based fees to Defendants without full disclosure; 3) doctored executed subscription agreement and operating agreement as well as I-526 petition form submitted to USCIS with only signature pages of Plaintiff's clients; 4) forced Plaintiff's clients to give up participating in income of 701 Fund and 702 Fund; 5) coerced Plaintiff's clients to sign consent letters to release Defendants USIF's liabilities and to give up claim to $50,000 administrative fee and interest income of $88,000 in exchange to return of $500,000 in 2018, causing Plaintiff unable to collect compensation; 6) filed malicious lawsuit and prosecuted Plaintiff for her criticism of

Defendants' deceptive activities in 2018, 7) coerced Plaintiff's clients to terminate business relationship with Plaintiff in negotiation of withdraw from 702 Fund controlled by Mastroianni; 8) spread lies about Plaintiff to EB-5 investors and, starting April 2019 after Plaintiff defeated Defendants in New York court, to Plaintiff's acquaintance in Chicago. Defendants used 1) the mails to submit false documents to Plaintiff's clients and USCIS, 2) Defendants used interstate "wires" – primarily emails – in connection with the racketeering activity and fraud. Thus, Defendants violated the mail fraud and wire fraud provision of the federal criminal law.

213.     The Defendants conducted or participated in the conduct of the enterprise through that pattern of racketeering activity. The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

214.     Predicate acts of racketeering activity are acts that are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. §1961(I)(B), as more specifically alleged below. Defendants each committed at least two such acts or else aided and abetted such acts.

215.     **<u>Relationship among Racketeering Acts</u>** The acts of racketeering were not isolated, but rather the acts of Defendants were connected by a common scheme, plan, or motive. These acts were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during a period of time beginning as early as 2010 when USIF was approved by USIF as a designated regional center and continuing to the present, and there is a continued threat of repetition of such conduct. *Sedima, S.P.R.L. v Imrex Co.*, 105 S. Ct. 3275 (1985). *United States v. Brooklier*, 685 F.2d 1208, 1222 (9th Cir. 1982).

216.   **Conducting the Enterprise through a Pattern of Racketeering** Defendants used their positions in the enterprise facilitated their commission of the racketeering acts and that the racketeering acts had some impact and effect on the enterprise.  The Defendants were able to commit the acts solely by virtue of their position or involvement in the affairs of the enterprise.  *United States v. Scotto*, 641 F.2d 47 (2d Cir, 1980), cert. denied, 452 U.S. 1961 (1982). *United States v. Provenzano*, 688 F.2d 194 (3d Cir.), cert. denied, 459 U.S. 1079 (1982). *United States v. Cauble*, 706 F.2d 1322 (5 th Cir. 1983), cert. denied, 104 S. Ct. 996 (1984).

217.   The association-in-fact enterprise and the alternative enterprises, as alleged herein, were not limited to the predicate acts and extended beyond the racketeering activity. Rather, they existed separate and apart from the pattern of racketeering activity for the legitimate business purpose of assisting Plaintiff's clients to apply for immigration benefits. Upon information and belief, Defendants have had and do have legitimate business plans outside of the pattern of racketeering activity.

218..   Plaintiff specifically alleges that Defendants participated in the operation and management of the association-in-fact enterprise and the alternative enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described below.

219.   **Predicate Act: Use of Mails and Wires to Injure Plaintiff in Violation of 18 U.S.C. §5 1341 and 1343.** Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1341 and 1343 in that they devised or intended to devise a scheme or artifice to interfere Plaintiff's clients' business relationship with Plaintiff and cause Plaintiff financial loss by means of false or fraudulent pretenses, representations or promises. For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and things by the US. mails or by private or commercial interstate carriers, or received such therefrom. Defendants also transmitted or caused to

be transmitted by means of wire communications in interstate or foreign commerce various writings, signs and signals. The acts of Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business. or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

220.    Defendants carried out their scheme in different states and countries and could not have done so unless they used the U.S. mails or private or commercial interstate carriers or interstate wires. In furtherance of their scheme alleged herein, Defendants Mastroianni and Ding communicated among themselves and with Plaintiff's clients in furtherance of the scheme to interfere with business relationship between Plaintiff and her clients and cause her financial loss. These communications were typically transmitted by wire (i.e., electronically) and/or through the United States mails or private or commercial carriers. Defendants also transmitted or caused the Letter and Agreements to be transmitted by mail or wire between 2014 and 2019.

221.    After Defendants coerced Plaintiff's clients to sign consent letter and imposed a loss of over $100,000 for each of Plaintiff's 12 clients between August to December 2018, Defendants finally transmit to each of 12 Plaintiff's clients $500,000 of dollar in fund by wire from bank accounts in the United States controlled by Mastroianni. As a result, Plaintiff lost $10,000 in consulting fee from each of her 12 clients.

222.    Defendants filed a malicious lawsuit to prosecute Plaintiff in New York court in October 2018 solely to weaponize law to assassin Plaintiff's reputation and business. Defendants used this lawsuit in their communications with their investors to legalize their slanderous statements against Plaintiff and deter EB-5 investors from using Plaintiff's service.  Plaintiff was informed that some investors in EB-5 funds managed by Defendants are reluctant to work with Plaintiff.  As Defendants claim to

manage $2.9 billions of EB-5 investment from over 5,000 EB-5 investors, Plaintiff is projected to suffer $50 million from loss of business as Plaintiff charge $10,000 per investor for fraud analysis service.

**Predicate Act: Transport and Receipt of Stolen Money in Violation of 18 U.S.C. §2314 and 2315.**

223.   Defendants committed acts constituting indictable offenses under 18 U.S.C. §2314 in that having devised or intended to devise a scheme or artifice to defraud Plaintiff and her clients or to obtain money from Plaintiff and her Plaintiff and her clients by means of false or fraudulent pretenses, representations or promises, Defendants transported or caused to be transported in interstate or foreign commerce money having a value of $5000 or more, which was stolen, converted or taken by fraud. Defendants also committed acts constituting indictable offenses under 18 U.S.C. §2315 in that they received money in excess of $5000, which crossed a State or United States boundary after being stolen, unlawfully converted or taken. The acts of Defendants set forth above were done willfully and with knowledge that the money was stolen, converted or taken by fraud. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

224.   Defendants Mastroianni and Ding are fully aware that, due to their misrepresentation, Chinese investors are entitled to rescission rights that Chinese investors will receive $500,000 capital contribution, $49,000 to $52,000, interests, and other costs.  On such belief, Defendants Mastroianni and Ding returned $552, 000 to one member of 702 Fund in December 2017.  Under information and belief, in June and July 2018, Defendants Mastroianni and Ding colluded with Fieldstone and devised a scheme to deny exiting members of 701 Fund the return of their full investment plus 3.5 years' interest income.   Defendants Mastroianni and Ding successfully recruited about 40 members of 701 Fund to be represented by Fieldstone as a leverage against exiting members of 701 Fund represented

by Litowitz assisted by Plaintiff. As a result, even though Litowitz demanded return of full investment of $550,000 plus 3.5 years' interest income on behalf of his clients, these clients were not as successful as the one member of 702 Fund in December 2017. Each exiting member of 701 Fund loss $50,000 administrative fee and 3.5 years of income without receiving the immigration visas that Defendants Mastroianni and Ding promised.

225.     Under information and belief most of $50,000 administrative fee and half of 3.5 years of income were diverted into the possession by Defendants Ding as transaction-based fee for placing investors in 701 Fund in 2015 and so-called investment advisory fee to investors for 3.5 years. As Litowitz and Plaintiff were contracted to receive compensation primarily based on return of the $50,000 administrative fee and 3.5 years of income, Plaintiff lost about $120,000 in service fee as result of conversion by Defendants Mastroianni and Ding. Upon information and belief Mastroianni and Mastroianni-Controlled companies, along with Ding, and Ding-controlled companies, also ensured that would receive transaction-based fees of $50,000 and interests earned on $500,000 at about 5.9% rate for four years from, directly and indirectly from Plaintiff and her clients invested in 701 Fund and 702 Fund while knowing that a portion of such money would be placed outside of US to avoid taxation by IRS. PPM of 701 Fund and 702 Fund provide that Plaintiff's clients may receive phantom income on that portion of the interest income received by Defendants which is (i) used to pay for operating expenses (including fees payable to foreign agents, the Regional Center and/or Manager, collective the Defendants) and (ii) not distributed to the Members.

**Predicate Act: Travel in Furtherance of Scheme to Defraud in Violation of 18 U.S.C. §1952.**

226.     Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1952 in that, having devised or intended to devise a scheme or artifice to defraud Plaintiff and her clients or to

obtain money from Plaintiff and her clients by means of false or fraudulent pretenses, representations or promises, Defendants then traveled in foreign commerce and used facilities of foreign commerce in order to promote, manage and facilitate the continuation of their scheme. Among other things, upon information and belief, in 2014, 2016, and 2018 Defendant Mastroianni and Defendant Ding on behalf of themselves and other Defendants, traveled to China and hosted roadshows with the intent to promote, manage and facilitate the Defendants' scheme to defraud Plaintiff and her clients by inducing EB-5 investors to invest in 701 Fund and 702 Fund as well as to for 701 investors re-invest their capital in 702 Project in 2018. In 2018, Attorney Richard Haddad, as a proxy of Defendants who do business in Florida, filed lawsuit against Plaintiff in New York and arrange a process serve to deliver summon to Plaintiff in Illinois. In 2019, Attorney Richard Haddad sent a proxy to Chicago to deliver slanderous information to Plaintiff's acquaintance.

227. **<u>Continuity of Conduct</u>**. Defendants' violations of state and federal law as set forth herein, each of which directly and proximately injured Plaintiff in addition to other EB-5 investors, constituted a continuous course of conduct which was intended to obtain money through malicious prosecution, false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. §1961(l) and (5).

228. Upon information and belief, Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(c).

229. The unlawful actions of Defendants, and each of them, have directly, illegally, and approximately caused and continue to cause injuries to Plaintiff in addition to EB-5 investors. Plaintiff seeks an award of damages in compensation for, among other things, $50 million in projected loss of business arising from the malicious prosecution and defamation since October 2018 as well as

$120,000 Defendants converted from Plaintiff when Defendants coerced each of her 12 clients to sign Consent Letter in August to December 2018 to give up claims of $50,000 administrative fee plus $88,000 in interest income on their $500,000 capital investment.

230.    Plaintiff accordingly seeks an award of three times the damages it sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.


**SECOND CAUSE OF ACTION**

**Conspiracy to Engage in a Pattern of Racketeering Activity:**

**18 U.S.C. § 1961(5), 1962(d)**

**(Defendants USIF, Mastroianni, USIF-NY, 701 Fund, 701 Fund Managers, 702 Fund, 702 Fund Managers, AYB II Fund, AYB II Manager,**

**Ding, and Qiaowai entities)**


231.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

232.    **Elements of Conspiracy** In violation of 18 U.S.C. § 1962(d), the Defendants Ding, Qiaowai, Mastroianni, USIF, USIF-NY, 701 Fund, 701 Fund Managers, 702 Fund, 702 Fund Managers, AYBII Fund, AYBII Manager, and each of them, knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of racketeering activity as alleged in paragraphs 130-160 above.  *United States v. Boffa,* 688 F.2d 919 (3d Cir. 1982), cert. denied, 103 S. Ct. 1272, 1280 (1983).  *United States v. Elliott,* 571 F. 2d 880 (5th Cir.), cert. denied, 439 U. S. 953 (1978).

233.    **The Commission of Racketeering Act**s The Defendants agreed to participate in the affairs of the enterprise through a patter of racketeering activity. By actually committing two or more

racketeering acts the defendants have shown that they agreed to participate in the affairs of the enterprise through a pattern of racketeering activity. *United States v. Elliott*, 571 F.2d 880 (5th Cir.), cert. denied, 439 U.S. 953 (1978). The conspiracy commenced specifically in Jan and June 2014 when Defendants and their representatives organized and hosted roadshows to promote AYB II Fund and 701 Fund to Chinese EB-5 investors and made no mention that investment in AYBII Fund and 701 Fund was securities and at risk for total loss. The conspiracy repeated in June 2016 when Defendants and their representatives organized and hosted roadshows to promote 702 Fund to Chinese EB-5 investors and made no mention that investment in 702 Fund was securities and at risk for total loss. The conspiracy continued in May 2018 when Defendants and their representatives announced to 701 Fund investors to re-invest their capital in 702 without disclosing securities violations committed by Defendants. Defendant Ding and Qiaowai used an agent "Linda" infiltrated WeChat of members of 701 Fund and started campaign to smear Plaintiff's reputation and recruit clients for Defendant USIF's former securities counsel, Fieldstone, away from independent securities attorney, Litowitz, that Plaintiff referred to some members of 701 Fund.  Later Defendants coerced exiting members of 701 Fund to sign consent letters to give up claims to $50,000 in administrative fee and $88,000 of interest income. The conspiracy continued in October 2018 when Defendants filed a malicious lawsuit against Plaintiff in New York court to assassin Plaintiff's reputation and business. Between February and April 2019 Defendants and Richard Haddad started a campaign of lies about Plaintiff out of their humiliated defeat in New York court.  Defendant Haddad has contacted at least of one of Plaintiff's acquaintance and told this individual that this Court has determined that Plaintiff has violated law by providing legal service illegally. The conspiracy's purpose was to deny Chinese EB-5 investors' right of full risk disclosure and fraud analysis provided by Plaintiff and induce Chinese investors to re-invest in securities without independent advisors and legal counsels, in violation securities regulations

of China and US. By sending the "Zoe Letter" to members of 702 Fund and interfere with business relationship between Plaintiff and her clients, Defendants try to deprive EB-5 investors of independent due diligence research critical to interests of EB-5 investors of 702 Fund or other funds controlled by Defendants.

234. **Agreement to Commit Two or More Racketeering Acts** Defendants agreed to participate in the affairs of the enterprise by personally committing two or more racketeering acts to further the affairs of the enterprise through a pattern of racketeering activity. *United States v. Winter*, 663 F.2d 1120 (1st Cir. 1981). *United States v. Phillips,* 664 F. 2d 971 (5 th Cir. 1981), cert, denied, 457 U.S. 1136 (1982). in October 2018 when Defendants filed a malicious lawsuit against Plaintiff in New York court to assassin Plaintiff's reputation and business. Between February and April 2019 Defendants and Richard Haddad started a campaign of lies about Plaintiff out of their humiliated defeat in New York court. Defendant Haddad has contacted at least of one of Plaintiff's acquaintance and told this individual that this Court has determined that Plaintiff has violated law by providing legal service illegally. Plaintiff discovered that Defendants intentionally withheld offering documents from Plaintiff's clients prior to inducing them to wire $550,000 to accounts controlled by Defendants and to pay hefty fees to migration agents for selling securities to them without their consents. Defendants intentionally failed to inform Plaintiff's clients in Chinese that they need to consult licensed securities advisers or provide Chinese translation of the subscription documents because Chinese investors don't read English. Defendant misled them to sign, which were only signature pages of offering documents under disguise as immigration paper work and I-526 petition form submitted to USCIS. Defendants doctored the executed Subscription Agreement and Operating Agreement without Plaintiff's clients' knowledge. Even the countersigned Subscription Agreement

and Operating Agreement by Mastroianni were mailed and hidden in Defendant Qiaowai's office for several years without Plaintiff's clients' knowledge.

235.    Defendants' EB-5 fund-raising displays all the hallmark signs of EB-5 scams described the Investor's Alert issued by SEC and USCIS in the 2013. Defendants were in the business of issuing securities, marketing securities, and providing investment advice for compensation, all done without registration with Securities and Exchange Commission in violation of 1933 Investment Act, 1940 Investment Adviser Act, and 1940 Investment Company Act. The investment made by 701 Fund and 702 Fund in 702 Development is investment contracts with 702 Developer instead of purchasing mortgage or direct interests in real estate under development. The investment contracts are securities and not qualified assets for 3C5 exemption from registration of 701 Fund and 702 Fund as investment company. At the time making EB-5 loan, 702 Developers have zero equity in 702 Development when the existing hotel with $540 million purchase price is used to secure $1.125 billion senior loan with GOLDMAN SACHS BANK. The sale of US based securities to the general public in China were not approved by Chinese regulators and without proper disclosure to the Chinese investors. Defendants retained a securities counsel to draft Private Placement Memorandum with full knowledge that they need to follow US securities law.  Defendants intentionally neglected to verify if they meet the exemption requirements with SEC and proceeded their activities without proper registration or notification, including filing Form D with SEC. Under information and belief, Defendants Mastroianni and Ding conspire with 702 Developer and AYB Developer to convert EB-5 investment into their piggy bank with no intention to return EB-5 investment to Chinese EB-5 investors, even though these Chinese EB-5 investors may never see the immigration visas they dream of and have paid over $550,000 for.

236. With consents of Defendants 702 Developer, that is Maefield Development and Fortress Investment Group, orchestrated the sale of 701 Hotel Project with the intention to transfer EB-5 investment in 701 Fund to finance 702 Development that was unable to secure a construction loan from JP Morgan for over two years. Ignoring the adverse effects of accepting early repayment on investors from 701 Fund, Defendants coerced investors into re-investing in 702 Development to benefit Maefield Development and Fortress Investment Group while taking an instant payout of $44,661,772.77 on December 12, 2018. Defendants conspire with 702 Developer to made a $494.5 million loan to 702 Developer secured with worthless pledges. The pledgors of EB-5 loan were 702 Developer's affiliates newly registered on the day of executing EB-5 loan agreement and have zero equity or assets.

237. With consents of Defendants Maefield Development and Fortress Investment Group and Defendants know that they are not registered investment advisors and they intentionally failed to inform investors of 701 Fund and 702 Fund to seek independent advisor to evaluate investment risk of re-investment. In addition Defendants filed lawsuit against Plaintiff to silence her as she is the most vocal critic of Defendants. By sending the "Zoe Letter" to their investors, Defendants continue to subject their investors to practice of manipulation and coercion.

238. Even if some of the Defendants did not agree to harm Plaintiff specifically and directly, the purpose of the acts they engaged in was to advance the overall objective of the conspiracy, and the harm to Plaintiff was a reasonably foreseeable consequence of Defendants' actions.

239. **Causation and Damages** Plaintiff has been injured and continues to be injured in her business and property by Defendants' conspiracy in violation of 18 U.S.C. § 1962(d) caused by the predicate acts or damages indirectly caused by the pattern of acts, or both. The unlawful actions of Defendants,

and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiff in its business or property. *Sedima, S.P.R.L. v. Imrex Co*., 105 S. Ct. 3275 (1985).

240.    **Damages** The unlawful actions of Defendants, and each of them, have directly, illegally, and approximately caused and continue to cause injuries to Plaintiff in addition to EB-5 investors. Plaintiff seeks an award of damages in compensation for, among other things, $50 million in projected loss of business arising from the malicious prosecution and defamation since October 2018 by Defendants as well as $120,000 Defendants converted from Plaintiff when Defendants coerced each of her 12 clients to sign Consent Letter in August to December 2018 to give up claims of $50,000 administrative fee plus $88,000 in interest income on their $500,000 capital investment. Plaintiff further seeks an award of three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized. *Alcorn County v. U.S. Interstate Supplies, Inc*., 731 F. 2d 1160, 1169 (5th Cir. 1984). *Hellenic Lines, Ltd. v. O'Hearn,* 523 F. Supp. 244 (S.D.N.Y. 1981). *Parness v. Heinold Commodities, Inc.,* 487 F. Supp. 645 (N.D. III. 1980).

## THIRD CAUSE OF ACTION

### (Malicious Prosecution)

### (Defendants USIF, USIF-NY, 701 Fund, 701 Fund Managers, Richard Haddad)

241.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

242.    On or about August 18, 2018 USIF's in-house counsel Jason Metula contacted Plaintiff and requested Plaintiff to remove the reference of USIF and Qiaowai from Reviv-East website that described a member of 702 Fund received $552,000 back from USIF and Qiaowai. Out of courtesy

Plaintiff took the reference of USIF off but refused to take off the reference of Qiaowai. Reviv-East is a Hong Kong company that Plaintiff was an independent contractor to conduct due diligence.

243. On or about August 22, 2018 Plaintiff received a Cease and Desist Letter from the in-house counsel, Ashley Flucas, of Defendants USIF and 701 Fund even though at the time, Defendants USIF and 701 Fund were represented by Michael Zuppone of Paul Hastings LP. Plaintiff told Defendants that they can sue Plaintiff in Chicago, where she lives.

244. On October 4, 2018 Defendants USIF and 701 Fund filed a lawsuit against Plaintiff, Litowitz as well Reviv-East in New York Court, not in Illinois court, alleging Litowitz and Plaintiff set up Reviv-East in 2017 to defraud Defendants USIF and 701 Fund. Defendants possess no evidence that Plaintiff and Litowitz together established Reviv-East in January 2018. Defendants possess no evidence that as many as 70 investors retained Litowitz and worked with Plaintiff to request to withdraw from 701 Fund between June and September 2018. This lawsuit is an attempt by Defendants USIF and 701 Fund and Richard Haddad to weaponize the law and use it to silence their critics and confuse unsophisticated EB-5 investors who are subjects of Defendants' tyranny. The lawsuit has been vexatious, frivolous, and improper at every word. Defendants' fraud and defamation claims rest upon their failure to do basic fact-finding research, their lack of competence and lack of professionalism.

245. On March 29, 2019, Defendants USIF and 701 Fund's lawsuit against Plaintiff was thrown out of court by a New York Judge.

246. Defendants' malicious prosecution caused injury to Plaintiff.

247.. Defendants conduct was willful, wanton, malicious, and oppressive.

248. Defendants' unlawful conduct has directly, legally, and proximately caused and continues to cause injuries to Plaintiff in its business or property. By reason of Defendants' misconduct Defendants

are liable to Plaintiff in an amount to be determined at trial. Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

## FOURTH CAUSE OF ACTION

### (Defamation)

### (Defendants USIF, USIF-NY, 701 Fund, 701 Fund Managers, 702 Fund, 702 Fund Manager, Ding, and Qiaowai entities, Richard Haddad)

249.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

250.     Starting in May 2018, Defendants used "Linda" as an agent to infiltrate Chinese EB-5 WeChat groups to discredit and defame Plaintiff and to draw Chinese investors away from being represented by Litowitz and by such act, Defendant recruited about 40 clients for USIF's former securities counsel, Ronnald Fieldstone.

251.     In February 2019, Defendants USIF and 702 Fund Manager used the New York Lawsuit to legalize their slanderous statement against Plaintiff and deter investors from using Plaintiff's fraud analysis service.  Plaintiff was informed that investors are reluctant to contact Plaintiff for service.

252.     Defendant Mastroianni publicly defamed Plaintiff and called her "ambulance chaser" when reporter interviewed him in relation to Plaintiff's defense in the New York Lawsuit.

253.     After the New York Court threw out the frivolous and malicious lawsuit filed by Defendants USIF and 701 Fund, Defendants USIF and 701 Fund and Richard Haddad started a campaign of lies about Plaintiff out of their humiliated defeat.  Defendant Haddad has contacted at least of one of Plaintiff's acquaintance and told this individual that this Court has determined that Plaintiff has violated law by providing legal service.

254. Defendants' defamation caused injury to Plaintiff.

255. Defendants conduct was willful, wanton, malicious, and oppressive.

256. Defendants' unlawful conduct has directly, legally, and proximately caused and continues to cause injuries to Plaintiff in its business or property. By reason of Defendants' misconduct Defendants are liable to Plaintiff in an amount to be determined at trial. Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.


**FOURTH CAUSE OF ACTION**

**(Collusion)**

**(Defendants USIF, USIF-NY, 701 Fund, 701 Fund Managers, 702 Fund, 702 Fund Manager, AYBII Fund, AYBII Fund Manager, Ding, and Qiaowai entities)**


257. Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

258. Defendants' EB-5 fund-raising displays all the hallmark signs of EB-5 scams described the Investor's Alert issued by SEC and USCIS in the 2013.

259. Defendants Mastroianni and Ding are fully aware that, due to their misrepresentation, Chinese investors are entitled to rescission rights that Chinese investors will receive $500,000 capital contribution, $49,000 to $52,000, interests, and other costs. On such belief, Defendants Mastroianni and Ding returned $552, 000 to one member of 702 Fund in December 2017.

260. Under information and belief, in June and July 2018, Defendants Mastroianni and Ding colluded with USIF former securities counsel Fieldstone and devised a scheme to deny exiting members of 701 Fund the return of their full investment plus 3.5 years' interest income.

261. Under information and belief most of $50,000 administrative fee and half of 3.5 years of income were diverted into the possession by Defendants Ding as transaction-based fee for placing

investors in 701 Fund in 2015 and so-called investment advisory fee to investors for 3.5 years. As Litowitz and Plaintiff were contracted to receive compensation primarily based on return of the $50,000 administrative fee and 3.5 years of income, Plaintiff lost about $120,000 in service fee as result of conversion by Defendants Mastroianni and Ding.

262.     Plaintiff are contracted to receive $10,000 from $50,000 administrative fee that exiting investors are entitled to receive from exercising their right to rescission, such possessions and effects which were stolen and, or, converted by Defendants who intended to permanently deprive Plaintiff of said property.

263.     Defendants conduct was willful, wanton, malicious, and oppressive.

264.     Defendants' unlawful conduct has directly, legally, and proximately caused and continues to cause injuries to Plaintiff in its business or property. By reason of Defendants' misconduct Defendants are liable to Plaintiff in an amount to be determined at trial. Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.


### FOURTH CAUSE OF ACTION

**(Conversion)**

**(Defendants USIF, USIF-NY, 701 Fund, 701 Fund Managers, 702 Fund, 702 Fund Manager, AYBII Fund, AYBII Fund Manager, Ding, and Qiaowai entities)**


265.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

267.     Defendants' EB-5 fund-raising displays all the hallmark signs of EB-5 scams described the Investor's Alert issued by SEC and USCIS in the 2013.

268.     Defendants Mastroianni and Ding are fully aware that, due to their misrepresentation, Chinese investors are entitled to rescission rights that Chinese investors will receive $500,000 capital

contribution, $49,000 to $52,000, interests, and other costs. On such belief, Defendants Mastroianni and Ding returned $552, 000 to one member of 702 Fund in December 2017.

269.    Under information and belief, in June and July 2018, Defendants Mastroianni and Ding colluded with USIF former securities counsel Fieldstone and devised a scheme to subotage Litowtiz's planned legal action for right of rescission and deny exiting members of 701 Fund the return of their full investment plus 3.5 years' interest income.

270.    Under information and belief, in June and July 2018, Defendants Mastroianni and Ding, through an agent name "Linda", recruited about 40 clients for Fieldstone to carry out Defendants' vicious plan.

271.    As the result of collusion between Defendants USIF and Fieldstone to fix the withdrawal procedures and amount of return, exiting members of 701 Fund was coerced to accept return of $500,000 capital and signed a release to discharge Defendants USIF, 701 Fund and 701 Manager from future claims.

272.    Under information and belief most of $50,000 administrative fee and half of 3.5 years of income were diverted into the possession by Defendants Ding as transaction-based fee for placing investors in 701 Fund in 2015 and so-called investment advisory fee to investors for 3.5 years. As Litowitz and Plaintiff were contracted to receive compensation primarily based on return of the $50,000 administrative fee and 3.5 years of income, Plaintiff lost about $120,000 in service fee as result of conversion by Defendants Mastroianni and Ding.

273.    Plaintiff are contracted to receive $10,000 from $50,000 administrative fee that exiting investors are entitled to receive from exercising their right to rescission, such possessions and effects which were stolen and, or, converted by Defendants who intended to permanently deprive Plaintiff of said property.

274. Defendants conduct was willful, wanton, malicious, and oppressive.

275. Defendants' unlawful conduct has directly, legally, and proximately caused and continues to cause injuries to Plaintiff in its business or property. By reason of Defendants' misconduct Defendants are liable to Plaintiff in an amount to be determined at trial. Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

<u>**FIFTH CAUSE OF ACTION**</u>

**(Conversion)**

**(Defendants USIF, USIF-NY, 701 Fund, 701 Fund Managers, 702 Fund, 702 Fund Manager, AYBII Fund, AYBII Fund Manager, Ding, and Qiaowai entities)**

276. Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

277. Defendants' EB-5 fund-raising displays all the hallmark signs of EB-5 scams described the Investor's Alert issued by SEC and USCIS in the 2013.

278. Defendants Mastroianni and Ding are fully aware that, due to their misrepresentation, Chinese investors are entitled to rescission rights that Chinese investors will receive $500,000 capital contribution, $49,000 to $52,000, interests, and other costs. On such belief, Defendants Mastroianni and Ding returned $552, 000 to one member of 702 Fund in December 2017.

279. Under information and belief, in June and July 2018, Defendants Mastroianni and Ding colluded with USIF former securities counsel Fieldstone and devised a scheme to sabotage Litowtiz's planned legal action for right of rescission and deny exiting members of 701 Fund the return of their full investment plus 3.5 years' interest income.

280. Under information and belief, in June and July 2018, Defendants Mastroianni and Ding, through an agent name "Linda", recruited about 40 clients for Fieldstone to carry out Defendants' vicious plan.

281. As the result of collusion between Defendants USIF and Fieldstone to fix the withdrawal procedures and amount of return, exiting members of 701 Fund was coerced to accept return of $500,000 capital and signed a release to discharge Defendants USIF, 701 Fund and 701 Fund manager from future claims.

282. Under information and belief most of $50,000 administrative fee and half of 3.5 years of income were diverted into the possession by Defendants Ding as transaction-based fee for placing investors in 701 Fund in 2015 and so-called investment advisory fee to investors for 3.5 years. As Litowitz and Plaintiff were contracted to receive compensation primarily based on return of the $50,000 administrative fee and 3.5 years of income, Plaintiff lost about $120,000 in service fee as result of conversion by Defendants Mastroianni and Ding.

283. Plaintiff are contracted to receive $10,000 from $50,000 administrative fee that exiting investors are entitled to receive from exercising their right to rescission, such possessions and effects which were stolen and, or, converted by Defendants who intended to permanently deprive Plaintiff of said property.

284. Defendants conduct was willful, wanton, malicious, and oppressive.

285. Defendants' unlawful conduct has directly, legally, and proximately caused and continues to cause injuries to Plaintiff in its business or property. By reason of Defendants' misconduct Defendants are liable to Plaintiff in an amount to be determined at trial. Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

## SIX CAUSE OF ACTION

**(Tortious Interference with a Business Relationship)**

**(Defendants USIF, Mastroianni, USIF-NY, 701 Fund, 701 Fund Managers, 702 Fund, 702 Fund Managers Ding and Qiaowai entities)**

286.     Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

287.      Plaintiff has business relationship with members of 701 Fund and members of 702 Fund.

288.     Defendants know of that relationship and Defendants, individually and in collusion with one another, and with knowledge, by engaging in the conduct described above, directly or indirectly, interfered with that relationship.

289.      Defendants individually and in collusion with one another, and with knowledge, by engaging in the conduct described above, directly or indirectly, acted solely out of malice and coercion, and/or improper means that amounted to a crime or independent tort.

290.     Defendants' interference caused injury to the relationship with her clients.

291.     Defendants conduct was willful, wanton, malicious, and oppressive.

292.     Defendants' unlawful conduct has directly, legally, and proximately caused and continues to cause injuries to Plaintiff in its business or property. By reason of Defendants' misconduct Defendants are liable to Plaintiff in an amount to be determined at trial. Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

## SEVEN CAUSE OF ACTION

**(Civil Conspiracy of Intentional Interference with Prospective Economic Relations)**

**(Defendants USIF, Mastroianni, USIF-NY, 701 Fund, 701 Fund Managers, 702 Fund, 702 Fund Managers Ding and Qiaowai entities)**

293.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

294.    Plaintiff has been an advocate for Chinese EB-5 investors' rights under the protection of US securities laws.  Plaintiff provides fraud analysis of EB-5 investment. Plaintiff is well known in the EB-5 investor community as a dedicated and knowledgeable EB-5 professional. Plaintiff's WeChat messages have inspired hundreds of Chinese EB-5 investors to protect their rights under US securities laws.  Due to this international exposure, Plaintiff has many ongoing and pending business and economic relationships with existing and potential clients within Chinese EB-5 investor community who have contributed over $20 billion to the EB-5 immigrant investor program, which will, in all probability, lead to future economic benefits if not, for Defendants' wrongful acts.

295.    Plaintiff is informed and believe and based thereon allege that Defendants had full knowledge of Plaintiff's international exposure, and the aforementioned existing and potential business and economic relationships.

296.    Plaintiff is informed and believe and based thereon allege that because Defendants had full knowledge that Plaintiff operates on an international scale, Defendants knew of the existence of the current and prospective business relationships between Plaintiff and their current or potential clients from China and the United States.

297.    Defendants deliberately, willfully, wrongfully and intentionally interfered with Plaintiff's right to transact business with, and derive business income from, her existing and potential relationships with third parties by sending "Zoe Letter" to her clients, and coercing existing and potential clients to refrain from entering into a business relationship with Plaintiff due to concerns of unprofessionalism, unethical conducts, and incompetence. Defendants knew that by sending "Zoe

Letter", it will damage Plaintiff's reputation and good will, and the interference with Plaintiff's business and economic relationships was certain or substantially certain to occur.

298. Each Defendant committed at least one overt act in furtherance of such conspiracy including coercing existing and potential EB-5 clients to refrain from entering into a business relationship with Plaintiff.

299. Each Defendant acted with the common intent to defraud Plaintiff and understood that all other Defendants shared in that common purpose.

300. Defendants' conduct was willful, wanton, malicious, and oppressive with intention to damage Plaintiffs' reputation and to promote their own business interests at the expense of Plaintiffs. As a result, Plaintiffs are entitled to punitive and exemplary damage.

301. Defendants' unlawful conduct has directly, legally, and proximately caused and continues to cause injuries to Plaintiff in its business or property. By reason of Defendants' misconduct Defendants are liable to Plaintiff in an amount to be determined at trial. Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.


PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

I. Award in excess of $50.12 million in compensatory damages, consequential, exemplary and punitive damages, not including the trebled damages for the RICO causes of action, against Defendants, each and every one of them jointly and severally.

II. Enjoin permanently Defendants from interfering business relations between Plaintiff and her clients in their request seeking return of their EB-5 investment in full and with interests.

III. Award attorneys' fees and other litigation costs reasonably incurred in this action pursuant to the Racketeer Influenced and Corrupt Organizations Act.

IV. Any other relief the Court deems just and proper.

**JURY DEMAND**

**Plaintiff respectfully demands a jury trial on all issues so triable.**

Dated: April 17, 2019

Respectfully Submitted,

_____/s/ Xuejun Makhsous_____

XUEJUN MAKHSOUS, Plaintiff, *pro se*

P. O. BOX 2651, GLENVIEW, IL 60025